**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF | § | |
| GREATER TEXAS FAMILY | § | |
| PLANNING AND PREVENTATIVE | § | |
| HEALTH SERVICES, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No.1:15-cv-01058-SS |
| v. | § | |
| | § | |
| CHARLES SMITH, et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

States have the right to terminate a provider's Medicaid agreement for reasons bearing on that provider's qualifications, and "qualified" means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Planned Parenthood of Gulf Coast, Inc., v. Gee*, 837 F.3d 477, 495 (5th Cir. 2016). The termination of Planned Parenthood's Medicaid provider agreements in Texas is attributable to the mounting evidence that they engage in gross violations of medical and ethical standards. On multiple occasions, Planned Parenthood has engaged in misrepresentation and obfuscation in order to conceal their activities. After they were caught on an undercover video[1] trying to arrange a

---

[1] DX-2(a).

deal with a tissue procurement company for fetal tissue, Planned Parenthood began repeating the baseless claim that the videos were deceptively edited, fraudulent, and discredited as if it were a fact. It is not—as the evidence in this case shows[2]—and neither are so many of the other baseless claims that Planned Parenthood continues to make regarding their activities related to fetal tissue donation, their corporate structure, and their dependence on Medicaid funds.

Here are the facts, which are borne out by the raw, unedited video footage shot at Planned Parenthood Gulf Coast ("PPGC"), the exhibits submitted by the Defendants, and the testimony to be presented at the hearing on January 17-19, 2017. Planned Parenthood has provided fetal tissue specimens to researchers for several years. They have professed a willingness to alter abortion procedures to obtain better, more intact specimens. Never mind that federal law governing fetal tissue research forbids altering procedures solely for research purposes. Planned Parenthood physicians have performed abortions, harvested fetal tissue from those abortions for their own published research without telling patients about their conflict of interest, and, in at least one instance, took the fetal tissue "home in their cooler."[3]

Planned Parenthood has gone to great lengths to mislead the public about the grisly reality exposed by the video footage. These efforts to distort the truth have not been limited to the public at-large, but also extend to a Texas Ranger, the United States Senate Committee on the Judiciary; and the Fifth Circuit Court of Appeals.

---

[2] *Id.*; DX-190.
[3] DX-2(a).

Plaintiffs argue that their termination is politically motivated, but once again, reality contradicts their claims. The termination of Planned Parenthood's Medicaid provider agreements is motivated by considerations of medical and ethical standards in addition to human decency. The fact that Planned Parenthood is willing to disregard medical and ethical standards compels the OIG to terminate their Medicaid agreements. As a result, Plaintiffs cannot show that they are entitled to a preliminary injunction against that termination, and their motion should be denied.

## STATEMENT OF FACTS

In mid-2015, the Center for Medical Progress ("CMP") began releasing a series of undercover videos filmed at various Planned Parenthood locations, including the Houston headquarters of PPGC. This video captured a discussion between PPGC employees and individuals posing as representatives from a biomedical company seeking aborted fetal tissue for research.[4] During the hours of footage, PPGC employees, most notably the director of research, expressed a willingness to alter the timing, method, and procedures for surgical abortions based upon the needs of the researchers.[5]

On October 19, 2015, the Health and Human Services Office of the Inspector General ("OIG") issued non-final Notice of Termination letters to Planned Parenthood Gulf Coast (PPGC"), Planned Parenthood Greater Texas ("PPGT"), and Planned Parenthood South Texas ("PPST") based on a series of program violations under both

---

[4] *Id.*
[5] *Id.*

state and federal law. The Provider plaintiffs elected not to participate in the administrative process that follows such a notice and filed the instant lawsuit along with several Jane Doe plaintiffs, requesting a preliminary injunction. But since a final determination to terminate the provider agreements had not been made, the parties agreed to stay the case pending a final determination.

Due to the need for further investigation into the underlying violations, the OIG did not issue a Final Notice of Termination of Enrollment ("Final Notice") until late last year.[6] On December 20, 2016, OIG issued the Final Notice of Termination for failure to provide medical services in a professionally competent, safe, legal, and ethical manner. The Final Notice explains that the unedited video footage displayed "that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion."[7] The Final Notice continues that Planned Parenthood's "practices violate accepted medical standards, as reflected in federal and state law, and are Medicaid program violations that justify termination."[8]

The Final Notice also explains that the OIG has "evidence that [Planned Parenthood] engaged in misrepresentations about [its] activity related to fetal tissue procurements, as revealed by evidence provided by the House Investigative Panel."[9] The House Investigative Panel was a group within the United States House of

---

[6] DX-1.
[7] *Id.*
[8] *Id.*
[9] *Id.*

Representatives charged with investigating the fetal tissue procurement industry.[10] After investigating PPGC, on December 1, 2016, the Panel made a referral to the Attorney General of Texas requesting further investigation.[11] Attached to the referral was copious evidence that was consistent with and supportive of the OIG's decision to terminate the Medicaid contracts of Planned Parenthood. The other Texas Planned Parenthood affiliates were terminated based on evidence of affiliation with PPGC and Planned Parenthood Federation of America ("PPFA"), as permitted by state law. The termination is to take effect on January 21, 2017.

On December 30, 2016, Planned Parenthood and several Jane Does requested the Court enjoin the termination.  Currently, this matter is set for an evidentiary hearing on January 17-19, 2017.

## ARGUMENT

Four equitable factors govern a preliminary injunction motion: (1) whether there is a substantial likelihood that the movant will prevail on the merits; (2) whether there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) whether the threatened injury outweighs the threatened harm, if any, to the non-movant; and (4) whether granting the preliminary injunction will serve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). The *movant* must clearly carry the burden of persuasion with respect to each factor. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan*

---

[10] DX-68.
[11] *Id.*

*Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (providing that a preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion").

If the movant fails to establish any of the four perquisites, injunctive relief will not be granted. *Women's Med. Ctr. Of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Even when a movant satisfies each of the four prerequisites, the decision whether to grant or deny a preliminary injunction remains within the discretion of the district court. *Id.* Stated differently, the award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of the interests of—and possible injuries to—the respective parties. *Yakus v. United States,* 321 U.S. 414, 440 (1944). Granting a preliminary injunction should be the exception rather the rule. *Miss. Power & Light Co.*, 760 F.2d at 621.

It is the Plaintiffs' motion, and therefore the Plaintiffs' burden to show that each of the four prongs of the test above are met. But Plaintiffs cannot make such a showing in the face of the substantial evidence the State will provide to support its termination of Planned Parenthood's Medicaid provider agreements. Thus, the motion for preliminary injunction should be denied.

I.   **Plaintiffs Cannot Show a Likelihood of Success on the Merits.**

In order to carry their burden in showing that they are entitled to a preliminary injunction, the Plaintiffs must show they are likely to succeed on the merits of their claims. *Jackson Women's Health*, 760 F.3d at 452. The standards of the underlying substantive law inform the likelihood of success analysis. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).

