## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

PLANNED PARENTHOOD OF GREATER
TEXAS FAMILY PLANNING AND
PREVENTATIVE HEALTH SERVICES, INC.;
PLANNED PARENTHOOD SAN ANTONIO;
PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD
SOUTH TEXAS SURGICAL CENTER;
PLANNED PARENTHOOD GULF COAST,
INC.; and JANE DOE #1; JANE DOE #2;
JANE DOE #4; JANE DOE #7; JANE DOE #9;
JANE DOE #10; and JANE DOE #11, on their
behalf and on behalf of all others similarly
situated,

               Plaintiffs,

     v.

CHARLES SMITH, Executive Commissioner,
Texas Health and Human Services Commission,
and STUART W. BOWEN, JR., Inspector
General, Texas Health and Human Services
Commission, Office of Inspector General,

               Defendants.

No. 1:15-CV-01058-SS

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF—CLASS ACTION

Plaintiffs, by and through their attorneys, and on behalf of all members of the class, bring

this Complaint against the above-named Defendants and their employees, agents, delegates, and

successors in office, in their official capacity, and in support thereof state the following:

### INTRODUCTORY STATEMENT

1.    This civil action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights

secured by the federal Medicaid statutes as well as the U.S. Constitution.

2.    Plaintiffs Planned Parenthood of Greater Texas Family Planning and Preventative

Health Services, Inc. ("PPGT"); Planned Parenthood San Antonio ("PPSA"), Planned

Parenthood Cameron County ("PPCC"), Planned Parenthood South Texas Surgical Center ("PPSTSC") (together with PPSA and PPCC, "PPST"); and Planned Parenthood Gulf Coast, Inc. ("PPGC") (collectively, "Provider Plaintiffs" or "Planned Parenthood Providers") provide critically needed family planning and preventive health services to thousands of women and men in underserved areas of Texas through the Medicaid program. For several decades, the Provider Plaintiffs have been trusted Medicaid providers for tens of thousands of Texans.

3.      As is required by federal law, Medicaid enrollees may seek services from a participating provider of their choice and have those services covered by Medicaid. Plaintiffs Jane Doe #1, 2, 4, 7, 9,10, and 11 ("Patient Plaintiffs") are such women—patients of Provider Plaintiffs who are enrolled in Medicaid and who prefer Provider Plaintiffs to other Medicaid providers. Texas Medicaid does not pay for abortions except in extremely narrow circumstances.

4.      In October 2015, without prior warning, the Texas Health and Human Services Commission ("HHSC") issued termination letters to the Provider Plaintiffs (who are the only Planned Parenthood Providers in Texas), relying primarily on deceptively edited and misleading YouTube videos made by a radical anti-abortion group with ties to violent extremists, videos that have been widely debunked and that are wholly irrelevant to four out of the five Provider Plaintiffs. HHSC also relied on a prior settlement of qui tam litigation, again, by only one of the providers (PPGC), even though the settlement contained no admission of liability and also contained an *agreement* by Texas that it would *not* seek to use the litigation as a basis to exclude PPGC from Medicaid.

5.      Perhaps aware of its failure to identify any legitimate basis for the terminations, after Plaintiffs filed suit seeking a TRO and/or preliminary injunction from this Court, HHSC backtracked, taking the position that it did not yet know if it would terminate the Provider

Plaintiffs. But it did not rescind the pending termination letters, instead promising ongoing investigations. Without further contacting the Provider Plaintiffs about this, fourteen months later, on December 20, 2016, HHSC issued a final notice of termination. Despite this lengthy delay and supposed ongoing investigation, HHSC makes only vague allegations—all about PPGC—that seem to relate almost entirely to one of the same YouTube videos HHSC cited last October, which was taken at PPGC.

