IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC., et al.<br>              Plaintiffs,<br>     v.<br>CHARLES SMITH, Executive Commissioner, Texas Health and Human Services Commission; et al.,<br>              Defendants. | No. 1:15-cv-01058 |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs hereby oppose Defendants' Motion to Dismiss. Contrary to Defendants' assertions, Plaintiffs have adequately stated an Equal Protection claim, and have a right of action enforceable through 42 U.S.C. § 1983.

## BACKGROUND

As this Court is aware, this case challenges the Texas Health and Human Services Commission's ("HHSC") politically-driven campaign to prevent thousands of Medicaid beneficiaries from obtaining critical family planning and preventative health care from Planned Parenthood of Greater Texas Family Planning and Preventative Health Services ("PPGT"); Planned Parenthood San Antonio, Planned Parenthood Cameron County, and Planned Parenthood South Texas Surgical Center (collectively, "PPST"); and Planned Parenthood Gulf Coast, Inc. ("PPGC") (collectively, "Planned Parenthood Providers" or "Provider Plaintiffs"). Through Medicaid, the Provider Plaintiffs provide critically needed family planning and other preventive health services, 90% federally funded, to nearly 11,000 low-income Texas residents each year, including the individual Doe Plaintiffs.

**Statement of Facts and Procedural History**

As is set forth in greater detail in Plaintiffs' Application and Memorandum of Law In Support Therefore for Temporary Restraining Order and Preliminary Injunction, ECF No. 58 (Jan. 4, 2017) ("PI Memo") and Proposed Findings of Fact and Conclusions of Law, ECF No. 93 (Jan. 30, 2017) ("Proposed Findings"), in August 2015, Governor Abbot publicized his "LIFE Initiative," which pledges that "[f]unding for Planned Parenthood" and other abortion providers will be "COMPLETELY ELIMINATED." LIFE Initiative, Abbott – Governor, https://www.gregabbott.com/life-initiative/ (last visited Feb. 13, 2017) (emphasis in original).[1] PI Memo at 9–10. In October 2015, Defendant HHSC made good on that promise, issuing termination letters to the Provider Plaintiffs (who are the only Planned Parenthood providers in Texas), relying primarily on deceptively edited and misleading YouTube videos made by a radical anti-abortion group with ties to violent extremists; videos that have been widely debunked and that are wholly irrelevant to PPST and PPGT. HHSC also relied on (among other facially inadequate bases for termination) a prior settlement of qui tam litigation, again, by only one of the providers (PPGC)–even though the settlement contained no admission of liability and also contained an agreement by Texas that it would not seek to use the litigation as a basis to

---

[1] *See also* Press Release, Governor Abbott Announces LIFE Initiative In Response To Planned Parenthood Videos (Aug. 28, 2015), Office of the Governor Greg Abbott, http://gov.texas.gov/news/press-release/21355. Notably, this was only the most recent example of the State's determination to eliminate the Planned Parenthood Providers from participation in publicly-funded health programs; indeed, the State was so determined to prevent the Planned Parenthood Providers from participating in the Women's Health Program that it did so in violation of federal law, which meant the state has had to forgo over $30 million in federal family planning funds each year since 2013, creating instead the wholly state-funded Texas Women's Health Program. Instead of viewing the massive loss of federal WHP funds as a public health crisis, Governor Abbott celebrated the state's role in "ensuring that Planned Parenthood is closing down clinics across the state of Texas." *See* PI Memo at 6–7; Proposed Findings ¶¶ 32–35.

exclude PPGC from Medicaid. Am. Compl., ECF No. 63-1 ¶ 36; *see also* PI Memo at 8–9, 15 n.9; Proposed Findings ¶¶ 11–14.