A.   **The Law Allows States to Terminate Medicaid Provider Agreements for Reasons Based on the Provider's Qualifications.**

The Medicaid program, created by Title XIX of the Social Security Act, is a program "through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585-86 (5th Cir. 2004). "Spending clause legislation like Medicaid 'is much in the nature of a contract.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Similarly, Medicaid providers must live up to certain obligations, as well. *See* 42 U.S.C. § 1320a-7. When providers fail to do so, the Secretary of HHS may exclude them under certain mandatory and permissive grounds in the Social Security Act. *Id.*

The hallmark of programs like Medicaid is the concept of cooperative federalism. Under such programs, the federal and state governments each contribute funds to the program and work cooperatively together to administer the program and its funds. Administrative authority flows both ways between the states and the federal government. Section 1002.2 of the Medicaid regulations recognizes a state's

authority to exclude a Medicaid provider as a state contractor "for any reason or period authorized by State law," expressly contemplating states filling in any gaps in the program's administration not addressed by the federal statutes *See* 42 C.F.R. § 1002.2(b). And federal law authorizes the Secretary to exclude providers who have been excluded on state law grounds, illustrating the complementary nature of determining provider eligibility under the regulatory scheme. 42 U.S.C. § 1320a-7(b)(5).

The free-choice-of-provider provision in the Medicaid Act states that beneficiaries may obtain medical care from any entity or person who is "qualified to perform the service or services required" and "who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23); *see also Gee,* 837 F.3d at 489.[12] The Medicaid statute itself, however, does not define the term "qualified." *See id.* at 492. Thus, defining what it means to be a "qualified" provider has been left up to the states. The Fifth Circuit has interpreted the term "qualified" in the Medicaid act to mean "capable of performing the needed medical services in a professionally competent,

---

[12] Texas does *not* concede that 42 U.S.C. § 1396a(a)(23) provides an individual with a private right of action. While the panel opinion in *Gee* came to the opposite conclusion, the Fifth Circuit is still considering whether to grant en banc review of that opinion. A response to the petition for rehearing en banc was requested by the court and was filed Oct. 11, 2016. In another case in the Fifth Circuit involving the Medicaid program, the court held that that the Medicaid Act's Equal Access provision did not confer individual private rights that are enforceable under § 1983. *See Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007) (refusing to allow Medicaid recipients to sue under § 1983 to enforce the Section 1396a(a)(30)). This intracircuit conflict creates a reasonably likelihood that the court may grant rehearing. Moreover, regardless of whether there is a private right of action for the Jane Doe plaintiffs under §1396(a)(23), Planned Parenthood lacks a right of action as providers, as they are clearly not the intended beneficiaries of the provision, *see Armstrong*, 135 S. Ct. at 1387. The *Gee* opinion addressed only the claims of the individual plaintiffs, not the provider plaintiffs. 837 F.3d at 485, 485 n.7. This argument will be discussed more fully in Defendants' forthcoming motion to dismiss.

safe, legal, and ethical manner." *Id.* What "professionally competent, safe, legal, and ethical" means in particular is defined by state law.

Consistent with this framework, Texas law sets forth grounds for termination based on provider qualifications. Under 1 Tex. Admin. Code § 371.1703(c)(8), OIG may terminate a Medicaid provider that the OIG establishes by prima facie evidence commits an act for which "sanctions, damages, penalties, or liability could be or are assessed by the OIG." § 371.1659(2) allows for sanctions where the provider "fails to provide an item or service to a recipient in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes that govern occupations." Broadly under *Gee*, and specifically under state law, then, adherence to medical ethics and the standard of care are directly related to a provider's qualifications to provide Medicaid services.

**1.   Planned Parenthood is not qualified as a Medicaid provider under the law due to evidence that they are willing to violate medical and ethical standards.**

1 Texas Admin. Code § 371.1659(2) and § 371.1703(c)(3) authorizes the OIG to terminate a Medicaid provider where the provider "fails to provide services in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes that govern occupations." And based on *Gee,* a Medicaid provider that fails to provide medical services in an ethical manner is not qualified for purposes of 42 U.S.C. §1396a(a)(23). Thus, broadly under *Gee*, and specifically under state law, adherence to medical and ethical standards directly relate to a provider's qualifications to provide Medicaid services.  And based

on the evidence here, Planned Parenthood has failed to adhere to medical and ethical standards in the provision of medical services to patients.   Their termination is therefore justified.

### a. Willingness to alter an abortion to target fetal tissue for research violates medical and ethical standards.

Modifying an abortion procedure solely for research purposes is a direct violation of federal law, regardless of whether or not the modification increased risk or discomfort to the patient.  42 U.S.C. § 289g-1[13] states that human fetal tissue may only be used for research if "no alteration to the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue." The law informs medical and ethical standards, and if medical providers are willing to engage in practices that violate the law, they also breach those standards.[14] There are numerous instances in the video footage that show a willingness on behalf of PPGC's research and medical staff to alter or modify abortion procedures in order to obtain better specimens for researchers. Moreover, the PPGC employees also state that their physicians are not only willing to do so in the future, but may have done so in the past.

The video shows that PPGC is willing to deviate from standard processes to procure samples that meet a researcher's needs. Specifically, the video shows that

---

[13] Plaintiffs assert in a footnote that 42 U.S.C. § 289g-1 pertains only to "transplantation of fetal tissue" and is therefore irrelevant. *See* Pls. Prelim. Inj. Mot. at 15 n.10; Fine Decl. ¶13. But the National Institutes of Health (NIH) does not interpret the statute in such a limited manner. *See* "Reminder of Legal Requirements Regarding the Acquisition and Use of Human Fetal Tissue for Research Purposes," NOT-OD-15-143 (Aug. 14, 2015) (citing § 289g-1 and 2 and making no mention of transplantation).

[14] *See* anticipated expert testimony of Professor Orlando Snead and Dr. Mikeal Love.

Planned Parenthood has permitted, in at least a few instances, staff physicians to alter procedures to get the samples they need for their own outside research. For example, at least one fetal tissue researcher worked at PPGC and performed abortions to procure fetal tissue for her own research. Melissa Farrell, PPGC's Director of Research, states that the researcher "knows what's involved in modifying what we need to do to get you the specimens that are intact because she's done it." She also states that this researcher was doing procedures at PPGC, selecting specific patients on the schedule and asking staff to try to enroll them based on the samples she wanted, and obtaining specimens for her own research.[15] Farrell even stated that this researcher would collect her own specimens and then "take it home with her in her cooler."[16] Farrell's statements not only display a willingness to alter the standard of care for a non-medical reason, but they also implicate prohibitions on researchers performing abortions and obtaining fetal tissue for their own research. 45 C.F.R. § 46.204 ("Pregnant women or fetuses may be involved in research if all of the following conditions are met . . . [i]ndividuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy . . . .").