6.     Plaintiffs seek declaratory and injunctive relief to protect Patient Plaintiffs' and other class members' access to—and the Provider Plaintiffs' own ability to provide—these critical medical services. Defendants' actions violate Section 1396a(a)(23) of Title 42 of the United States Code ("Medicaid freedom of choice provision") because, by barring the Provider Plaintiffs from the Medicaid program, Defendants prevent Provider Plaintiffs' patients, including Patient Plaintiffs, from receiving services from their qualified, willing provider of choice. Defendants' actions further impermissibly single out Plaintiffs for unfavorable treatment without adequate justification, in violation of the Equal Protection Clause of the Fourteenth Amendment.

7.     Unless enjoined, the termination of Provider Plaintiffs' Medicaid provider agreements will take effect as early as January 21, 2017, immediately disqualifying Provider Plaintiffs from providing basic and preventive health care services to nearly 11,000 Texas women and men who depend on Provider Plaintiffs for that care. Defendants' actions will cause significant and irreparable harm to Provider Plaintiffs and to their Medicaid patients, including Patient Plaintiffs, who will lose their provider of choice, will find their family planning services interrupted, and in many cases will be left with reduced access to care.

## JURISDICTION AND VENUE

8.     Subject-matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

9.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

10.    Venue in this judicial district is proper under 28 U.S.C. § 1391.

## THE PARTIES

### A.    Plaintiffs

11.    Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. is a Texas not-for-profit corporation, headquartered in Dallas. PPGT and its predecessor organizations have provided high-quality care to Medicaid beneficiaries in Texas for decades. PPGT provides family planning and other preventive health services to Medicaid beneficiaries at seventeen health centers in Texas: in Addison, Arlington, Austin, Bedford, Cedar Hill, Dallas, Denton, Fort Worth, Plano, Lewisville, Mesquite, Paris, Tyler, and Waco. PPGT offers Medicaid patients a range of family planning and other health services at these centers, including physical exams, contraception (including long-acting reversible contraception or "LARC") and contraceptive counseling, clinical breast exams, screening and treatment for cervical cancer, testing for sexually transmitted infections ("STIs"), pregnancy testing and counseling, and certain procedures including biopsies and colposcopy. In 2015, PPGT provided over 8000 visits to over 4000 Medicaid beneficiaries, including over 3800 STI/HIV tests and screenings, over 2500 well-woman exams, and over 4400 visits for hormonal contraception, as well as over 1300 units of LARCs. PPGT brings this action on behalf of itself and its patients.

12.     Planned Parenthood San Antonio, Planned Parenthood Cameron County, and Planned Parenthood South Texas Surgical Center, not-for-profit corporations headquartered in San Antonio, are subsidiaries of Planned Parenthood South Texas, Inc. PPST and its predecessor organizations have provided high-quality care to Medicaid beneficiaries in Texas for decades. PPST provides family planning and other preventive health services to Medicaid beneficiaries at six health centers in Texas in Brownsville, Harlingen, and San Antonio. PPST offers Medicaid patients a range of family planning and other health services at these centers, including physical exams, contraception (including LARC) and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, screening for STIs, pregnancy testing and counseling, and certain procedures including biopsies and colposcopy. In 2015, PPST provided over 2600 visits to over 1700 Medicaid patients, including over 3500 STI tests (including nearly 600 HIV screenings), and over 3100 units of hormonal contraception, including the birth control shot. PPST brings this action on behalf of itself and its patients.

13.     Planned Parenthood Gulf Coast, Inc. is a Texas not-for-profit corporation, headquartered in Houston. PPGC and its predecessor organizations have provided high-quality care to Medicaid beneficiaries in Texas for decades. PPGC provides family planning and other preventive health services to Medicaid beneficiaries at seven health centers in the Houston Metropolitan area. PPGC offers Medicaid patients a range of family planning and other health services at these centers, including physical exams, contraception (including LARC) and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, screening for STIs, pregnancy testing and counseling, and certain procedures including biopsies and colposcopy. In calendar year 2015, PPGC provided over 7900 visits to over 5000 patients

enrolled in the Texas Medicaid program, including over 9000 STI tests (which include over 1900 HIV screenings), and over 4600 units of LARC and birth control shots.