Perhaps aware of its failure to identify any legitimate basis for the terminations, after Plaintiffs filed suit seeking a TRO and/or preliminary injunction from this Court, HHSC backtracked, taking the position that it did not yet know if it would terminate the Provider Plaintiffs. But it did not rescind the pending termination letters, instead promising ongoing investigations. *See, e.g.*, Governor Abbott Statement on Planned Parenthood Investigation, (Jan. 25, 2016) http://gov.texas.gov/news/press-release/21883 ("[HHSC]'s Inspector General and the Attorney General's office have an ongoing investigation into Planned Parenthood's actions . . . . The State of Texas will continue to protect life."); PI Memo at 9–10; *see also* Proposed Findings ¶16; Am. Compl. ¶ 37. Despite investigations by numerous entities, in addition to the investigations that had already been conducted in the wake of the videos, *see* Am. Compl. ¶¶ 38–46; *see also* PI Memo at 11–14; Proposed Findings ¶¶ 36–55, when HHSC issued a final notice of termination 14 months later, on December 20, 2016, it made only vague allegations–again only about PPGC–that seem to relate almost entirely to a different version of the video HHSC cited last October. Am. Compl. ¶¶ 47–51; *see also* PI Memo at 14–16; Proposed Findings ¶¶ 17, 57–63.

Plaintiffs brought this action pursuant to § 1983 to enforce their Medicaid Act and Equal Protection rights, which Defendants have violated by taking steps to terminate these qualified providers from Medicaid. As this Court is aware, after conducting a three-day evidentiary hearing, it issued a temporary restraining order preventing the pending terminations from taking effect, *see* Order, ECF No. 84 (Jan. 19, 2017), and has indicated its intention to rule on Plaintiffs' pending motion for a preliminary injunction predicated on their Free Choice of Provider claim

3

prior to the expiration of that TRO. In the interim, Plaintiffs hereby respond to Defendants' motion to dismiss, which focuses on their separate Equal Protection claim (which is not at issue in the preliminary injunction motion), as well as on the Provider Plaintiffs' standing to bring the Free Choice of Provider claim.[2]

## ARGUMENT

### I. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When standing is challenged on a motion to dismiss under Rule 12(b)(1), a court must "'accept as true all material allegations of the complaint'" and "'construe the complaint in favor of the complaining party.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010) (*quoting Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)). The Court may also consider materials extrinsic to the pleadings. *See* Fed. R. Civ. P. 12(d); *see also* 5C Charles Alan Wright, et al., Fed. Prac. & Proc., § 1364 (3d ed. & Supp. Apr. 2016). (noting that "[a] wide range of material may be introduced in conjunction with a Rule 12(b) motion, subject, of course, to the district court's discretion").

---

[2] Defendants claim they "do[] not concede," Defs.' Br. at 9, that the Doe Plaintiffs have a private right of action to bring their Free Choice claim, but they acknowledge–as they must–that this issue was already decided in Plaintiffs' favor by the unanimous panel in *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 837 F.3d 477 (5th Cir. 2016).

## II. Plaintiffs Have Stated a Valid Equal Protection Claim

As is clear from the history set forth above, Plaintiffs have more than sufficiently pleaded that Defendants singled out the Provider Plaintiffs from all other Medicaid providers in the state and taken action against them and their patients alone, based solely on their shared characteristics of associating with Planned Parenthood Federation of America and with other Planned Parenthood organizations that provide abortion and/or advocate for reproductive rights, and on PPGC's lawful facilitation of some patients' desire to donate fetal tissue and PPST and PPGT's association with PPGC. Defendant's actions violate equal protection because animus is not a justifiable reason for prohibiting longstanding and qualified Medicaid providers from providing non-abortion family planning services to enrolled beneficiaries.