Farrell also states that Planned Parenthood is willing to "get creative" and deviate from standard procedures in order to obtain the specimens researchers desire:

> Well, so under the scope of where we probably have an edge over other organizations, our organization has been doing research for many, many, many years and we've had studies in which the company or in the

---

[15] DX-2(a).
[16] *Id.*

case of the investigator has a specific need for a certain portion of the
products of conception, and we bake that into our contract and our
protocol, that we follow this. So we deviate from our standard in order
to do that. So, you know, we can do it in a way that we're still verifying
that everything is there for the safety of the patient, but then we still
maintain the integrity of that sample.  So yeah, that's definitely
something we can do.  But as far as this is our standard process, I'm
telling you this so then we can get creative about when and where and
under what conditions can we interject something that is specific to the
tissue procurement needs.[17]

That is not the only time Farrell indicates Planned Parenthood's willingness

to change the procedure or standard of care in order to provide research specimens,

and Farrell also makes multiple assurances that the doctors are willing and able to

do it. Farrell stated:

Yeah, I think we can [obtain intact 18-22 week neural specimens].  I
mean some of it is really outside—some of it will be happenstance.
Because, you know, sometimes as the procedure is happening, the
procedure itself for the removal is generally standardized, and so just
depending on the patient's anatomy, how many weeks, other—where it's
placed in the uterus.  We're going to be potentially be able to have some
that will be more or less intact and then some that will not be.  So and
we—but it's something we can look at exploring how we can make that
happen so we have a higher chance.  It will probably also require a little
bit of input from the doctors.  Because the doctors are the ones acting,
directly doing that, and you know, when it matters, you know in the case
of the when it matters and the physicians also need an intact specimen,
they can make it happen.[18]

Acknowledging that they cannot put the patients at increased risk, she states

that doctors are still willing to change the procedure to ensure the best specimens

and have done it that way before for their own research, so she is confident they will

do so:

---

[17] *Id.*

[18] *Id.*

Obviously the change in procedure will have to be where it's not going to put the patient at more risk, prolong the procedure putting her at more risk, and altering the procedure where we leave content in the patient, which obviously we're trying to get, we want everything, yeah. It's you know—and that's something we'll have to discuss, you know, with the docs and see how they can do it. Because some of our doctors in the past have projects, and they're collecting the specimens so they do it in a way that they get the best specimen. So I know it can happen.[19]

Farrell further states on the video that "we get what we need to do—to alter the standard of care—where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it."[20]

These statements demonstrate a willingness to deviate from medical and ethical standards based upon a research motivation.[21] Texas has the right to hold Medicaid providers to minimum medical and ethical standards, and a stated willingness to deviate from the standard provides a sound basis for termination under state law.

### b. Failing to obtain informed consent by patients undergoing abortion procedures and donating fetal tissue violates medical and ethical standards.

Evidence of another significant violation of medical and ethical standards by Planned Parenthood in the context of fetal tissue research came to light when the House Select Investigative Panel released its full report on December 30, 2016. The evidence attached to the report includes a copy of PPFA's policy on fetal tissue research and their required consent form.[22] As both witnesses from Planned

---

[19] *Id.*
[20] *Id.*
[21] At the upcoming hearing, Defendants' experts will testify in detail as to ethical concerns and the standard of care in relation to the statements made in the video on this subject.
[22] DX-68; DX-64; DX-65.

Parenthood before the House Committee agree,[23] this form is not sufficient to obtain informed consent.

First, related to Section I(A)(2)(a) above, even if it were acceptable within the standard of care and the law for Planned Parenthood physicians to alter or modify an abortion procedure to obtain a better fetal tissue specimen for researchers, it would still be a violation of medical and ethical standards for them to do so because the required consent form unequivocally states, "I understand there will be *no* changes to how or when my abortion is done in order to get my blood or the tissue."[24] Thus, *any* modification to the procedure for research purposes, regardless of whether it increases risk for the patient, would breach the medical and ethical standards because there would be a lack of fully informed consent for the procedure.

It should also be noted that PPFA's policy contains a much broader statement than the consent form on the subject of alterations to the procedure.  In contrast to the consent form it references, PPFA's policy states that "no *substantive* alteration in the timing of terminating the pregnancy or of the method used was made for the purpose of obtaining the blood and/or tissue."[25] Thus, on their faces, PPFA's documents related to fetal tissue research allow the doctor to make changes to the procedure so long as he or she believes they are not "substantive," but tells the patient that *no* changes whatsoever will be made.  This discrepancy violates medical and

---

[23] DX-68; DX-66; DX-67.
[24] *Id.*
[25] DX-64 (emphasis added).

ethical standards—Planned Parenthood cannot tell their patients one thing and then do something else when their patients are under anesthesia.

Finally, Planned Parenthood's required consent form contains a misleading statement, which further violates medical and ethical standards.  The form states at the top, "Research using the blood from pregnant women and tissue that has been aborted has been used to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS."[26]   As Planned Parenthood's first witness in the House proceedings pointed out, "To my knowledge there is no cure for AIDS.  So that is probably an inaccurate statement . . . I told you I am not an ethicist, but a consent form should not have an incorrect statement."[27]

A consent form for tissue donation which promises treatments and cures for notable diseases using that tissue violates medical and ethical standards because it has the danger of inducing someone to donate based on a false pretense.  Additionally, making inaccurate claims in a consent form results in the patient not being fully informed of the risks and benefits of the procedure.  It is a breach of medical and ethical standards for a physician to perform a procedure without obtaining informed consent, and Planned Parenthood's standard forms are inadequate for that purpose.[28]

---

[26] DX-65.
[27] *Id.* at Ex. 8.37.
[28] At the upcoming hearing, Defendants' experts will testify in greater detail regarding medical ethics and the standard of care in relation to informed consent procedures.

**2.    Planned Parenthood's misrepresentations and misleading statements are consistent with and support termination.**

Ethical behavior and truthfulness are also defined by state law to relate to a provider's qualifications. In more than one regulation, state law allows for the termination of providers who are dishonest in their dealings with the state. 1 Tex. Admin. Code § 371.1651(15) (provider subject to administrative action if the provider makes a false statement, misrepresentation or omission of a pertinent fact on, or fails to fully or correctly complete or execute a provider enrollment application, agreement, or any doc requested as a prerequisite for Medicaid); *id.* § 371.1655(7) and (24) (provider may be terminated for failure to establish effective compliance program for detecting criminal/civil/administrative violations that promotes quality of care; provider may be terminated for failure to prevent, obstruct, impede, or attempts to prevent a state agency from conducting necessary duties).

Here, there is evidence that Planned Parenthood made a false statement to law enforcement officials, which further calls into question Planned Parenthood's qualifications. There is also evidence that Planned Parenthood has attempted to mislead other governmental entities. This willingness to manipulate the truth and omit pertinent facts is consistent with and further supports termination.

**a. Engaging in conduct that may be criminal justifies termination of the Medicaid provider's agreement.**

Where a provider engages in activity that constitutes a crime, regardless of whether there is a conviction, state law allows for termination on that basis. 1 Tex. Admin. Code § 371.1661(8) states that a provider "is subject to administrative actions

or sanctions if the person is convicted of or engages in an act that constitutes under state or federal law a criminal offense related to the interference with or obstruction of any audit or investigation into an alleged criminal offense." 1 Tex. Penal Code §37.08(a) makes it a crime to "with intent to deceive . . . knowingly make[] a false statement that is material to a criminal investigation and make[] the statement to a peace officer or federal special investigator conducting the investigation; or any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and the actor knows is conducting the investigation."