14.     PPGC does not provide abortions. PPGC has a facilities and services agreement with a separate organization, Planned Parenthood Center for Choice, Inc. ("PPCFC"), which does. PPCFC rents space in a building owned by PPGC and operates the PPCFC Ambulatory Surgical Center.  PPGC and PPCFC share a president and CEO, but each organization has its own board of directors, bylaws, and staff. PPGC brings this action on behalf of itself and its Texas patients.

15.     Plaintiff Jane Doe #1, a Texas resident and Medicaid patient, obtains her reproductive health care at various PPST health centers and desires to continue to do so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

16.     Plaintiff Jane Doe #2, a Texas resident and Medicaid patient, obtains her reproductive health care at PPST's Marbach health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

17.     Plaintiff Jane Doe #4, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGC's Prevention Park health center and desires to continue to do so.  She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGC.

18.     Plaintiff Jane Doe #7, a Texas resident and Medicaid patient, obtains her reproductive health care at PPST's Marbach health center and desires to continue to do so.  She

sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

19.     Plaintiff Jane Doe #9, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGC's Greenspoint health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGC.

20.     Plaintiff Jane Doe #10, a Texas resident and Medicaid patient, obtains her reproductive health care at PPGT's North Austin health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPGT.

21.     Plaintiff Jane Doe #11, a Texas resident and Medicaid patient, obtains her reproductive health care at PPST's Marbach health center and desires to continue to do so. She sues on behalf of herself and as a representative of a class of Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at PPST.

22.     Patient Plaintiffs appear pseudonymously because of the private and personal nature of the medical care that they receive at Provider Plaintiffs, and their desire not to have that information become public in order for them to assert their legal rights.

**B.     Defendants**

23.     Charles Smith is Executive Commissioner of HHSC, and in that role, governs HHSC, which is the state agency that administers Texas's Medicaid program and has notified the Provider Plaintiffs that it is terminating their provider agreements. Defendant Smith is sued in his official capacity, as are his employees, agents, and successors in office.

24.     Stuart W. Bowen, Jr. is Inspector General of HHSC, whose office—the Office of Inspector General—is a division within HHSC. Defendant Bowen notified Provider Plaintiffs that his office is terminating their provider agreements on behalf of HHSC.  Defendant Bowen is sued in his official capacity, as are his employees, agents, and successors in office.

## THE MEDICAID PROGRAM

25.     The Medicaid program, established under Title XIX of the Social Security Act of 1935, 42 U.S.C. § 1396 *et seq.*, pays for medical care for eligible needy people. A state may elect whether or not to participate; if it chooses to do so, it must comply with the requirements imposed by the Medicaid statute and by the Secretary of the U.S. Department of Health and Human Services ("HHS") in her administration of Medicaid. *See generally* 42 U.S.C. § 1396a(a)(1)–(83).

26.     To receive federal funding, a participating state must develop a "plan for medical assistance" and submit it to the Secretary of HHS for approval. 42 U.S.C. § 1396a(a).

27.     Among other requirements, the State plan must provide that: "[A]ny individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A).

28.     Congress has singled out family planning services for special additional protections to ensure freedom of choice, specifically providing that, with respect to these services and with certain limited exceptions not applicable here, "enrollment of an individual eligible for medical assistance in a primary care case-management system . . . , a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services . . . ." 42 U.S.C. § 1396a(a)(23)(B).

29.     The federal government reimburses the state of Texas 90% of expenditures attributable to offering, arranging, and furnishing family planning services and supplies in Medicaid. 42 U.S.C. § 1396b(a)(5).

30.     Texas has some of the most stringent Medicaid requirements in the country: in addition to having a low income, an individual must also meet a special characteristic, such as having dependent children or a disability, to be eligible for Medicaid. For example, a woman with dependent children qualifies for Medicaid only if she has an income up to 15% of the federal poverty level, which amounts to an annual household income of $3756 for a family of three.