As the Supreme Court has explained, the bare desire to harm a politically unpopular group "cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–447 (1985) (same); *cf. Romer v. Evans*, 517 U.S. 620, 632 (1996) (the "sheer breadth" of the challenged law "is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class that it affects"). Other courts that have reviewed similar state actions targeting Planned Parenthood providers–with less evidence of animus–have recognized that such actions violate the providers' right to equal protection. *See Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 327 (M.D.N.C. 2012) (finding equal protection violation because the "State's interest in favoring childbirth over abortions" cannot provide a rational basis for barring Planned Parenthood affiliate "from receiving funding for *non-abortion-related* services for which [it] would otherwise be eligible"); *Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 737–38 (M.D. Tenn. 2012)

5

(finding likelihood of success on equal protection claim when "the Defendant acted with political motivation to defund Planned Parenthood from a federal grant program funded by the federal government"); *Planned Parenthood of Kan., Inc. v. City of Wichita*, 729 F. Supp. 1282, 1291 (D. Kan. 1990) (law banning contract with Planned Parenthood provider violates equal protection where it was "deprived of the benefit of continued access to Title X funding simply because of the reputation and unpopularity of Planned Parenthood").

At this threshold stage, the only question before this Court is whether Plaintiffs have validly stated an equal protection claim. Defendants urge outright dismissal, asserting that Plaintiffs' equal protection claim is a "class-of-one" claim and that this Court should extend existing precedent to find that such claims cannot be brought to challenge Medicaid contract decisions. Defs.' Mot. to Dismiss, ECF No. 95 (Jan. 31, 2017) ("Defs.' Br.") at 4–5. At the outset this argument is meritless because the Provider Plaintiffs are not "one." They are separate organizations, *see* Am. Compl. ¶¶ 54–64; *see also* PI Memo at 4–5; Proposed Findings ¶¶ 153–168, 229–243, who make up a class of entities being singled out by Defendants based on (1) their shared characteristics of associating with other Planned Parenthood organizations that provide abortion and/or advocate for reproductive rights, and (2) PPGC's lawful facilitation of some patients' desire to donate fetal tissue and PPST and PPGT's association with PPGC. And, of course, the Doe Plaintiffs–who Defendants have also singled out for different treatment–are not a class of one. In other words, this is a traditional equal protection claim not subject to any arguable limits related to "class-of-one" theories of discrimination.[3] Indeed, Defendants' attempt to treat these separate Provider Plaintiffs as one "Planned Parenthood" entity only

---

[3] Because the classification at issue bears on fundamental rights, Plaintiffs' equal protection claim is not subject to rational basis review as Defendants claim, *see* Defs.' Br. at 6, but rather to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Under either standard, however, Plaintiffs have validly stated an equal protection claim.

6

underscores that they are treating them differently than any other Medicaid providers, as they can point to no instance in which they have ever terminated a provider based solely on supposed bad acts by another, independent provider, in the absence of a showing of ownership and control. *See* PI Memo at 29–32; Proposed Findings ¶¶ 236–237, 241.

Independently, even if this were a "class-of-one" claim, it should be allowed to proceed. The Supreme Court first recognized the validity of class-of-one claims in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), which held that despite not alleging discrimination based on membership in an identifiable class, plaintiff property owner stated an equal protection claim where a village had conditioned connection to the municipal water supply on grant of a longer easement than it had required for other property owners. More recently, in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 598 (2008), the Court clarified that such claims do not apply in the employment context because "unique considerations [are] applicable when the government acts as employer as opposed to sovereign." In so doing the Court did not overrule *Olech*, but explained that courts could not second-guess employment decisions because they are "forms of state action. . .which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments. . .[in which] treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. In such cases, the Court held:

> the rule that people should be treated alike, under like circumstances and conditions is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* (internal quotation marks and citation omitted).

7

In extending *Engquist* to certain independent contractor relationships–and specifically, to a tow company's equal protection challenge to a city's decision not to select it for discretionary inclusion on a list of tow companies the city would work with–the Fifth Circuit has recognized that whether a class-of-one claims remain viable post-*Engquist* turns on the degree of discretion afforded the state actor: "[t]hat conclusion [that a class-of-one equal protection claim is unavailable] logically applies as well to a local government's discretionary decision to include or not include a company on a non-consent tow list, where allowing equal protection claims on such grounds would be incompatible with the discretion inherent in the challenged action." *Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581 (5th Cir. 2016) (internal citation and quotation marks omitted). The Fifth Circuit further reasoned that "[s]uch a potential [class-of-one] theory of recovery is available where there is a 'clear standard against which departures, even for a single plaintiff, could be readily assessed,'" *id.* at 587 (*quoting Engquist*, 553 U.S. at 602); in contrast, determination of what towing companies to use properly includes "factors that are not reasonably measurable, such as reputation, personal experience, and the particularities of how the city wishes to operate its non-consent tow program." *Id.*[4]