Between October 31, 2013 and October 13, 2015, Farrell corresponded with individuals at Baylor College of Medicine ("BCM") regarding the procurement of fetal tissue specimens for a research study.[29] Drafts of a contract were exchanged and Farrell apparently assisted the researchers in the process of obtaining Institutional Review Board ("IRB")[30] approval for the study, which they pursued in reliance on the agreement they had made with PPGC.[31] On November 17, 2014, Farrell received an email from Supriya Parikh ("Parikh") with the subject line, "FW: Pediatrics Research Proposal- Dr Paust/Baylor College of Medicine- IRB Approval Obtained."[32] Parikh states in the email, "I would like to thank you for your support through our IRB review process. We heard back from the IRB today and like we discussed, the study does not constitute human subjects research."[33] Farrell responded the same day,

---

[29] DX-72-80(a).
[30] Institutional Review Board approval is required by federal law whenever there are research studies done with human subjects. *See* http://www.baylor.edu/research/irb/index.php?id=926196.
[31] DX-72-80(a).
[32] DX-79.
[33] *Id.*

stating, "Thank you!"[34]  In June and early July 2015, the parties exchanged further emails about the contract.[35] A few days after Farrell's last email about the IRB approval and contract, the first of the series of undercover videos relating to Planned Parenthood's fetal tissue research activities was released on July 14, 2015. On October 15, 2015, Dr. Paust sent an email to Farrell asking if they needed to make changes to the contract in light of recent events, referring to the release of the videos.[36] On November 4, 2015, Farrell responded by denying that the parties were on the cusp of executing the contract.[37]

On October 22, 2015, Texas Ranger Daron Parker, Houston Police Department Homicide Division Sergeant Chris Hassig, and Assistant District Attorneys Anshu "Sunni" Mitchell, Inger Chandler, and Melissa Hervey, visited PPGC's headquarters as part of an investigation.[38] PPGC's general counsel Katie Beth Gottlieb and criminal attorney Josh Schaffer were also present. Gottlieb led the investigators on a tour of the facility and answered virtually all of their questions. In response to questions from investigators about their participation in fetal tissue research, Gottlieb stated:

> [T]he last collected fetal tissue specimen collected by GCPP [Gulf Coast Planned Parenthood] for a scientific study was on 07-26-2011, for the University of Texas Medical Branch [("UTMB")].  GCPP was recently approached by the Baylor College of Medicine and Rice University for fetal tissue studies.  The Institutional Review Board had not yet given approval for the Baylor or Rice studies.[39]

---

[34] *Id.*
[35] *Id.*
[36] DX-80(a).
[37] *Id.*
[38] DX-81.
[39] *Id.*

The statement that the IRB had not given approval for the BCM study was false. PPGC knew it had IRB approval.[40] Making matters worse, after the release of the videos, Farrell tried to deny she had even negotiated the contract to provide fetal tissue specimens.

Notably, Planned Parenthood did not even respond to this basis for termination in their motion, describing it only as "unspecified 'evidence' of unidentified 'misrepresentations'" and dismissing it as a "cryptic and vague allegation."[41] Yet the Final Termination letter makes clear that the evidence of misrepresentations uncovered in the Select Investigative Panel investigation was "consistent with and supportive of th[e] termination."[42] The Panel's initial findings were made public the day after Planned Parenthood received the Final Notice of Termination, and well before Plaintiffs filed the instant motion.[43] The Panel's initial findings go into detail about the above evidence—all of the emails between Farrell and BCM, the evidence that PPGC knew the study had IRB approval, the Ranger's report containing the false statement about IRB approval—and concludes that this evidence indicates a possible violation of Texas law, citing the same penal code provision as above.[44] PPGC was also in possession of this letter, as indicated in paragraph 33 and Exhibit H of the declaration of PPGC CEO Melaney Linton.

---

[40] *Id.*
[41] Pls. Prelim. Inj. Mot. at 26, 18.
[42] DX-1 at 2.
[43] https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/letters/20161221TX%20AG%20%20%28PPGC%29%20REDACTED.pdf
[44] DX-68.

Nothing about this is "cryptic"— apparently, Planned Parenthood simply had no response to it.

### b. Planned Parenthood has made misrepresentations and misleading statements about the issues germane to this action.

Planned Parenthood has also made misrepresentations and misleading statements about the issues in this action, which are relevant to its qualifications. As an initial matter, PPGC has stated, in its brief and elsewhere, that it does not have the video relied upon by the OIG.[45]  This statement is categorically false.

Specifically, Josh Schaffer, PPGC's criminal defense attorney, stated in a sworn affidavit that as soon as PPGC became the subject of a criminal investigation related to the videos, he "made it a priority to try to obtain the raw, unedited, complete video footage that [David] Daleiden had recorded at PPGC on April 9, 2015."[46] He further stated that former Assistant District Attorney Mitchell, the prosecutor charged with investigating PPGC, obtained the unedited footage directly from David Daleiden's attorney and then promptly gave it to Schaffer on December 18, 2015.[47] Schaffer then gave the video to Gottlieb, PPGC's general counsel.[48] Thus, contrary to PPGC's assertion, the unedited footage has evidently been in PPGC's possession for over a year.

---

[45] *See* Pls. Prelim. Inj. Mot. at 26 (stating that the OIG's "justification for termination is especially inadequate when this video – the supposedly unedited version of which the Attorney General has yet to provide to Plaintiffs – is the only 'evidence' of wrongdoing Defendants can come up with . . . .").
[46] DX-106 at 34.
[47] *Id*. at 35-36.
[48] *Id*. at 36.

Additionally, Planned Parenthood's claim that the videos in question are "fraudulent and deceptively edited" has been repeated ad nauseam. PPGC has continued to claim this even in the briefing to this Court, despite also insisting it has not seen the raw footage. What Planned Parenthood omits is that even the "full footage" versions of the videos posted on YouTube were verified through an independent, highly reputable, professional digital forensic group with clients like 3M, Amazon, Intel, Lexis Nexis, Oracle, and Toshiba[49] to be authentic and not edited except for removing non-pertinent footage such as bathroom visits. This was determined by comparing them to the raw, unedited footage.

This kind of misrepresentation has occurred in other contexts specifically related to Planned Parenthood's activities in the area of fetal tissue research. For example, in the *Gee* litigation, Linton stated several times in a declaration and the attached exhibits that PPGC "does not currently participate in any fetal tissue donation programs," and denied receiving remuneration in exchange for fetal tissue.[50] The Fifth Circuit took this to mean that "PPGC does not perform any abortions or operate any fetal tissue donation programs." *Gee*, 837 F.3d at 497-98. But it appears that during this time period, and even to this day, PPGC advertises on their website that they provide donated fetal tissue for clinical research.[51]

---

[49] DX-3; *see also* https://www.coalfire.com/Solutions/Coalfire-Labs/Digital-Forensics; https://www.coalfire.com/About.
[50] Decl. of Melanie Linton, *Planned Parenthood Gulf Coast, et al. v. Kliebert* (M.D. La. Oct. 9, 2015) (No.3:15-cv-00565) (ECF No. 46-1) ("Linton Gee Decl.") ¶21, Ex. H, Ex. F at 3, Ex. H at 2.
[51] DX-120-127.

Further, during the Senate Judiciary Committee's investigation, Planned Parenthood stated through counsel that only four of its affiliates—all in California— had engaged in fetal tissue donation between 2010-2015 and received funds in exchange.[52] Yet PPGC engaged in fetal tissue donation between 2010-2011 during the UTMB study and received $21,000 in payments.[53]

Finally, Planned Parenthood has also attempted to mislead courts about their corporate structure. In the *Gee* litigation, the Fifth Circuit believed that "PPGC does not perform any abortions or operate any fetal tissue donation programs"[54] because Linton, again, made several misleading statements in a declaration and the attached exhibits—namely in copies of the letters that PPGC wrote in response to the Louisiana Department of Health and Hospitals' inquiries. These statements created the impression that PPGC could not be guilty of any malfeasance related to fetal tissue research because it had no access to fetal tissue, and PPCFC could not be guilty of any malfeasance related to fetal tissue because it engaged in no donation programs. Both of these impressions are inaccurate.