31.     For decades, the Centers for Medicare & Medicaid Services ("CMS"), the agency within HHS that administers Medicaid (and its predecessor organization), has repeatedly interpreted the "qualified" language in Section 1396a(a)(23) to prohibit states from denying access to a provider for reasons unrelated to the ability of that provider to perform Medicaid-covered services or to properly bill for those services, including reasons such as the scope of the medical services that the provider chooses to offer.

32.     CMS has explained that "[t]he purpose of the free choice provision is to allow [Medicaid] recipients the same opportunities to choose among available providers of covered health care and services as are normally offered to the general population." Ctrs. for Medicare & Medicaid Servs., CMS Manuals Publication #45, State Medicaid Manual § 2100.

## HHSC'S ATTEMPTS TO TERMINATE PROVIDER PLAINTIFFS FROM MEDICAID

### A.     First Notice of Termination

33.     On April 9, 2015, two anti-abortion extremists from a radical anti-abortion organization known as the Center for Medical Progress ("CMP"), masquerading as

representatives from a sham tissue biotechnology company, set up a meeting at PPGC's headquarters in Houston. Unbeknownst to PPGC staff, these individuals secretly recorded the meeting, at which they repeatedly baited PPGC staff in an attempt to gain statements that could be distorted to suggest wrongdoing.

34.     Then, starting in July 2015, CMP began publicly releasing a series of heavily edited and misleading videos of secretly recorded conversations with Planned Parenthood staff and other individuals. These videos were edited and spliced to try to create an impression of wrongdoing on the part of Planned Parenthood staff and others. On August 4, 2015, CMP released such a video featuring PPGC's Director of Research.

35.     Although CMP spent many hours baiting PPGC staff, distorting their words, and heavily editing the raw footage in an effort to create an appearance of wrongdoing, these videos do not show any violations of the law or other applicable standards.

36.     On October 19, 2015, without prior warning, HHSC sent a letter titled "Notice of Termination" to each Provider Plaintiff terminating its Medicaid provider numbers, to be effective fifteen days after the receipt of a final notice of termination. Each stated: "The State has determined that you . . . are no longer capable of performing medical services in a professionally competent, safe, and legal manner," and that "[i]f you fail to respond to this Notice of Termination within 30 calendar days of receipt, then we will issue a Final Notice of Termination." While sent to all of the Provider Plaintiffs, those Notices rely largely on videos that, while unidentified, appear to be the CMP videos, and focus entirely on (false) allegations against Plaintiff PPGC and Planned Parenthood Federation of America ("PPFA"). The Notices also relied on a prior settlement of qui tam litigation, again, by only PPGC, even though the

settlement contained no admission of liability and also contained an agreement by Texas that it would *not* seek to use the litigation as a basis to exclude PPGC from Medicaid.

37.     Perhaps aware of its failure to identify any legitimate basis for the terminations, after Plaintiffs filed suit seeking a TRO and/or preliminary injunction from this Court, HHSC backtracked, taking the position that it did not yet know if it would terminate the Provider Plaintiffs. But it did not rescind the pending termination letters, instead promising ongoing investigations.

**B.     The Intervening Year**

**(1)     Texas State Investigations**

38.     The day after the CMP video concerning PPGC came out, Lieutenant Governor Dan Patrick directed the Harris County District Attorney to initiate a criminal investigation. The District Attorney conducted a thorough joint investigation, together with the Texas Rangers and the Houston Police Department, and PPGC cooperated in full, making its staff, facilities, and documents available as requested.

39.     At the conclusion of the joint investigation, on January 25, 2016, the District Attorney announced: "For more than two months, the 232nd Grand Jury extensively reviewed the joint investigation into allegations of misconduct by PPGC . . . [and] cleared PPGC of breaking the law." Instead, the grand jury indicted two of the anti-abortion extremists who created the videos.