---

[4] Other circuits to consider extending *Engquist* beyond the employment context have similarly emphasized the degree of discretion involved in the state decision-making at issue. *See, e.g.*, *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142–43 (2d Cir. 2010) (*Engquist* did not foreclose class-of-one claim by laboratory claiming arbitrary application of permitting standards, because the Department of Health "does not possess unfettered discretion in deciding whether revoke, suspend, or otherwise limit an existing license"); *Hanes v. Zurick*, 578 F.3d 491, 495 (7th Cir. 2009) (declining to extend *Engquist* to policing decision because "[a]lthough the police enjoy broad freedom of action, their discretion is much narrower than the discretion given public employers") (internal citation omitted); *Caesars Mass. Mgmt. Co. v. Crosby*, 778 F.3d 327, 336 (1st Cir. 2015) (extending *Engquist* to casino licensing decisions "given the remarkable breadth of discretion provided by the [state] casino licensing statute"); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (extending *Engquist* to highway paving contracting because "in the absence of a restricting contract or statute, decisions involving government contractors require broad discretion").

The analysis of *Engquist* and *Integrity Collision* is plainly inapposite in the Medicaid context. Whereas in the employment context it may be "accepted" that like individuals will sometimes be treated differently "based on a vast array of subjective, individualized assessments," *Engquist*, 553 U.S. at 603, the Medicaid Act expressly *prohibits* a state from terminating a provider based on a discretionary preference for a different provider–and instead guarantees to Medicaid beneficiaries the right to receive care from any willing provider who is "qualified to provide the service or services required" and "who undertakes to provide...such services." *Planned Parenthood Gulf Coast Inc., et al. v. Gee*, 837 F.3d 477, 489 (5th Cir. 2016); *see also Id.* at 500 ("the free-choice-of provider provision unambiguously requires that states participating in the Medicaid program allow covered patients to choose among the family planning medical practitioners they could use were they paying out of their own pockets.") (citing *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 971 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014)).[5]

While Plaintiffs maintain that *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016), on which Defendants rely, was wrongly decided on this issue, the Tenth Circuit's preliminary injunction ruling is nonetheless not to the contrary. Indeed, as with *Integrity Collision*, its analysis of why *Engquist* may be extended to some independent contractor contexts is expressly predicated on the discretion that is normally accorded the state in selecting such contractors–and recognized that such discretion can be removed by statutory restriction. *Id.* at 1256 (noting "*absent contractual, statutory, or constitutional restriction*, the government is entitled to terminate [employees and contractors] for no reason at all") (alterations in original) (emphasis added) (quoting *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996));

---

[5] The Free Choice of Provider requirement is discussed in greater detail in Plaintiffs' PI Memo at 22–24 and Proposed Findings at ¶¶ 201–212.

9

*Id*. at 1257 ("Perhaps there is little to no discretion afforded the State of Utah regarding these contracts and their termination. But all that is contained in the record on appeal are the specific contracts at issue between PPAU and the State of Utah."). Here, of course, such discretion is expressly foreclosed by the statutes and rules that govern the Medicaid program, including the Free Choice of Provider requirement.[6]

Defendants next claim that Plaintiffs have failed to identify similarly situated providers that were treated differently, because they have failed to identify other entities "engaged in violations of medical and ethical standards" who were permitted to continue as Medicaid providers. Defs.' Br. at 7. This argument fundamentally misstates the nature of Plaintiffs' claim. The Provider Plaintiffs have not engaged in any violations of medical or ethical standards. To the contrary, Defendants seek to terminate PPGC from Medicaid based on a video that on its face shows no such misconduct, and seek to terminate PPST and PPGT from Medicaid based on their association with PPGC. Indeed, the Final Notice of Termination uses tortured language to avoid contending that PPGC has ever actually altered the timing or method of an abortion or obtained improper compensation for fetal tissue donation, instead accusing PPGC of "follow[ing] a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion." PX-1; Am. Compl. ¶ 49.[7] The video shows no such thing, *see* Proposed Findings at ¶¶ 70–129–but even if it did, Defendants have identified no instance in which it has ever terminated a Medicaid provider based on this type of "thought crime."