Linton claimed that PPCFC "does not have fetal tissue donation programs in Texas currently," and PPGC "does not provide abortion services."[55] In response, LDHH asked, "are you defining PPCFC as a fully standalone entity that is not an affiliate, subsidiary or associate of PPGC?" PPGC/PPCFC's answer: "PPGC and

---

[52] https://www.grassley.senate.gov/sites/default/files/judiciary/upload/22920%20-%20FTR.pdf at Ex. 11-12.
[53] DX-70.
[54] *Gee*, 837 F.3d at 497-98.
[55] Linton Gee Decl. Ex. F at 2.

PPCFC are both Texas non-profit corporations.  Neither entity is a subsidiary of the other, and the entities have no members or owners in common.  Other relationships between the entities are purely contractual in nature."[56]  As non-profit corporations, Planned Parenthood affiliates have no "owners," and Planned Parenthood affiliates have no "members," which begs the question of why Linton made that statement unless it was to create the impression that PPGC and PPCFC are more independent from one another than they are.

In this case, Linton slightly modified her claim. In paragraph 5 of her declaration, she states, "PPGC does not provide abortions. PPGC has a facilities and services agreement with a separate organization, [PPCFC], which does.  PPCFC rents space in a building owned by PPGC and operates the PPCFC Ambulatory Surgical Center. I am President and CEO of both organizations, but each has its own board of directors, bylaws, and staff."[57]

The truth is that PPGC and PPCFC essentially operate as one entity.[58] The two organizations share the same address.[59] They share the same building.[60] As Linton now admits, she is President and CEO of both entities.[61] The board members and directors of PPCFC are the same as board members and directors of PPGC.[62]

---

[56] Linton Gee Decl., Ex. F at 2.
[57] Linton Decl. ¶5.
[58] PPGT and PPST appear to operate in a similar fashion in conjunction with their abortion subsidiaries.  *See* DX-142-149; DX-88; DX-91; DX-93; DX-164-166; DX-173; DX-177-178.
[59] DX-112-114; DX-130-132.
[60] DX-2.
[61] Linton Decl. ¶5.
[62] DX-112-114; DX-130-132.

PPGC and PPCFC share executive staff.[63] PPCFC and PPGC also state that they are related entities on their Internal Revenue Service Form 990s.[64]

In practice, there is also limited functional separation between PPCFC and PPGC's operations. Even though PPCFC is purportedly the abortion provider, PPGC, not PPCFC, advertised for new employees to assist with abortions.[65] Abortions are performed inside PPCFC's ambulatory surgical center ("ASC"), located inside PPGC's building.[66] PPGC, not PPCFC, negotiates and enters into agreements with research entities to procure fetal tissue.[67] PPGC also receives the funds for that procurement.[68] The PPGC website advertises that it, not PPCFC, provides donated fetal tissue for clinical research.[69] Farrell is an employee of PPGC, not PPCFC, yet she negotiates agreements to procure fetal tissue from abortions with outside parties.[70] For purposes of fetal tissue procurement, the two entities operate as one unit, and Planned Parenthood's statements to the contrary are misleading.

These efforts to obscure their activities related to fetal tissue procurement raise serious questions as to the qualifications of Planned Parenthood with respect to the Medicaid program, as they indicate unethical behavior that is consistent with and supportive of  the termination.

---

[63] *Id.*
[64] DX-132 at Part IV, Line 34.
[65] DX-128-129.
[66] DX-2.
[67] DX-71; DX-78.
[68] DX-70-71.
[69] DX-120-127.
[70] DX-72-80(a).

### c. Accepting money in exchange for fetal tissue not tied to reimbursing the actual costs of providing such tissue arguably violates the law and violates medical and ethical standards.

42 U.S.C. § 289g-2(a) states that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce." "Valuable consideration" does not include "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue." § 289g-2(e). Tex. Penal Code § 48.02(b) makes it a misdemeanor if someone "knowingly or intentionally offers to buy, offers to sell, acquires, receives, sells, or otherwise transfers any human organ for valuable consideration." The statute defines "human organ" to include fetal tissue. *Id.* at § 48.02(c). The statute also defines "valuable consideration" to exclude "a fee paid to a physician or to other medical personnel for services rendered in the usual course of medical practice or a fee paid for hospital or other clinical services," and "reimbursement of legal or medical expenses incurred for the benefit of the ultimate receiver of the organ." *Id.* at §48.02(a).

On the video, Farrell asserts that even though PPGC is "already set up" to do the tissue procurement, "we will definitely need to work out, you know, something in terms of covering additional costs for additional things related to it."[71] She also explains how she uses the language of the contract to make seem that payments are going only to "administrative costs" rather than a compensation for specimens, which

---

[71] DX-2; DX-2(a).

she admits is "touchy" under federal law: "I'm very particular about working with the language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen. Because that borders on some language in the federal regs, it's a little touchy."[72]

She also makes it clear that Planned Parenthood cares about the bottom line in terms of providing the donated tissue:

> Well, I know – that's another thing that is –you know, a lot of folks – I get this mainly from academic institutions. They see Planned Parenthood, oh, they're nonprofit, that means you're nonbudget. And they will come to us with, you know, budgets that are, quite frankly, insulting. You know, like really? I mean where in the United States can you – a consent form, you know, eight-page consent form for this amount of money and it takes 30 minutes to administer that to a patient. So, you know, again with the understanding that, you know, just because we're nonprofit does not mean we're fiscally unstable.[73]

Farrell also states in the video that she goes to lengths to determine what their costs are so she can cover them in the contract, but in practice, Planned Parenthood Witness #2 (which is seems is likely Farrell, given the content of her testimony and her location at PPGC) admitted to Congress that her calculations were not tied to reimbursing actual costs but instead are "basically back-of-the-envelope type calculations."[74]  The invoices PPGC issued to UTMB reflect that as well.  The "per consent" costs and "administrative fees" are perfectly round numbers—$50 per consent in advance,[75] $2,000 annual "administrative fee",[76] $1,500 for CITI training

---

[72] *Id.*
[73] *Id.*
[74] DX-62.
[75] DX-60; DX-70.
[76] *Id.*

of new staff in both 2010 and 2011,[77] $25 per consent obtained in 2010,[78] $150 "consent payment" in 2010-2011.[79]  Only one entry on the invoices to UTMB appears to be a reimbursement of an actual cost: "reimbursement for study supplies" in the amount of $574.98.[80]

PPGC continued to obtain payment this way.  During the negotiations with Baylor three years later in 2014, the price apparently settled on (as reflected in multiple drafts of the contract between the parties) was $5,750 for 25 consents, which comes out to $230 per consent.[81]  This included $50 per consent for staff time, including consents for which no sample is obtained, plus a $2,000 administrative fee, which includes "Surgical Services and Research Management oversight, consent storage, and supply storage.[82]  This list is not all inclusive."[83]  It also purportedly included $100 per consent for "sterile procedure room set-up and sample collection," but this was also not an exclusive list of potential costs.[84]