40.     Immediately after the release of the first CMP video, which did not contain any information or allegations regarding PPGC or PPCFC, officials from the Texas Attorney General's office and the Department of State Health Services ("DSHS") visited PPCFC's

Ambulatory Surgical Center and demanded information regarding, among other things, fetal tissue donation and disposal. PPCFC staff fully cooperated with these requests.

41.     Soon after their visit to PPCFC's Ambulatory Surgical Center, on July 22, 2015, DSHS officials requested from each Provider Plaintiff detailed information regarding fetal tissue that had been donated over the past seven years. Provider Plaintiffs quickly provided all requested information to DSHS.

42.     Then in late July 2015, the Attorney General's office sent requests to examine demanding a large number of documents from Provider Plaintiffs, and referenced potential violations of Texas law related to fetal tissue as the reason for the requests. Provider Plaintiffs produced hundreds of pages of documents to the Attorney General in response to these requests.

43.     Further, three days after it issued the initial Notices of Termination, HHSC dispatched investigators to the Texas Planned Parenthood Providers' health centers across the state to deliver subpoenas for a wide range of documents and other records. Provider Plaintiffs complied fully, submitting thousands of pages of documents.

### (2)     Congressional Investigations

44.     After the CMP videos were released in July 2015, four separate Congressional Committees initiated investigations into PPFA and Planned Parenthood affiliates in connection with the videos. PPFA and Planned Parenthood affiliates, including PPGC, fully cooperated with the Congressional investigations, producing over 25,000 pages of documents and making Planned Parenthood staff from across the country available for interviews. The exhaustive investigations by all four Committees found no wrongdoing by PPGC or any Texas Planned Parenthood affiliate. While one Congressional Committee referred four Planned Parenthood affiliates for further investigation, there was no such similar referral for PPGC.

45.     Then, in October 2015, the House of Representatives formed and tasked another, fifth, Committee with investigating PPFA and Planned Parenthood affiliates: the Select Investigative Panel ("Select Panel"). On December 1, 2016, the Chairwoman of the Select Panel, Representative Marsha Blackburn, who strongly opposes abortion and has consistently voted for abortion restrictions, wrote a letter asking the Texas Attorney General to further investigate PPGC. After more than a year of investigation, Chairwoman Blackburn could point to no actual evidence of wrongdoing by PPGC, but instead could only request the Texas Attorney General investigate claims that had already been investigated by the Harris County District Attorney. Instead, Representative Blackburn's letter appears to suggest that the Attorney General should investigate whether PPGC violated a Texas statute forbidding transferring a human organ for valuable consideration (a charge already rejected by the Harris County District Attorney investigation).

46.     As the Democrat minority members of the Select Panel made clear in their December 2016 report, the Select Panel majority has used the committee "as a political weapon to punish women, their doctors, and researchers," "adopt[ed] McCarthy-era tactics to demand names and bully witnesses," "conducted an end-to-end attack on fetal tissue donation and women's health care," and "abused congressional authority and made repeated inflammatory claims of criminal misconduct in continued reliance on the discredited []CMP videos and without any actual evidence of wrongdoing." After considering the exhaustive documentary and testimonial evidence supplied by Planned Parenthood entities and others involved in the research process, the minority members found that "the key concern for [Planned Parenthood] providers is always patient safety, and they do not alter the timing or method of abortions . . . to enhance fetal

tissue donation," and that "Planned Parenthood affiliates do not profit and actually lose money when they facilitate fetal tissue donation, as do other clinics."

### C.    The Final Notice of Termination

#### (1)    PPGC Allegations

47.    On December 20, 2016, HHSC sent a Final Notice of Termination ("Final Notice") to each Provider Plaintiff purporting to complete the process that was begun 14 months ago. None of these supposed bases undermines PPGC's competence to provide care in the Medicaid program—much less the competence of PPGT and PPST—and none is sustainable.