---

[6] In addition, there was no claim in *Herbert* that the Governor's actions violated the plaintiff's patients' equal protection rights.

[7] Indeed, at the preliminary injunction hearing, Defendant Bowen and other State witnesses conceded the video does not show that any Planned Parenthood doctor ever actually violated the prohibition on altering the timing, method, or procedures of an abortion in order to obtain usable tissue for research. Proposed Findings ¶ 70.

Nor can Defendants point to any instance in which they have ever terminated a Medicaid provider based on supposed bad conduct by a different, independent provider, absent a showing of ownership and control. *See* Am. Compl. ¶¶ 52, 89; PI Memo at 29–32; Proposed Findings at ¶¶ 236–237, 241–242. To the contrary, with the exception of the Provider Plaintiffs, it appears that Defendants have done as the Medicaid Act requires and permitted patients to receive services from any qualified Medicaid provider who stands ready to provide them.

Thus, at this preliminary, pre-discovery stage, Plaintiffs have more than met their burden of pleading that Defendants have singled them out as a class and treated them differently from similarly situated providers and patients, and Defendants' motion should be denied. *See Cansler*, 877 F. Supp. 2d at 326 (rejecting argument that equal protection claim fails because Planned Parenthood provider cannot identify any other abortion provider that currently receives Title X funds; the proper comparison group is "all other persons or entities that might be eligible for DHHS-administered grants or contracts); *City of Wichita*, 729 F. Supp. at 1290–91 (proper comparison group is other organizations whose family planning contracts were allowed to continue when Planned Parenthood provider's contract was not); *Betts v. McCaughtry*, 827 F. Supp. 1400, 1405 (W.D. Wis. 1993) ("To be 'similarly situated,' groups need not be identical in makeup, they need only share commonalities that merit similar treatment.").

### III. Plaintiffs Have A Private Right Of Action Under § 1983

Defendants next contend that the Provider Plaintiffs lack standing to assert their Free Choice of Provider claim, on the ground that "there is nothing to indicate that the providers themselves are the intended beneficiaries of the free-choice-of-provider provision." Defs.' Br. at 8. This Court need not reach that issue as there can be no question that the Doe Plaintiffs have standing to assert the Free Choice of Provider claim and it, therefore, cannot be dismissed. *See*

*Gee*, 837 F.3d at 489 ("We begin by joining every other circuit to have addressed the issue to conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983.").[8] Indeed, the cases are legion in which courts decline to consider the standing of one party when another clearly has standing. *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977) ("[A]ppellee Population Planning Associates, Inc. (PPA) has the requisite standing and therefore [we] have no occasion to decide the standing of the other appellees."); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."); *Gilbert v. Donahoe*, 751 F.3d 303, 312 (5th Cir. 2014) ("'[T]he critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'") (quoting *Horne v. Flores*, 557 U.S. 433, 445 (2009)); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 n.10 (3d Cir. 2000) ("We need not address this argument [that Planned Parenthood does not have standing] . . . because it is uncontested that the plaintiff physicians perform abortions and, therefore, at least they have standing to assert the claims."); *Planned Parenthood Ass'n of the Atlanta Area, Inc. v. Miller*, 934 F.2d 1462, 1465 n.2 (11th Cir. 1991) ("Since [the physician plaintiff] has standing, we need not consider the standing of the other parties." (citations omitted)).