The Senate Judiciary Committee examined this issue, and the Majority Staff Report details how PPFA admitted that its affiliates failed to obtain accounting to document their actual costs of procuring fetal tissue per PPFA's policy.[85] According to the report, PPFA also admitted that its affiliates were engaging in fetal tissue

---

[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] DX-78.
[82] *Id.*
[83] *Id.*; DX-72-80.
[84] *Id.*
[85] *See* https://www.judiciary.senate.gov/imo/media/doc/2016-12-13%20MAJORITY%20REPORT%20-%20Human%20Fetal%20Tissue%20Research%20-%20Context%20and%20Controversy.pdf

research programs in order "to increase their revenues."[86] When asked to provide an accounting, PPFA's affiliates attempted to belatedly justify their costs by "shoehorn[ing] a vast array of indirect or tenuously related costs into § 289g-2's exception, including attributing several thousands of dollars in costs to amorphous "General Administrative & Medical Overhead."[87]

The Majority Staff Report went on to state:

> As noted above, interpreting § 289g-2's exception this broadly would clearly be at odds with the primary purpose of the law, which is apparent from the legislative history. Any company could simply shift unrelated costs into such categories to hide actual profits obtained from the transactions—the very scenario Senator Smith described when trying to resolve the issue in 1999. Accordingly, there is reason to question whether Planned Parenthood fully complied with federal requirements relating to fetal tissue transfer payments. As noted above, when PPFA learned that its affiliates had failed to comply with the policies it had in place to prevent breaking the law, PPFA reportedly contacted the affiliates and then modified PPFA accreditation reviews in a manner that facilitated the continuation of those fetal tissue payments. PPFA's and the affiliates' actions may implicate the federal criminal conspiracy statute, 18 U.S.C. § 371.[88]

From the documentation we have without discovery, it does not appear that Planned Parenthood is making extraordinarily large sums of money by selling fetal tissue. But it does appear that they have been accepting payments not tied to the reimbursement of actual costs, which indicates a likelihood of "valuable consideration" being received. Given the grave moral concerns related to the existence of any financial incentive to procure fetal tissue, which prompted Congress

---

[86] *Id*. at 49.
[87] *Id*. at 52.
[88] *Id*. at 52-53.

to pass §289g-2 in the first place,[89] accepting remuneration not tied to reimbursement is unethical and breaches the standard of care, which does not contemplate a market of any sort for human body parts.[90]  The evidence illustrating Planned Parenthood's practice of exchanging fetal tissue for money not tied to actual costs therefore provides an additional basis for termination of their Medicaid provider agreements.

### 3. Texas's termination of Planned Parenthood's Medicaid provider agreements is in full accordance with Fifth Circuit precedent, and cases coming to different conclusions in other jurisdictions are distinguishable.

Planned Parenthood makes much of the fact that other courts have granted injunctions against the termination of their Medicaid contracts in other states. But not only does the termination of their contracts in Texas fully comport with the Fifth Circuit's opinion in *Gee*, the legal and factual bases for termination are greater than those in those other states, rendering other courts' conclusions about the likelihood of success on the merits at a preliminary stage of the case far from dispositive.

In *Gee*, PPGC (who had two non-abortion clinics in Louisiana at the time) challenged Louisiana's at-will termination of their provider agreements. 837 F.3d at 484. After the case was filed, Louisiana revoked their notice of termination and argued the case was moot. *Id.* The next day, the state issued a new notice of termination on three grounds: two qui tam False Claims Act claims against PPGC, "misrepresentations" in PPGC's correspondence with LDHH, and an investigation of

---

[89] *See Id.* at 8-28.
[90] At the upcoming hearing, Defendants' expert witnesses will testify in greater detail regarding this subject.

PPGC by LDHH and the Louisiana OIG.[91] *Id.* The Fifth Circuit concluded that while states have the authority to create regulations regarding the qualifications of Medicaid providers and may terminate providers consistent with federal and state law, they simply do not "have an unlimited authority to exclude providers for any reason whatsoever." *Id.* at 494.

The *Gee* panel was convinced that the individual plaintiffs had shown a likelihood of success on the merits because, according to the Court, the state failed to include any explanation of the alleged "misrepresentations" in either their termination letter or its briefing, and it found that the mere initiation of an investigation and settlement of the FCA cases without admission of liability were not evidence of any wrongdoing which would call into question PPGC's qualifications as a provider. *Id.* at 496-98. The court concluded that "[a]t the most, LDHH has simply pasted the labels of 'fraud' and 'misrepresentations' on PPGC's conduct, and then insisted that these labels should insulate its termination actions from any § 1396a(a)23 challenges." *Id.* at 499. Given the lack of evidence put forward by the state, the court concluded the termination was not based on PPGC's qualifications as a provider,[92] and it therefore held that termination of Planned Parenthood's Medicaid provider agreements for reasons unrelated to their qualifications likely violated the free-choice-of-provider provision of § 1396a(a)(23). *Id.* at 498-99.

---

[91] Of note: LDHH stated that the PPGC video was not a basis for their decision to terminate. Transcript of Mot. Hr'g at 35 - 36, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F.Supp.3d 604 (2015) (No. 59-00565) ECF No. 59.

[92] Significantly, LDHH conceded that PPGC was competent to render the relevant medical services. *Gee*, 837 F.3d at 492. OIG makes no such concession in this case.

By contrast, in this case, as detailed above, OIG has put forth specific evidence substantiating the termination under state law, for reasons bearing directly on Planned Parenthood's qualifications as a Medicaid provider as defined by *Gee* and state law. *Gee* expressly allowed for a different outcome where the termination is based on provider qualifications. In a section of the opinion titled, "Limits of Our Opinion," the panel "emphasize[d] the unique circumstances of the instant case," and affirmed that "[s]tates undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance." *Id.* at 498-99. It also stated, "the general grounds for termination invoked by LDHH—fraud, misrepresentations, and investigations—will often relate to a provider's qualifications." *Id.* at 499. Because OIG has given specific grounds for termination supported by evidence relating directly to Planned Parenthood's qualifications to provide medical services in a "professionally competent, safe, legal, and ethical manner," the termination is wholly consistent with *Gee*.

Cases involving Planned Parenthood's termination in other jurisdictions are distinguishable for similar reasons. At the outset, none of the other states have based their termination decision on video evidence filmed in their state—Texas is unique in that respect. In *Planned Parenthood Southeast, Inc., v. Bentley*, the Governor of Alabama decided to terminate the provider agreement of Planned Parenthood's Alabama affiliate after he watched one of the videos released by CMP. 141 F. Supp. 3d 1207, 1213 (M.D. Ala. 2015). In *Bentley*, the "narrow question before the court [wa]s whether the Medicaid Act allows a State to terminate a provider agreement

based on no reason other than the existence of a contractual at-will termination provision like the one in P[lanned Parenthood Southeast's]." *Id.* at 1220. The court concluded that "[t]he answer to that narrow question is 'no.'" *Id.* But as Defendants have already discussed at length, the termination in this case was for cause.

In *Planned Parenthood of Kansas v. Mosier*, the decision to terminate was based in part on the videos, but they were not offered into evidence. No. 2:16-cv-02284, 2016 WL 3597457, *4 (D. Kan. Jul. 5, 2016). As none of the activities depicted took place within Kansas, the court determined that the state would have to justify termination based solely on affiliation. *Id.* at *18-19. It appears that Kansas law, unlike the law in Texas, did not permit termination based on affiliation. *Id.* at *21 n. 121.