48.    The Final Notice appears to abandon three of the four bases of termination listed in the first Notice.

49.    The Final Notice states that PPGC "follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion." It also provides several additional, unclear examples of what HHSC claims are violations of accepted standards of medical practice, including that PPGC has "a history of deviating from accepted standards to procure samples that meet researcher's needs," "a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research," and a "willingness to charge more than the costs incurred for procuring fetal tissue." It states these claims are supported by what the Final Notice claims is an unedited version of the CMP video taken at PPGC.

50.    These allegations are without basis in fact. Neither PPGC nor its related entity PPCFC (which, unlike PPGC, provides abortions) has any such policy. PPGC does not provide abortions, and does not participate in any fetal tissue donation. PPCFC is not currently involved in any way with fetal tissue donation and has not been for several years,

and its policies expressly forbid alteration of the timing or method of the abortion for the purpose of obtaining fetal tissue; nor have its physicians ever engaged in such alteration. And similarly, PPCFC has never accepted "valuable consideration" for fetal tissue donation or been reimbursed more than its actual costs, as is legally and ethically permitted.

51.     The Final Notice also alleges that HHSC has unspecified "evidence that you engaged in misrepresentations about your activity related to fetal tissue procurements." HHSC offers no explanation of what this "evidence" is, beyond that it was provided by the Select Panel. The Final Notice does not identify what misrepresentations it claims PPGC has made.

52.     On information and belief, Defendants' bases for terminating PPGC's provider agreements are highly irregular and have not been applied to any other Medicaid provider.

53.     Absent an injunction from the Court, Defendants will terminate PPGC's provider agreements on or about January 21, 2017.

### (2)   PPGT and PPST Allegations

54.     While the Final Notice does not distinguish among the Planned Parenthood Providers in its accusations, its accusations all relate to a CMP video taken at one of PPGC's health centers, and thus appear to focus entirely on allegations against PPGC.

55.     The allegations in the Final Notice do not pertain to PPGT or PPST.

56.     PPGT does not engage—and has not engaged—in fetal tissue donation. No PPGT staff member appears in the video that is the basis for the first allegation.

57.     PPST does not engage—and has not engaged—in fetal tissue donation. No PPST staff member appears in the video that is the basis for the first allegation.

58.    The Final Notice does not appear to suggest that PPGT or PPST has made any misrepresentations, given that the subject matter of claimed misrepresentations is fetal tissue procurement.

59.    The Final Notice claims PPGT and PPST may be terminated because it is allegedly affiliated with PPGC, based on several "indicia of affiliation" it claims are established by the CMP video and other unidentified "evidence."

60.    PPGT and PPST are wholly separate corporations from each other and from PPGC. There is no overlap whatsoever between PPGT, PPST, and PPGC in ownership, control, operations, personnel or finances.

61.    The only legal relationship between PPGT, PPST, and PPGC is that each are members of PPFA, a membership organization that promulgates medical and other standards to which members (known as "affiliates") must adhere to operate under the name "Planned Parenthood" and otherwise use the Planned Parenthood mark. PPGT, PPST, and other members enter into affiliation agreements with PPFA, but members do not have affiliation agreements amongst themselves.

62.    PPGT is not an affiliate, subsidiary, parent, employee, contractor, vendor, or agent of PPGC. Nor is PPGC an affiliate, subsidiary, parent, employee, contractor, vendor, or agent of PPGT.

63.    PPST is not an affiliate, subsidiary, parent, employee, contractor, vendor, or agent of PPGC. Nor is PPGC an affiliate, subsidiary, parent, employee, contractor, vendor, or agent of PPST.

64.    There are fifty-six Planned Parenthood affiliates across the country, each with its own board, CEO, and management structure, and each with control of its own finances and

operations.

65.     Absent an injunction from the Court, Defendants will terminate PPGT's and PPST's provider agreements on or about January 21, 2017.