However, should this Court feel the need to reach the Provider Plaintiffs' standing to assert their Free Choice of Provder claim, Defendants have misstated nature of their claim. Provider Plaintiffs are not seeking to vindicate their own rights, but rather the rights of their

---

[8] As noted in note 1, *supra*, Defendants do not concede that the Doe Plaintiffs have a private right of action to assert their Free Choice of Provider Claims, because an application for en banc review of the Fifth Circuit's unanimous panel decision in *Gee* remains pending. Defs.' Br. at 9–10. Plaintiffs will not address this issue, however, as the *Gee* decision is binding on this Court.

12

Medicaid patients, which the Provider Plaintiffs have standing to assert on their behalf. *See* Am. Compl. ¶ 87 ("Defendant's actions violate Section 1396a(a)(23) of Title 42 of the United States Code by denying Provider Plaintiffs' patients, including the Patient Plaintiffs, the right to choose any willing, qualified health care provider in the Medicaid program"); *see also id.* ¶¶ 11–14 (bringing action on behalf of patients).

The well-established test for third-party standing permits a litigant to bring an action on behalf of third parties when three criteria are satisfied: (1) the litigant has suffered an "injury in fact" that gives him a "sufficiently concrete interest" in the outcome of the action; (2) the litigant has "a close relation to the third party"; and (3) there is "some hindrance to the third-party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citing *Singleton v. Wulff*, 428 U.S. 106, 112–16 (1976) (plurality opinion)); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbot*, 748 F.3d 583, 589 (5th Cir. 2014) ("The rule for third-party standing requires the named plaintiff to have suffered an injury in fact and to share a 'close' relationship with third-parties who face an obstacle inhibiting them from bringing the claim on their own behalf.") (*citing Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

As countless courts have recognized of similar providers asserting the rights of patients seeking reproductive health services, *see infra*, the Provider Plaintiffs here also readily satisfy the third-party standing criteria. First, Defendants' termination of the Provider Plaintiffs from the Medicaid program directly injures the Provider Plaintiffs. As the Supreme Court held in *Singleton*, "there is no doubt" that the denial of Medicaid reimbursement for services inflicts a "concrete injury" on medical providers who would otherwise receive payment for these services. 428 U.S. at 112–13; *see also* Am. Compl. ¶¶ 76–79. In addition, turning away patients or forcing them to pay out-of-pocket for health care services they cannot afford fundamentally

13

conflicts with the core mission of the Provider Plaintiffs to enable patients to plan their families and protect their health and well-being. Proposed Findings ¶¶ 199, 248.

Second, the relationship between a medical provider and its patients is exactly the type of close relationship that permits third-party standing. In *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965), the Supreme Court recognized that the "confidential relation" between a medical provider and his patients permitted the provider to challenge restrictions on the use of contraception on behalf of his patients. *See also Abbott*, 748 F.3d at 589 (for purposes of third-party standing analysis "doctors who perform abortions share a sufficiently close relationship with their patients . . . ."); *Planned Parenthood of N. New Eng. v. Heed*, 390 F.3d 53, 56 n. 2 (1st Cir. 2004), *rev'd on other grounds sub nom Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916–18 (9th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005) ("[P]hysicians and clinics performing abortions are routinely recognized as having standing to bring broad facial challenges to abortion statutes.")). Similarly, in *Singleton*, the Supreme Court recognized that the "closeness of the relationship" between a physician and Medicaid patients seeking an abortion "is patent. . . A woman cannot safely secure an abortion without the aid of a physician." 428 U.S. at 117. The Provider Plaintiffs' close relationship with their Medicaid patients, who receive critical family planning and other preventative health care services from the Provider Plaintiffs that they cannot obtain without the help of a medical professional, plainly qualifies them as appropriate plaintiffs to assert the third-party rights of their patients.

Indeed, this has been recognized by courts in § 1983 actions brought by medical providers on behalf of their patients to challenge Medicaid Act violations. *See Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 477–78 (8th Cir. 2002) ("even

14

without individual standing, the provider plaintiffs in this case have standing to assert the rights of their [Medicaid] patients" in 1983 action (*citing Singleton*, 428 U.S. at 115–117)); *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 n.5 (10th Cir. 1988) (rejecting argument that nursing home operators do not have standing to challenge Medicaid provisions on behalf of Medicaid recipients, finding that Medicaid patients and health-care providers have parallel interests*); see also Betlach*, 727 F.3d at 965–68 (treating both Planned Parenthood affiliate as well as individual Medicaid recipients as plaintiffs in action to enforce the free choice of provider provision); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind.*, 699 F. 3d 962, 968 (7th Cir. 2012) (same).