Similarly, in *Planned Parenthood Arkansas and Eastern Oklahoma v. Selig*, the court entered a preliminary injunction on the basis that the Planned Parenthood affiliates in that case did not perform surgical abortions and therefore could not be involved in fetal tissue donation, and affiliation alone did not suffice. Prelim. Inj. Order on Behalf of Patient Class, No. 4:15-cv-00566, ECF No. 127 (E.D. Ark. Sept. 29, 2016). But it does not appear that there was a state law basis for termination based on affiliation. *See id.* at 14-16.

The video at issue in this case was filmed at a Texas Planned Parenthood facility. All of the Texas Planned Parenthood affiliates perform surgical abortions, so the issue of fetal tissue donation is pertinent to all of them.[93] In addition, Texas law

---

[93] DX-144, DX-176.

permits termination of a Medicaid provider based on affiliation, as explained in Section I(B) *infra*. The grounds for termination of the providers here are directly related to their qualifications as providers. Thus, the above cases are unpersuasive.

### B. The Law Permits OIG to Terminate Affiliates of Unqualified Medicaid Providers.

Based on the above, there is clearly enough evidence to support termination of PPGC and PPCFC. But there is also an adequate basis under federal and state law for terminating the rest of the Planned Parenthood affiliates in Texas. 42 C.F.R. § 1001.1001(a)(1)(i)(C) provides that the OIG "may exclude an entity if . . . [a] person with a relationship with such entity . . . [h]as been excluded from participation in Medicare or any of the State health care programs."

Plaintiffs appear to assert that because federal law does not interpret affiliation as broadly as state law, that the affiliates' termination under state law is somehow improper. To the extent they are attempting to make a preemption argument, it must fail because (1) Plaintiffs have not made a preemption claim, nor challenged the state law provisions at issue; and (2) Medicaid's statutory and regulatory scheme contemplates cooperative administration of the program, with authority to terminate provider agreements on both sides of the equation, leaving room for states to act even where the federal government does not.[94]

Moreover, there can be nothing improper about the termination of all the Texas affiliates in this case where HHS has expressly interpreted the Medicaid statutes to

---

[94] *See* Part I(A) *supra.*

allow for the termination of entire corporate entities, not just the offending individual or entity. Plaintiffs cite HHS guidance to support their narrow interpretation of 42 C.F.R. §1001.1001 as merely an attempt to prevent an excluded provider from continuing to receive funds from a corporate entity they own or have substantial interest in, and that corporate entities on a whole cannot be excluded for other reasons. "Health Care Programs: Fraud and Abuse; Amendments to OIG Exclusion and CMP Authorities Resulting from Public Law 100-93," 57 Fed. Reg. 3298-01, 3309 (Jan. 29, 1992). But the same document supports the idea that entire corporate entities may be terminated:

> The statute contemplates excluding an entity that has a substantial relationship with a sanctioned individual. While it may often be possible to target only one offending subsidiary or site for exclusion, we believe that there are situations where *an entire corporate entity* may be found to have a substantial relationship with one individual who deals primarily with one of its subsidiaries. In deciding whether to exclude an *entire corporate network* or one isolated subsidiary, we intend to evaluate the nature and extent of the relationship and determine what parties were actually at fault for engaging in a relationship with a sanctioned individual, as well as which entities the sanctioned individual actually controls. The OIG will always consider whether the interests of the programs and their beneficiaries are furthered by excluding an *entire corporate network*.

> *Id.* (emphasis added).

The same document also refutes the idea that the Medicaid statutes limit the States' authority to exclude entities from Medicaid for reasons pursuant to state law, or that an existing basis for termination or sanction in the federal statutes or regulations prevent a state from imposing stricter requirements:

> This comment appears to refer to § 1002.2(b), which simply states that nothing in the regulations limit a State's own authority to exclude an

individual or entity from Medicaid for any reason or period authorized by State law. State agencies may prosecute and sanction providers on their own initiative when State law authorizes them to do so. Nothing in section 1128(d) of the Act or its legislative history indicates that the Federal statutory provisions governing the length of exclusions were intended to supplant State law provisions governing exclusions from State health care programs. In fact, section 1128(d)(3)(B)(ii) provides that 'a State health care program may provide for a period of exclusion which is longer than the period of exclusion under title XVIII (Medicare)."

*Id.* at 3322. Given the cooperative federalism model of Medicaid, the evidence of complementary authority in the statutes themselves, as well as agency interpretations consistent with those ideas, Plaintiffs' attempt to limit OIG in acting pursuant to state law in administering the Texas Medicaid program must fail.

## 1. Texas law allows for the termination of affiliates of unqualified providers.

The evidence available at this time, as well as the evidence that will be presented at the hearing, justifies the termination of the provider agreements for all Texas affiliates. There is evidence of wrongdoing by PPGC and PPCFC. There is also evidence of a substantial relationship between PPGC/PPCFC and other the Texas affiliates by virtue of their affiliation with PPFA. As a result, termination of all Texas affiliates is supported by state law.

1 Tex. Admin Code. § 371.1703(c)(7) provides that "[W]hen the OIG establishes the following by prima facie evidence, the OIG may terminate or cancel the enrollment or contract from Medicaid, CHIP, or any other HHS program of . . . a

person that is affiliated with a person who commits a program violation." An

"affiliate" is someone who:

> (A) *has a direct or indirect ownership interest (or any combination thereof) of five percent or more in the person*;
> (B) is the owner of a whole or part interest in any mortgage, deed of trust, note or other obligation secured (in whole or in part) by the entity whose interest is equal to or exceeds five percent of the value of the property or assets of the person;
> (C) *is an officer or director of the person, if the person is a corporation;*
> (D) is a partner of the person, if the person is organized as a partnership;
> (E) is an agent or consultant of the person;
> (F) *is a consultant of the person and can control or be controlled by the person or a third party can control both the person and the consultant*;
> (G) is a managing employee of the person, that is, a person (including a general manager, business manager, administrator or director) who exercises operational or managerial control over a person or part thereof, or directly or indirectly conducts the day-to-day operations of the person or part thereof;
> (H) *has financial, managerial, or administrative influence over the operational decisions of a person*;
> (I) *shares any identifying information with another person, including tax identification numbers, social security numbers, bank accounts, telephone numbers, business addresses, national provider numbers, Texas provider numbers, and corporate or franchise names; or*
> (J) has a former relationship with another person as described in subparagraphs (A)-(I) of this definition, but is no longer described, because of a transfer of ownership or control interest to an immediate family member or a member of the person's household of this section within the previous five years if the transfer occurred after the affiliate received notice of an audit, review, investigation, or potential adverse action, sanction, board order, or other civil, criminal, or administrative liability.

1 Tex. Admin. Code § 371.1(3) (emphasis added).

The fact that the Texas affiliates are all being represented in this lawsuit by

the same legal counsel, and particularly by a lawyer from PPFA, should be the Court's

first indication that they share a sufficiently close relationship. But there is also

documentary evidence that shows that PPFA is sufficiently connected to the affiliates as to justify the termination of all the entities.