### THE IMPACT OF DEFENDANTS' ACTIONS ON PROVIDER PLAINTIFFS AND THEIR PATIENTS

66.     The need for publicly supported family planning services is great in Texas, which regularly ranks among the worst states for reproductive health care. In 2010, 54% of pregnancies in Texas were unintended. The state has the fifth highest teen pregnancy rate among the 50 states. Approximately 74% of Texas's unplanned births are publicly funded, which is higher than the national average of 68%. Texas also has high and rising STIs rates. Chlamydia and gonorrhea rates in Texas are well above the national average. Moreover, the number of reported gonorrhea, chlamydia, and syphilis cases has increased consistently since 2010.

67.     In 2014, an estimated 3,264,120 Texas women needed contraceptive services and supplies. Of these, 1,795,160 women (54.9%) needed publicly supported services.

68.     Only the most needy individuals in Texas are eligible to receive Medicaid coverage. In addition to having a low-income, an individual must also meet a special characteristic, such as being pregnant or having a disability, to be eligible for Medicaid. These patients are extremely vulnerable to begin with, even without this additional hardship.

69.     Other Medicaid providers are already stretched thin, with some not taking any non-pregnant Medicaid patients and others having long wait-times. If Provider Plaintiffs are forced to stop providing care in the Medicaid program, this situation will worsen.

70.     Many of Provider Plaintiffs' health centers are situated in areas that have *already* been designated as medically underserved areas or serve specific populations that are medically underserved; some areas also suffer from a shortage of primary care providers. Patients in these

areas may have a particularly difficult time finding prompt or adequate alternative family planning care.

71.     In recent years, the provider network available to Texas Medicaid patients has declined, to just over 30% of practicing physicians as of 2012.

72.     Even if other providers were available, patients insured through Medicaid choose Provider Plaintiffs based on a number of factors that are generally not available at other providers. With its evidence-based practices and up-to-date technology, Provider Plaintiffs are known as providers of high-quality medical care. Many individuals who receive other health care through community care providers or other Medicaid providers choose to have a separate provider such as Provider Plaintiffs for their reproductive health care because they are concerned about their privacy and because they fear being judged by other providers.

73.     In addition, many low-income patients have unique scheduling constraints because they are juggling inflexible work schedules, childcare obligations, transportation challenges, and lack of childcare resources. To ensure that these patients have access to family planning services, Provider Plaintiffs offer extended hours. In addition, Provider Plaintiffs space patient appointments so as to minimize wait times. They also offer same-day birth control shots, birth control implants, and intrauterine devices, so that patients only need to make one trip to a health center to obtain their contraceptive method of choice. Provider Plaintiffs have either a full-time Spanish speaker on staff or translator services available to non-English speaking patients at all times.

74.     Defendants' actions will deprive all of Provider Plaintiffs' Medicaid patients, including Patient Plaintiffs, of access to the high-quality, specialized care that Provider Plaintiffs provide.

75.     All Patient Plaintiffs rely on Provider Plaintiffs as the providers they can turn to for critical medical care and for prompt, efficient, and compassionate services. If Provider Plaintiffs are eliminated from Medicaid, Patient Plaintiffs, and other class members, will be prevented from receiving services from their provider of choice, will have their health care interrupted, and may encounter difficulties finding alternative care.

76.     In 2015, PPGT's reimbursements for providing these critical health services to low-income patients totaled nearly 5% of its overall revenue.

77.     In 2015, PPST's reimbursements for providing these critical health services to low-income patients totaled 6% of its overall revenue.

78.     In 2015, PPGC's reimbursements for providing these critical health services to low-income patients totaled over 29% of its Texas revenue.

79.     Without this revenue, Provider Plaintiffs may be unable to continue to provide services in the same manner and may be forced to lay off staff members, reduce hours, or close a health center. If a health center closes, this will affect not only the Medicaid patients at that health center, but all of the patients who seek reproductive health care at that health center.