Third, the Provider Plaintiffs' Medicaid patients are hindered in their ability to assert claims on their own behalf because of the highly sensitive and personal nature of reproductive health care decisions. The Supreme Court has recognized that decisions about contraception are "among the most intimate that a person can make." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015); *see also Carey*, 431 U.S. at 685 (1977) ("decisions whether to accomplish or prevent conception are among the most private and sensitive"). The Provider Plaintiffs provide contraceptive counseling, a range of contraceptive methods, as well as screening and treatment for sexually transmitted infections ("STIs") and pregnancy testing and counseling to their Medicaid patients. Am. Compl. ¶¶ 11–14. The desire to keep this sort of highly sensitive medical information private is precisely the type of obstacle that hinders a third-party's ability to enforce its own rights. *See Singleton*, 428 U.S. at 117 ("[an abortion patient] may be chilled from

such assertion [of her rights] by a desire to protect the very privacy of her decision from the publicity of a court suit.").[9]

Therefore, if this Court decides it needs to reach the issue of the Provider Plaintiffs' standing under the Free Choice of Provider claim, it should find they readily meet the three criteria for third-party standing and they should be allowed to assert the § 1983 claims of their Medicaid family planning patients.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted the 14th of February, 2017.

BY: */s/ Jennifer Sandman*
JENNIFER SANDMAN*
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Jennifer.Sandman@ppfa.org
123 William St, Fl. 9
New York, NY 10038
(212) 261-4584
(212) 247-6811 (facsimile)

THOMAS H. WATKINS
HUSCH BLACKWELL LLP
Texas Bar No. 20928000
Email: Tom.Watkins@huschblackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (facsimile)

---

[9] These obstacles need not be insurmountable. *See Singleton*, 428 U.S. at 117–18 (observing that a suit may be brought under a pseudonym, by a woman who is no longer pregnant, or a class could be assembled, but "if the assertion of the right is to be 'representative' to such an extent anyway, there seems little loss in terms of effective advocacy from allowing its assertion by a physician.").

MAITHREYI RATAKONDA*
ROGER EVANS*
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Mai.Ratakonda@ppfa.org
Email: Roger.Evans@ppfa.org
123 William St, Fl. 9
New York, NY 10038
 (212) 261-4405 (Maithreyi Ratakonda)
(212) 261-4708 (Roger Evans)
(212) 247-6811 (facsimile)

ALICE CLAPMAN *
RICHARD MUNIZ *
PLANNED PARENTHOOD FEDERATION OF AMERICA
Email: Alice.Clapman@ppfa.org
Email: Richard.Muniz@ppfa.org
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4862 (Alice Clapman)
(202) 973-4997 (Richard Muniz)
(202) 296-3480 (facsimile)

ATTORNEYS FOR PLAINTIFFS

* Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I certify that on this 14th day of February, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Adam Arthur Biggs
Amanda J. Cochran-McCall
Shelley Dahlberg
Office of the Attorney General
300 W. 15th Street Austin, TX 78701
Email: adam.biggs@oag.texas.gov
Email: amanda.cochran-mccall@texasattorneygeneral.gov

Andrew Bowman
Stephens Marc
Edward Rietvelt
Office of the Attorney General of Texas
PO Box 12548 Capital Station
Austin, TX 78711
(512) 463-2120 (Andrew Bowman Stephens)
(512) 463-2120 (Marc Edward Rietvelt)
Fax: (512)320-0667
Email: andrew.stephens@texasattorneygeneral.gov
Email: marc.rietvelt@texasattorneygeneral.gov

BY: */s/ Jennifer Sandman*
JENNIFER SANDMAN