PPFA has characteristics of a franchise operation, with affiliates paying annual dues. In exchange for these payments, affiliates can hold themselves out to the public by using the franchise name "Planned Parenthood."[95]  This connection is sufficient under state law to link all the entities in this action. *See id.* § 371.1(I) (defining an affiliate as someone who "shares any identifying information with another person, including . . . corporate or franchise names ").

Furthermore, PPFA exercises functional control over the affiliate entities.  For example, affiliates are "bound by PPFA's standards of affiliation and bylaws."[96] These standards give PPFA control over, among other things, how affiliates generate revenue, engage in research, and structure their clinical programs.[97] In fact, since 2013, PPFA has required that all affiliates provide abortions regardless if the affiliates wanted to or not. This top-down control exercised by PPFA over its affiliates provides a sufficient basis for the OIG to terminate the provider agreement of not just PPGC/PPCFC, but each of the affiliates. *See id.* § 371.1(F) (defining an affiliate as someone who "can control or be controlled by the person or a third party can control both the person and the consultant"); *Id.* at § 371.1(H) *(*defining an affiliate as someone who "has financial, managerial, or administrative influence over the operational decisions of a person").

---

[95] *See e.g.* DX-115; DX-119; DX-148; DX-85 at 4.
[96] DX-159 at ¶ 8.
[97] DX-85 at 4 and 12.

## II. Plaintiffs Have Failed to Show Irreparable Harm Absent a Preliminary Injunction.

To satisfy the requirement of showing irreparable harm absent an injunction, Plaintiffs must assert "more than an unfounded fear."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.) Courts will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury." *Id.* Instead, the plaintiff must show a "presently existing actual threat." *Id.; see also Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("We agree . . . that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (internal citations omitted). Planned Parenthood and the Jane Doe plaintiffs cannot make such a showing and therefore are not entitled to an injunction.

### A. Medicaid Funds Represent a Small Percentage of Planned Parenthood's Overall Multi-Million Dollar Budget.

Planned Parenthood claims that it will suffer irreparable harm because it "rel[ies] on public funding, and loss of Medicaid funds will significantly impact [the] operating budgets."[98] This assertion, like so many others made by Planned Parenthood, is misleading.  Specifically, the fear of a significant impact on the budget is unfounded because the amount paid by Medicaid is *de minimis* in view of the total 30 billion dollar Medicaid expenditure.[99] For instance, in 2013, PPGC reported

---

[98] Pls. Prelim. Inj. Mot. at 31.
[99] *See* expected testimony of Lesley French, Associate Commissioner, Health, Development and Independent Services at Texas Health and Human Services Commission.
 (HHSC).

$19,667,024 in total revenue.[100]  PPGC also reported net assets of $43,548,729.[101] In contrast, PPGC's annual report for 2012-2013 attributed only $1,017,712 or 4% to "Government Contracts for Medical Services", which includes Medicaid.[102]  Clearly, the Provider plaintiffs are economically viable.[103] It appears unlikely that the loss of Medicaid would cause much harm, if any at all, to their ability to operate.

Moreover, contrary to Plaintiffs' alarmist claims that terminating Planned Parenthood's Medicaid provider agreements will precipitate a women's health crisis in Texas, women's health in Texas is generously provided for by several state-funded programs: the Texas Women's Health Program, Family Planning Program, and Expanded Primary Heath Care Program. As the state's witnesses will testify, these three programs provide family planning services to low-income women including pelvic examinations, sexually transmitted disease screening and treatment, HIV screening,  health screenings for diabetes, high blood pressure, and cholesterol, breast and cervical cancer screenings, and contraceptives. Moreover, as the state's witnesses will testify, these three programs are available to more women than those eligible for services through Medicaid because the Texas programs are available to low-income women whose income is higher than the federal poverty level, which is the cut-off for the program administered through Medicaid. Hence, the Court should

---

[100] DX-113 at 1.
[101] *Id*.
[102] DX-111 at 4.
[103] DX-165 (reporting total revenue of $33,922,566 and net assets of $41,839,154 for PPGT); DX-142 (reporting total revenue of $4,252,525 and net assets of $3,749,103 for PPST).

deny the requested relief because the Plaintiffs have failed to show a presently existing threat that services will cease absent the injunction.

### III.    The Public Interest is Served Through Denial of the Injunction Because it Protects Patients from Providers With a History of Violating Medical and Ethical Standards.

To obtain a preliminary injunction, the movant also has the burden to show that if granted, the injunction would not be adverse to public interest. *Star Satellite, Inc. v. Biloxi,* 779 F.2d 1074, 1079 (5th Cir.1986). If no public interest supports granting preliminary relief, such relief should ordinarily be denied, "even if the public interest would not be harmed by one." Wright & Miller § 2948.4. "Consequently, an evaluation of the public interest should be given considerable weight in determining whether a motion for a preliminary injunction should be granted." *Id.*

It is clearly in the public interest to allow OIG to terminate an unqualified provider that has shown a repeated willingness to engage in behavior that violates medical and ethical standards. The state should not have to wait until it is too late before it can act to protect Medicaid recipients and taxpayers. Medical providers hold a special position of trust in our society and therefore must adhere to the highest standards of accountability. A medical provider that is willing to transgress medical and ethical standards should not receive the benefit of state or federal monies, and denying the request for an injunction will allow the state to protect the integrity of the Medicaid program, which is in the public's interest. As discussed above, Planned Parenthood provides such a small percentage of overall Medicaid services in the state, and other state programs provide virtually identical services for the same patient

population, so terminating Planned Parenthood as a provider will not cause harm to the public.  The injunction should be denied.

## IV.    Even if the Court were Inclined to Issue an Injunction, a Bond Must Be Required.

Federal Rule of Civil Procedure Rule 65(c) states that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The analysis turns on the damages, if any, that the state would sustain during the period that a wrongfully issued preliminary injunction remained in effect. Wright & Miller § 2954.

If OIG were enjoined in this case, the state would have to continue reimbursing Planned Parenthood. Planned Parenthood argues that these reimbursements would have no effect on the state budget because another Medicaid provider would take its place. This ignores, however, Texas's sovereign interest in ensuring that Medicaid providers comply with the requirements in the Texas Administrative Code, the Texas Medicaid Provider Procedures Manual, and other state and federal laws governing or regulating Medicaid. Wrongfully compelling the state to fund Planned Parenthood, in violation of the state's legitimate authority over the administration of the Medicaid program within its borders, therefore harms Texas even if it reimburses another organization that complies with federal and state law. Accordingly, Planned Parenthood should be required to post a bond equivalent to the amount that Texas reimburses Planned Parenthood over a one-year period, which amounts to ten percent of the proceeds that Planned Parenthood receives under the Medicaid program. 42

U.S.C. § 1396b(a)(5). Planned Parenthood received approximately 3.5 million dollars from Texas Medicaid in 2016. Thus, an appropriate bond amount is approximately $350,000.

## CONCLUSION

Because Plaintiffs cannot satisfy their burden of meeting all four prerequisites for a preliminary injunction, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
AMANDA J. COCHRAN-MCCALL
Texas Bar No. 24069526
ADAM A. BIGGS
Texas Bar No. 24077727
Assistant Attorneys General

Office of the Attorney General
300 West 15th Street
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)

(512) 320-0667 (fax)

*Attorneys for Defendants*