## CLASS ALLEGATIONS

80.     This lawsuit is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(1)(B) and (b)(2).

81.     The class consists of all Texas Medicaid beneficiaries who obtain, or who seek to obtain, covered health care services at Provider Plaintiffs.

82.     Although the precise size of the class is unknowable, as alleged in Paragraphs 11, 12, and 13 above, Provider Plaintiffs provided covered health care services to nearly 11,000 Medicaid patients in 2015.  Therefore, the approximate size of the class is 11,000 individuals.

83.     Patient Plaintiffs are adequate class representatives because they, like other members of the class, are Texas residents and Medicaid patients who obtain their reproductive health care at Provider Plaintiffs' health centers and desire to continue to do so. Unless Defendants are enjoined, class representatives and class members will suffer the same injury and resulting harm: they will be unable to obtain health care services at the provider of their choice. As a result, many of Provider Plaintiffs' Medicaid patients, including Patient Plaintiffs and other class members, who already have few or no alternative options, will find it difficult or impossible to access the reproductive and other health care services they need.

84.     Defendants' actions—terminating Provider Plaintiffs from the Medicaid program—apply generally to the class, such that both declaratory and injunctive relief is appropriate for all members of the class.

85.     Class members raise the same questions of law, including whether Defendants' termination of Provider Plaintiffs' Medicaid provider agreements violates the Medicaid freedom-of-choice provision, 42 U.S.C. § 1396a(a)(23), and the Fourteenth Amendment, such that, as a practical matter, adjudication of their claims would be dispositive of the interests of the other class members.

## CLAIMS FOR RELIEF

## CLAIM I—MEDICAID ACT (TITLE XIX OF SOCIAL SECURITY ACT)

86.     Plaintiffs hereby incorporate Paragraphs 1 through 85 above.

87.     Defendants' actions violate Section 1396a(a)(23) of Title 42 of the United States Code by denying Provider Plaintiffs' patients, including the Patient Plaintiffs, the right to choose any willing, qualified health care provider in the Medicaid program.

## CLAIM II—FOURTEENTH AMENDMENT EQUAL PROTECTION

88.     Plaintiffs hereby incorporate Paragraphs 1 through 84 above.

89.     Defendants' actions violate Plaintiffs' rights by singling them out for unfavorable treatment without adequate justification.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

90.     Order that this action be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1)(B) and/or 23(b)(2);

91.     Issue a declaratory judgment that Defendants' actions violate the Medicaid Act;

92.     Issue a declaratory judgment that Defendants' actions violate the Fourteenth Amendment;

93.     Issue temporary, preliminary, and permanent injunctive relief, without bond, enjoining Defendants and their agents, employees, appointees, delegates, or successors from terminating, or threatening to terminate, Provider Plaintiffs' Medicaid provider agreements;

94.     Grant Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and,

95.     Grant such further relief as this Court deems just and proper.

Respectfully submitted the 6th day of January, 2017.

> HUSCH BLACKWELL, L.L.P
> BY: /s/ Thomas H. Watkins
> THOMAS H. WATKINS
> Texas Bar No. 20928000
> Email: Tom.Watkins@huschblackwell.com
> 111 Congress Avenue, Suite 1400
> Austin, Texas 78701
> (512) 472-5456
> (512) 479-1101 (facsimile)

JENNIFER SANDMAN*
MAITHREYI RATAKONDA*
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Jennifer.Sandman@ppfa.org
Email: Mai.Ratakonda@ppfa.org
123 William Street, 9th Floor
New York, NY 10038
(212) 261-4584 (Jennifer Sandman)
(212) 261-4405 (Maithreyi Ratakonda)
(212) 247-6811 (facsimile)

ALICE CLAPMAN*
RICHARD MUNIZ*
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Alice.Clapman@ppfa.org
Email: Richard.Muniz@ppfa.org
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4862 (Alice Clapman)
(202) 973-4997 (Richard Muniz)
(202) 296-3480 (facsimile)

ATTORNEYS FOR PLAINTIFFS

* Admitted *pro hac vice*