

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC., PLANNED PARENTHOOD SAN ANTONIO, PLANNED PARENTHOOD CAMERON COUNTY, PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER, PLANNED PARENTHOOD GULF COAST, INC., and JANE DOES ##1, 2, 4, 7, 9–11 on Their Behalf and on Behalf of All Others Similarly Situated,**
                              **Plaintiffs,**

-vs-                                                    **Case No.  A-15-CA-1058-SS**

**CHARLES SMITH, Executive Commissioner, Texas Health and Human Services Commission, and STUART W. BOWEN, JR., Inspector General, Texas Health and Human Services Commission, Office of Inspector General,**
                              **Defendants.**

---

## <u>O R D E R</u>

BE IT REMEMBERED on the 17th, 18th, and 19th days of January 2017, the Court held a

hearing in the above-styled cause, and the parties appeared in person or through counsel. This case

concerns a § 1983 suit brought by five Texas Planned Parenthood health care providers (Provider

Plaintiffs) and seven known but anonymized Jane Does (Individual Plaintiffs) (collectively,

Plaintiffs). Plaintiffs sue Defendants Charles Smith and Stuart Bowen, Jr. in their official capacities

as Executive Commissioner and Inspector General of the Texas Health and Human Services

Commission (HHSC), challenging HHSC's decision to terminate its Medicaid provider agreements with Provider Plaintiffs.

Before the Court are Plaintiffs' Motion for a Preliminary Injunction [#58], HHSC's Response [#70] in opposition, Plaintiffs' Letter Brief [#91] in support, HHSC's Letter Brief [#92] in opposition, Plaintiffs' Proposed Findings of Fact and Conclusions of Law [#93] in support, and HHSC's Proposed Findings of Fact and Conclusions of Law [#94] in opposition.[1] Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

## Introduction

A secretly recorded video, fake names, a grand jury indictment, congressional investigations—these are the building blocks of a best-selling novel rather than a case concerning the interplay of federal and state authority through the Medicaid program. Yet, rather than a villain plotting to take over the world, the subject of this case is the State of Texas's efforts to expel a group of health care providers from a social health care program for families and individuals with limited resources.

Stalling for nearly a year after issuing an initial notice of termination, HHSC reinitiated its efforts to terminate Planned Parenthood health care providers from the Texas Medicaid program. Following extensive investigations, the Inspector General's reasons for termination constituted unsubstantiated and indeterminate allegations, including a "policy of agreeing to" and a

---

[1] There are also three other pending motions in this case. First, Plaintiffs filed a motion to certify class, but a ruling on this motion is postponed until it is fully briefed. *See* Mot. Certify Class [#9]. Because the motion does not specify whether it is opposed or unopposed and this case was stayed, the Court will allow HHSC seven days to respond to the motion to certify. Second, HHSC filed a motion to seal [#71], which the Court GRANTS. Third, HHSC filed a motion to dismiss, which only became ripe three days ago and the Court has yet to fully examine. *See* Mot. Dismiss [#95].

"willingness" to violate medical and ethical standards. Without any evidence indicating an actual program violation warranting termination, the Inspector General nevertheless acted to terminate one of the Provider Plaintiffs from the Texas Medicaid program and sought to terminate the other Provider Plaintiffs by extension. After reviewing the evidence currently in the record, the Court finds the Inspector General, and thus HHSC, likely acted to disenroll qualified health care providers from Medicaid without cause. Such action would deprive Medicaid patients of their statutory right to obtain health care from their chosen qualified provider. The deprivation of that right is an irreparable injury in and of itself but could also disrupt the care of the 12,500 Texas Medicaid patients receiving services from Planned Parenthood.

In sum, the Individual Plaintiffs have established entitlement to a preliminary injunction by proving a substantial likelihood of success on the merits, an irreparable injury, and both the balance of harms and public interest favor granting the injunction. The Court therefore grants Plaintiffs' motion for a preliminary injunction to preserve its ability to render a meaningful decision on the merits.

## Background

### I.      Parties

### A.      Provider Plaintiffs

The five Provider Plaintiffs in this suit are all nonprofit organizations domiciled in Texas providing services both through the Medicaid Program and to the general public.

Planned Parenthood Gulf Coast (PPGC), the Provider Plaintiff central to this case, is headquartered in Houston and operates seven health centers throughout the Houston area. Pls.' Hr'g Ex. 65 (Linton Decl.) ¶ 3. Another Provider Plaintiff, Planned Parenthood Greater Texas, Inc.

(PPGT), is headquartered in Dallas and operates seventeen health centers in Addison, Arlington, Austin, Bedford, Cedar Hill, Dallas, Denton, Fort Worth, Plano, Lewisville, Mesquite, Paris, Tyler, and Waco. Pls.' Hr'g Ex. 40 (Lambrecht Decl.) ¶ 3. The final three Provider Plaintiffs, Planned Parenthood Cameron County, Planned Parenthood San Antonio, and Planned Parenthood South Texas Surgical Center, are all entities under the umbrella of Planned Parenthood South Texas (PPST). Pls.' Proposed Findings [#93] ¶ 3. PPST operates six health centers offering services to Medicaid patients. *Id.*

In total, PPGC, PPGT, and PPST provide Medicaid services at thirty health centers across Texas. *Id.* ¶ 4. Approximately 12,500 Texas Medicaid patients receive services from Planned Parenthood. Hr'g Tr. Vol. 3 at 14:5–10. Specializing in reproductive and sexual health, these clinics offer Medicaid patients contraception and contraceptive counseling, breast cancer screening, cervical cancer screening and treatment, sexually transmitted disease (STD) testing and treatment, pregnancy testing and counseling, as well as other services. Mot. Prelim. Inj. [#58] at 5. In the Texas Medicaid program, only the Provider Plaintiffs are labeled as family planning specialists. Hr'g Tr. Vol. 3 at 17:10–17.

In addition to reproductive health care, the Provider Plaintiffs offer other limited primary care services because their patients may not see other doctors. Hr'g Tr. Vol. 1 at 209:1–210:6. The Provider Plaintiffs strive to accommodate low-income patients who may face additional barriers to health care access, such as child care or inflexible work schedules, by offering evening and weekend hours, walk-in appointments, short wait times, bilingual staff or translation services, and same-day contraceptive services. *Id.* at 19:23–20:19; Mot. Prelim. Inj. [#58] at 5–6.

While PPGC, PPGT, and PPST are separate organizations, they are all affiliates, of the Planned Parenthood Federation of America (PPFA). Mot. Prelim. Inj. [#58] at 4. PPFA is a membership organization that develops medical and organizational standards to which its affiliates must adhere in order to operate under the Planned Parenthood name and use the Planned Parenthood mark. *Id.* There are approximately fifty-six affiliates across the county. *Id.*

The facts of this case primarily focus on PPGC, the only Provider Plaintiff to participate in fetal tissue research. While PPGC itself does not perform abortions, its related entity, Planned Parenthood Center For Choice (PPCFC) does perform abortions. *Id.* at 16. PPGC's headquarters and a health care clinic are located in the same building in Houston as PPCFC. Hr'g Tr. Vol. 1 at 120:20–121:9. While PPGC and PPCFC were originally one entity, the entities separated in 2005 as a condition of PPGC receiving funding it no longer receives. Hr'g Tr. Vol. 1 at 38:8–13. Most significantly here, PPGC's research department handles any research requests or agreements that involve PPCFC because PPCFC has no research department or separate personnel of its own.[2] *Id.* at 64:12–65:13.

**B.     Individual Plaintiffs**

The Individual Plaintiffs are all Texas residents insured through Medicaid. A brief introduction to each Jane Doe plaintiff, anonymized to protect their identities, provides context for this suit.

---

[2] At this stage of the lawsuit, the Court declines to determine whether PPCG and PPCFC are separate entities or are effectively one organization. Instead, the Court assumes, without deciding, the actions of PPCFC can be considered the actions of PPGC. Rather than attempt to distinguish between the actions of PPGC and PPCFC for purposes of this motion for a preliminary injunction, the Court will only refer to PPGC for the remainder of this order.

Doe # 1 lives in San Antonio and has been a patient at a variety of the health centers under PPST's umbrella since she was seventeen. Pls.' Hr'g Ex. 94 (Doe # 1 Decl.) ¶ 2. Now thirty-three, she has obtained a spectrum of services from PPST health centers including annual exams, STD screening, birth control, pregnancy tests, and general reproductive care. *Id.* ¶ 5. Doe # 1 wishes to continue receiving health care from PPST because she would not know where to go if she could not get care from Planned Parenthood, cannot afford to pay out of pocket, and fears she will end up at a health center where it is difficult to schedule appointments or where she will not like how she is treated. *Id.* ¶ 7.

Doe # 2 is an eighteen-year-old patient of a Planned Parenthood health center under PPST. Pls.' Hr'g Ex. 96 (Doe # 2 Decl.) ¶¶ 1–2. She is a full-time student in a pre-medical program and has a two-year-old son. *Id.* ¶ 3. She relies on her Planned Parenthood health center for STD screening, pregnancy testing, and birth control. *Id.* ¶ 4. She does not know if she could obtain the same services from another provider or if she would be comfortable with another provider. *Id.* ¶ 6.

Doe # 4 has thrombocytopenia, a shortage of blood platelets. Pls.' Hr'g Ex. 97 (Doe # 4 Decl.) ¶ 2. As a result of her condition, she is prone to excessive bleeding. *Id.* When her prior OB/GYN provider prescribed a drug that had to be injected to treat her condition but could not do the injections himself, she turned to PPGC. *Id.* ¶ 5. Doe # 4 now visits PPGC every three months for her injections as well as for other treatments. *Id.* ¶ 6. She wishes to continue her care with PPGC in light of her positive experience, especially considering the long waits she faced with other providers. *Id.*

Twenty-six-year-old Doe # 7 is a single mother who tries to get all her health care from a Planned Parenthood health center under PPST. Pls.' Hr'g Ex. 99 (Doe # 7 Decl.) ¶¶ 1–2, 8. She

-6-

sometimes visits her Planned Parenthood health center as a walk-in patient, but if she calls for an appointment her Planned Parenthood center is usually able to fit her in the same day. *Id.* ¶ 6. She feels less comfortable talking to other doctors about women's reproductive issues and wishes to continue to get the services she needs through PPST. *Id.* ¶¶ 7, 9.

Doe # 9 has a four-year-old son, is a part-time student, and works part-time. Pls.' Hr'g Ex. 100 (Doe # 9 Decl.) ¶ 2. She visits a PPGC health center for well-woman exams, STD testing, and birth control. *Id.* ¶ 3. She appreciates that PPGC treats Medicaid patients the same as patients with private insurance. *Id.* ¶ 4. She previously saw another provider who accepted Medicaid, but the wait times for that provider ranged up to two hours. *Id.* ¶ 5. Doe # 9 has found it difficult to find a good provider who will take Medicaid patients and worries she will be unable to find another provider in light of her commitments to her son, school, and work. *Id.* ¶ 7. She would prefer to remain with PPGC which has her medical history and has earned her trust. *Id.* ¶ 8.

Doe # 10 is an Austin resident who grew up in the foster care system. Pls.' Hr'g Ex. 102 (Doe # 10 Decl.) ¶¶ 1, 3. Doe # 10 was raped and had a negative experience with the doctor who examined her afterward. *Id.* ¶ 5. As a result, she is very nervous in a health center. *Id.* She wishes to continue her care with PPGT because she is comfortable with the doctors there and PPGT is flexible with scheduling. *Id.* ¶¶ 7–8. She and her younger sister do not know where they would go for health care if PPGT was not an option. *Id.* ¶¶ 9–10.

Doe # 11, now twenty-four, has been a patient of a PPST health center since she was fifteen. Pls.' Hr'g Ex. 104 (Doe # 11 Decl.) ¶¶ 1–2. While she briefly went to another provider when her Planned Parenthood health center was closed, she returned to her Planned Parenthood health center

when it reopened because it had all her medical records and she was more comfortable there. *Id.* ¶ 5.

She also appreciates the reproductive health education Planned Parenthood provided her. *Id.* ¶ 7.

**C.     HHSC**

Defendant Charles Smith is the Executive Commissioner of HHSC and Defendant Stuart

Bowen is the Inspector General of HHSC (Inspector General). The Inspector General consulted with

his organization's Chief Medical Officer in deciding to terminate the Provider Plaintiffs from the

Texas Medicaid Program, but the ultimate decision to terminate was made by the Inspector General

individually. Hr'g Tr. Vol 2 at 18:24–20:15, 88:8–13.

**II.     The Texas Medicaid Program**

In Texas, there are approximately 4.3 million people enrolled in Medicaid. Hr'g Tr. Vol. 3

at 6:15–17. In order for a health care provider to serve these patients through the Medicaid program,

it must execute a HHSC Medicaid Provider Agreement (Provider Agreement), which lays out the

responsibilities and obligations of a Texas Medicaid provider. Hr'g Tr. Vol. 2 at 11:3–10. By signing

a Provider Agreement, a provider agrees to comply with all the requirements of the Provider Manual,

a document describing Texas Medicaid program policies, as well as state and federal law. Defs.'

Hr'g Ex. 21 (Provider Agreement) at 1. A provider also agrees to ensure all its employees and agents

comply with such requirements. *Id.* All of the Provider Plaintiffs involved in this lawsuit executed

a Provider Agreement. Hr'g Tr. Vol. 2 at 11:24–12:2.

Section 6 of a Provider Agreement indicates the circumstances under which a Provider

Agreement may be terminated:

> [E]xclusion from participation in Medicare, Medicaid, or any other publically funded
> health-care program; loss or suspension of professional license or certification; any
> circumstance resulting in ineligibility to participate in Texas Medicaid; and failure

> to comply with the provisions of this Agreement or any applicable law, rule or policy of the Medicaid program; and any circumstances indicating that the health or safety of clients is or may be at risk.

Provider Agreement at 13. The Provider Manual supplies additional guidance on the rules governing Texas Medicaid providers. For instance, "[i]t is a violation of Texas Medicaid rules when a provider fails to provide health care services or items to Medicaid clients in accordance with accepted medical community standards . . . ." Defs.' Hr'g Ex. 20 (Provider Manual) at 13. Simply put, any violation of federal law, state law, or the Texas Medicaid program policies is a basis for termination, commonly referred to as a program violation. *See* Hr'g Tr. Vol. 2 11:3–23.

Under Texas law, the Inspector General is charged with enforcing the rules of the Mediciaid program. 1 TEX. ADMIN. CODE § 371.1603. Such enforcement authority includes the ability to expel a provider from enrollment in the Texas Medicaid program. *Id.* Specifically, the Inspector General may terminate a provider's participation in the Texas Medicaid program when the Inspector General establishes by prima facie evidence the provider committed a program violation, is affiliated with a provider that commits a program violation, or commits an act for which sanctions, damages, penalties, or liability could be assessed by the Inspector General. *Id.* § 371.1703©.

In terms of substantive coverage, Texas does not pay for abortions for women insured by Medicaid except in extremely narrow circumstances. Lambrecht Decl. ¶ 6.

In addition to Medicaid, Texas oversees other state health programs such as the Healthy Texas Women Program, the Family Planning Program, and the Breast and Cervical Cancer Screening Program. Hr'g Tr. Vol. 2 at 135:10–15.

## III.    Research Activities of the Provider Plaintiffs

PPGC has an internal department devoted to research, headed by Research Director Melissa Farrell (Ms. Farrell). Pls.' Hr'g Ex. 225 (Farrell Decl.) ¶ 2. Ms. Farrell worked as a nurse for two years in labor and delivery and pre-natal care before becoming the research coordinator at Baylor College of Medicine. *Id.* ¶ 1. In 2006, she became the research director at PPGC. *Id.* She has never witnessed an abortion or even been in the room when an abortion was performed. Hr'g Tr. Vol. 1 at 64:2–11.

The PPGC research department is involved in approximately twenty projects a year, responsible for coordinating and managing research-related activities between PPGC and third-parties. *Id.* The majority of research projects facilitated by PPCG's research department concern family planning services. *Id.* Such projects have included developing new forms of STD screening and treatment, advances in emergency contraception, and an HPV vaccine. *Id.*

When PPGC receives a request for a research partnership, Ms. Farrell works with the researchers to gather information and learn whether PPGC could participate. Pls.' Hr'g Ex. 108 (Fine Decl.) ¶ 23. Ms. Farrell's role includes providing researchers with information about PPGC's services and facilities, developing a budget, negotiating a contract, facilitating Institutional Review Board (IRB) submissions and approval, and guiding internal approval processes. Farrell Decl. ¶¶ 4–5. As part of this process, she consults with other staff members from PPGC to evaluate whether the research request is feasible and what operational changes and additional training would be required. Fine Decl. ¶ 23. Before any research project can begin, it must be approved by PPGC's medical director, the CEO, and PPFA. *Id.* If a project is approved, Ms. Farrell coordinates staff training and clinical logistics. Hr'g Tr. Vol. 1 at 78:21–79:14.

While PPGC is not currently involved with any fetal tissue studies or fetal tissue donation, it has facilitated fetal tissue donation in the past. Fine Decl. ¶ 10. Since 2006, PPGC has been involved in two research projects relating to fetal tissue. Farrell Decl. ¶¶ 9–10; Hr'g Tr. Vol. 1 at 74:23–75:12. The first study, in progress when Ms. Farrell arrived at PPGC in 2006, concerned first-trimester fetal tissue. Hr'g Tr. Vol. 1 at 75:2–3. The second study, running from 2010 to 2011, concerned first-trimester placental tissue. Farrell Decl. ¶ 9. During Ms. Farrell's tenure as research director PPGC has not engaged in research on or the donation of fetal tissue obtained from second-trimester abortions. Farrell Decl. ¶ 10.

When the prior studies relating to fetal tissue received all the required approvals, Ms. Farrell integrated each study into the clinical procedures of an abortion. In a typical procedure modified for research, a patient would receive a consultation and ultrasound and would be walked through the abortion consent process. Hr'g Tr. Vol. 1 at 76:16–77:1. The doctor would then determine the abortion method entirely based on the gestational age of the embryo or fetus without considering whether the patient was interested in donating fetal tissue. Fine Decl. ¶ 17.

Donation of fetal tissue was not discussed until after the woman completed all consents necessary for the abortion. Hr'g Tr. Vol. 1 at 77:4–13. A separate research consent process would then be undertaken. *Id.* at 76:22–77:3. If a patient consented to donate fetal tissue, a separate file and chart with the patient's research profile was created. *Id.* The doctor was not involved in obtaining a patient's consent to participate in fetal tissue donation and was not informed whether a particular patient agreed to donate tissue. *Id.* at 77:21–78:13, 177:1–6; Fine Decl. ¶ 22. The separate research file was delivered to a laboratory where all fetal tissue would be evaluated after a procedure. Hr'g Tr. Vol. 1 at 78:3–13.

After an abortion, the doctor would then be asked to sign off on a form indicating no change was made to the timing, method, or procedure of the abortion for fetal tissue tagged for research. *Id.* at 78:9–13. After the doctor's signature was obtained, the fetal tissue would be processed and packaged according to research needs.

The most recent study concluded in 2011 and was conducted in conjunction with the University of Texas Medical Branch in Galveston (UTMB). Farrell Decl. ¶ 10. It concerned the collection of first-trimester placental tissue from women who consented and required PPGC to use a sterile process to collect the placental tissue after the abortion. *Id.*; Hr'g Tr. Vol. 1 at 79:15–81:17.

As part of the contract between UTMB and PPGC, UTMB agreed to reimburse PPGC twenty-five dollars "for staff time expense involved in obtaining consent" for up to 500 patients and $1,500 for expenses related to a specific training necessary for the research. Pls.' Hr'g Ex. 239 (Tissue Supply Agreement and Amendment) at 1. Once the study began, the agreement was amended, however, to account for costs related to the length of time required to obtain consent, the sterile procedures, the collection of a maternal blood draw, and an administrative fee. *Id.* at 3–4; Hr'g Tr. Vol. 1 at 84:7–85:22. Under the amended agreement, UTMB reimbursed PPGC $50 per patient consent and $100 per consent for the combination of the sterile process and maternal blood draw; UTMB also reimbursed a one-time $2,000 fee for surgical services, research management, oversight, and storage. Hr'g Tr. Vol. 1 at 85:21–86:22. In total, UTMB reimbursed PPGC slightly less than $10,000. *Id.* at 87:3–6. Ms. Farrell testified that amount did not fully reimburse PPGC for all of its expenses in light of administrative and staff time devoted to the research partnership. *Id.* at 87:7–23.

One of PPGC's physicians who performed abortions was also an investigator on the research side for the UTMB project. *Id.* at 77:14–16.

-12-

Neither PPGT, its related entity that performs abortions, nor PPST participates or previously participated in fetal tissue research or a donation program. Lambrecht Decl. ¶ 6; Pls.' Hr'g Ex. 92 (Hons Decl.) ¶ 7.

## IV.    Center for Medical Progress Videos

On April 9, 2015, Ms. Farrell conducted a site visit with two individuals purporting to be representatives of a tissue procurement company. Farrell Decl. ¶¶ 6–7. The two individuals, however, were not tissue procurement representatives but were affiliated with the Center for Medical Progress (CMP), an anti-abortion organization. *Id.* Using fake names, the two anti-abortion activists attended PPFA conferences and portrayed themselves as starting a company interested in connecting Planned Parenthood health centers with research studies. *Id.* In response to an email from these activists, Ms. Farrell arranged the site visit to PPGC's headquarters. *Id.*

During the site visit, one of the activists secretly videotaped conversations with Ms. Farrell and the tour of the PPGC facility she provided. *See* Defs.' Hr'g Ex. 2 (CMP Video). Ms. Farrell also arranged for the anti-abortion activists to meet with the Ambulatory Surgical Center (ASC) Director and to take a tour of the surgical facilities. *Id.* While touring the surgical facilities, the activists asked to see an example of fetal tissue and the hosts obliged. *Id.* All of these interactions were covertly recorded, netting over eight hours of undercover video. *Id.*

A few months later, CMP released a series of undercover videos, including the one filmed at PPGC's headquarters, purportedly showing Planned Parenthood and its affiliates were contracting to sell aborted human fetal tissue and body parts. Mot. Prelim. Inj. [#58] at 7. The release of the videos prompted a number of federal and state investigations concerning Planned Parenthood organizations.

In Texas, the Harris County District Attorney, together with the Texas Rangers and the Houston Police Department, investigated PPGC. Mot. Prelim. Inj. [#58-1] Ex. 2C (Harris County District Attorney Press Release). The investigation found no wrongdoing by PPGC, but the grand jury indicted the two anti-abortion activists who created the videos. *Id.* These charges were eventually dismissed. Linton Decl. ¶ 25 n.1. During the same period, the Texas Attorney General's Office, Texas Department of State Health Services, and HHSC all conducted their own investigations. *Id.* ¶¶ 27–30. Aside from HHSC's allegations with respect to the Texas Medicaid program, the record includes no additional findings of wrongdoing from the investigations and no efforts to revoke any license or qualification of the Plaintiff Providers.

## V.     Proposed Research Project with Baylor College of Medicine

Starting in 2013, a researcher from Baylor College of Medicine (Baylor) approached PPGC to explore a new fetal tissue donation project. Farrell Decl. ¶ 36. Ms. Farrell, the Baylor researcher, and a research coordinator from Baylor corresponded for nearly a year concerning the potential project. *Id.*

In mid-November of 2014, the research coordinator from Baylor emailed Ms. Farrell. Pls.' Hr'g Ex. 198 (Nov. 17, 2014) at 2. The title of the email included the phrase "IRB Approval Obtained" and indicated "[Baylor] heard back from the IRB today and like we discussed, the study does not constitute human subject[] research." *Id.* Ms. Farrell responded to the email "Thank you!" *Id.* at 1. The next email in the chain, from the Baylor researcher, asked about next steps "[n]ow that we have approval for these studies . . . ." *Id.*

Following the November 2014 email chain, both Baylor and PPGC continued to discuss the project, exchanging a draft contract. *See* Pls.' Hr'g Exs. 205 (May 21, 2015 Emails), 206 (Jun. 22,

2015 Emails). On July 7, 2015, Ms. Farrell asked the Baylor team to "insert any language that is pertinent to the project" into the contract and emphasized "that if this study involves DNA, isolation of cell lines, etc…[sic] the IRB approval and ICF need to specify this. I don't have a recollection that DNA research was your projected plan." Pls.' Hr'g Ex. 207 (July 7, 2015 Emails) at 1.

No site visit concerning the potential project was ever conducted. Farrell Decl. ¶¶ 38–39. No contract or budget was ever finalized or approved by PPGC or PPFA. *Id.*

After the release of the CMP videos, the Baylor researcher emailed Ms. Farrell to ask if "[i]n light of recent events," they needed to make other changes to the contract. Pls.' Hr'g Ex. 214 (Oct. 13, 2015 Email to PPGC). Nearly a month later, Ms. Farrell responded, clarifying that there was no valid contract and "PPGC will not commit to engage in any fetal tissue research endeavors at this time." Pls.' Notice Filing [#81-12] Ex. K (Nov. 4, 2015 Email to Baylor) at 2.

## VI.    Congressional Investigation

In the wake of several Congressional committee investigations following the release of videos by CMP, the Select Investigative Panel (Select Panel) was formed by the House of Representatives and tasked with investigating fetal tissue donation practices. Defs.' Hr'g Ex. 61 (Select Panel Report) at 2–3. Representative Marsha Blackburn of Tennessee, a Republican, was named Chair of the Select Panel. *Id.* In addition to the Chair, seven Republicans and six Democrats were selected to serve on the Select Panel. *Id.* at 3.

On December 1, 2016, Representative Blackburn emailed Ken Paxton, the Attorney General of Texas, a letter describing evidence the Select Panel had gathered concerning PPGC. Defs.' Hr'g Ex. 68 (Referral Letter). Representative Blackburn claimed PPGC had violated two specific laws:

Texas Penal Code § 48.02, prohibiting the purchase and sale of human organs, and Texas Penal Code § 37.08, prohibiting a false report to a law enforcement officer. *Id.* at 1, 10.

Representative Blackburn concluded her letter, "Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether PPGC violated these statutes, and, if you agree that such violations occurred, to take all appropriate action." *Id.* at 11. Representative Blackburn signed the letter with her name and title as Chairman of the Select Panel. *Id.* No other Select Panel member signed the letter. *See id.*

On December 30, 2016, the Select Panel issued a final report. *See* Select Panel Report. Only Representative Blackburn's name and the seven Republican panel members' names appear in the author block of the final report. *Id.*

## VII.    Procedural History of this Suit

### A.    October 2015 Termination Letter

On October 19, 2015, HHSC issued a "Notice of Termination" to each of the Provider Plaintiffs. *E.g.*, Mot. Prelim. Inj. [#58-1] Ex.1A (Initial Notice). The Initial Notice "effect[ed] a process to end [the Provider Plaintiffs'] enrollment in the Texas Medicaid program." *Id.* (citing 1 TEX. ADMIN. CODE § 371.1703(e)).[3] Plaintiffs filed suit, seeking a temporary restraining order or, alternatively, a preliminary injunction. Compl. [#1] at 19.

Although the Initial Notice warned the Provider Plaintiffs their Provider Agreements would be terminated fifteen days following receipt of a Final Notice of Termination, HHSC claimed the

---

[3] The Initial Notice alleged four bases for termination: video evidence indicating (1) a policy of agreeing to procure fetal tissue "even if it means altering the timing or method of an abortion"; (2) failure to prevent conditions allowing the spread of infectious diseases; and (3) inadequate training for infection control and barrier precaution in handling fetal blood and tissue; as well as (4) prior *qui tam* litigation. *See* Initial Notice.

lawsuit was premature as it had not yet actually decided termination was in order. Defs.' Ltr. Br. [#38] (citing Initial Notice). In light of HHSC's representation, the Court stayed the case pending the issuance of a final termination notice. Ord. of Jan. 27, 2016 [#42]. The case remained dormant for nearly a year. *See* Mot. Prelim. Inj. [#58] at 14.

**B.     December 2016 Termination Letter**

On December 20, 2016, more than a year after the Initial Notice had been issued, HHSC sent a Final Notice of Termination (Final Notice) to each of the Provider Plaintiffs. Pls.' Hr'g Ex. 1 (Final Notice) at 1. The Final Notice informed the Provider Plaintiffs that the Inspector General "finds you are not qualified to provide medical services in a professionally competent, safe, legal and ethical manner under . . . state and federal law pertaining to Medicaid providers." *Id.* at 1–2.

The Final Notice cites three sources of evidence for the Inspector General's conclusions: the video footage obtained by CMP (CMP Video), discussions with PPGC staff, and evidence uncovered by the Select Panel. *Id.* at 2. According to the Final Notice, "the unedited video footage indicates that Planned Parenthood follows a policy of agreeing to procure fetal tissue, potentially for valuable consideration, even if it means altering the timing or method of an abortion." *Id.* The Final Notice also states the Inspector General consulted with his agency's Chief Medical Officer, who reviewed the video and concluded the Plaintiff Providers' "willingness to engage in these practices violates generally accepted medical standards . . . ." *Id.*

Summarizing the evidence from the CMP Video, the Final Notice enumerates alleged violations of generally accepted standards of medical practice:

1.     a history of deviating from accepted standards to procure samples that meet researcher's needs;

2.   a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research;

3.   a willingness to convert normal pregnancies to the breech position to ensure researchers receive intact specimens;

4.   an admission that "we get what we need to do to alter the standard of care where we are still maintaining patient safety, still maintaining efficiency in clinic operations, but we integrate research into it";

5.   an admission that Planned Parenthood gets requests for "information from our study sponsor on what data they need that is not our standard of care," and that [Planned Parenthood] provides what is needed by creating a separate research protocol or template that can include medically unnecessary testing; and

6.   a willingness to charge more than the costs incurred for procuring fetal tissue.

*Id.*

In addition to alleging violations of medical and ethical standards, the Final Notice indicates the Inspector General relied on evidence from the Select Panel that Planned Parenthood "engaged in misrepresentations about [its] activity related to fetal tissue procurements . . . ." *Id.* at 3. While the Final Notice primarily outlines bases for termination pertaining to PPGC, it also notes "if you are affiliated with a provider that commits a program violation subjecting it to enrollment termination, then the affiliate is also subject to enrollment termination." *Id.* The Final Notice then outlines indicia of affiliation. *Id.*

With the Provider Plaintiffs' termination from Medicaid set to take place thirty days after the receipt of the Final Notice, Plaintiffs filed an amended complaint and a new motion for a preliminary injunction to prevent termination. Am. Compl. [#76]; Mot. Prelim. Inj. [#58]. Starting January 17, 2017, this Court held a three-day evidentiary hearing on Plaintiffs' motion for injunctive relief. At the conclusion of the evidentiary hearing, the Court entered an order prohibiting the termination of

the Plaintiff Providers' enrollment in Medicaid until February 21, 2017. Ord. of Jan. 19, 2017 [#84] at 2. The Court also requested letter briefs and authorized the parties to file findings of fact and conclusions of law. *Id.* Both parties have done so.

## Analysis

### I.    Legal Standard for Injunctive Relief

A preliminary injunction is an "extraordinary equitable remedy." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). In essence, "[t]he purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 627 (5th Cir. 1985) (citation omitted).

The Court may issue such relief only if the movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jackson Women's Health Org.,* 760 F.3d at 452 (citation and internal quotation omitted). Because preliminary injunctions are extraordinary remedies, the movant must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp. Inc. v. Fort Worth & W.R.R. Co.,* 418 F.3d 535, 545 (5th Cir. 2005) (citation and internal quotation omitted).

### II.    Application

### A.    Substantial Likelihood of Success on the Merits

Plaintiffs bring this suit based on rights secured by the federal Medicaid statute and the United States Constitution. Am. Compl. [#76] ¶¶ 86–89. Yet, Plaintiffs seek a preliminary injunction

solely via their federal Medicaid statutory claim, not the constitutional claim. See Mot. Prelim. Inj. [#58] at 22–32. Specifically, Plaintiffs allege a violation of 42 U.S.C. § 1396a(a)(23)(A), which states, "[A]ny individual eligible for medical assistance may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . and who undertakes to provide him such services . . . ." Plaintiffs allege HHSC violated this provision, referred to as the free-choice-of-provider requirement, because the Provider Plaintiffs are qualified and willing to undertake family planning services.

The Court briefly addresses the issue of standing before examining the merits of Plaintiffs' Medicaid Act claim.

## I.      Standing

The Fifth Circuit's recent opinion in *Planned Parenthood of Gulf Coast v. Gee* provides the guidance for a § 1983 action alleging a violation of Medicaid's free-choice-of-provider requirement. 837 F.3d 477 (5th Cir. 2016). In *Gee*, the Fifth Circuit affirmed the district court's holding that the Medicaid's free-choice-of-provider requirement creates a private right enforceable under § 1983 and the individual plaintiffs met their burden to show entitlement to a preliminary injunction. *Id.* at 487, 502. Thus, this Court looks both to the Fifth Circuit's *Gee* opinion as well as to the district court's opinion in the same case, *Planned Parenthood Gulf Coast, Inc. v. Kliebert,* 141 F. Supp. 3d 604 (M.D. La. 2015).

HHSC raises the issue of standing, emphasizing the Fifth Circuit is still considering whether to grant en banc review of the *Gee* opinion. Defs.' Proposed Findings [#94] at 45 n. 6. HHSC refuses to concede § 1396a(a)(23) provides a private right of action for individuals and also argues providers do not have a right of action under the same provision. *Id.*

Although the Fifth Circuit may grant en banc review, the *Gee* opinion currently stands as the authority in the Fifth Circuit. In *Gee*, the Fifth Circuit "join[ed] every other circuit to have addressed this issue to conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983." 837 F.3d at 489. Thus, this Court, heeding the Fifth Circuit's unqualified statement from *Gee*, finds the Individual Plaintiffs in this case have a right of action under § 1396a(a)(23).

Moreover, just as the district court in *Kliebert* concluded, this Court finds if either the Individual Plaintiffs or the Provider Plaintiffs prevail on the merits, "the same remedy—a permanent injunction—would be due and any potential action by [HHSC] would be similarly affected." 141 F. Supp. 3d at 636. The Court need not conclude all Plaintiffs have a substantial likelihood of prevailing on the Medicaid Act claim for a preliminary injunction to issue at this time. *Id.* at 636. If Plaintiffs satisfy the elements needed to show a substantial likelihood of success on the Individual Plaintiffs' § 1396a(a)(23) claim only, so long as the other factors are met, a preliminary injunction is appropriate. *See id.* Accordingly, because this Court finds the Individual Plaintiffs have a right of action, it need not decide whether the Provider Plaintiffs also have such a right, either on their own behalf or on the behalf of their patients. *See id.*

### ii.    Medicaid Act Claim

"Medicaid is a cooperative program between the federal government and the states in which the federal government gives financial assistance to states to provide medical services to Medicaid-eligible individuals." *Gee,* 837 F.3d at 489. Through Medicaid, the federal government and participating states share health care costs. *Id.* at 489 (citing *Atkins v. Rivera,* 477 U.S. 154, 156–57 (1986)). The federal government provides the states with federal funding, and "[i]n return participating States are to comply with the requirements imposed by the [Medicaid] Act and by the

Secretary of Health and Human Services." *Id.* (internal quotation marks omitted). In other words, "Medicaid offers the States a bargain: Congress provided federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." *Id.* (quoting *Armstrong v. Exceptional Child Ctr., Inc.,* 135 S.Ct. 1378, 1382 (2015) (Scalia, J.) (plurality opinion) (internal quotation marks omitted)).

This case concerns the contours of Medicaid's mandated free-choice-of-provider requirement. As the Supreme Court explained, the free-choice-of-provider requirement "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 785 (1980). While the Medicaid statute does not define the term "qualified," the Fifth Circuit interpreted qualified in the Medicaid context to mean "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Gee,* 837 F. 3d at 495 (internal quotation marks omitted) (quoting *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,* 699 F.3d 962, 978 (7th Cir. 2012)).

Within the federal Medicaid scheme, states may exclude providers on the grounds provided under § 1396a(p)(1) of the Medicaid Act and on analogous state grounds relating to provider qualification. *Id.* at 495. Therefore, while a state retains broad authority to define provider qualifications and to exclude providers who are not qualified, that authority is limited by the meaning of qualified as it relates to the ability to perform medical services. *Id.*

Previously, the Fifth Circuit rejected Louisiana's asserted bases for terminating PPGC—two *qui tam* claims, unspecified misrepresentations, and a pending investigation—because they did not relate to PPGC's qualifications. *Id.* at 495–96. In particular, Louisiana failed to show how its

-22-

grounds for termination even related to PPGC's qualifications. *Id.* The Fifth Circuit implied that in order to survive a § 1396a(a)(23) challenge, a state's basis for denying a Medicaid beneficiary their chosen provider requires "factual support or linkage" between the grounds for termination and the provider's qualifications. *Id.* at 499.

Under Texas law, the Inspector General may terminate a provider's enrollment in Medicaid if the Inspector General establishes by prima facie evidence the provider committed a program violation, is affiliated with a provider that commits a program violation, or commits an act for which sanctions, damages, penalties, or liability could be assessed by the Inspector General. 1 TEX. ADMIN. CODE § 371.1703©. Prima facie evidence in this context is defined as evidence "sufficient to establish a fact or raise a presumption unless disproved."*Id.* § 371.1(62). Thus, in order for the Inspector General to terminate a provider, he must have evidence sufficient to establish the provider or its affiliate committed a program violation, i.e. a violation of state law, federal law, or Texas Medicaid policies. *See id.* § 371.1703©.

Additionally, both federal and Texas law require a provider be given notice of termination, which must describe the reasons for termination. *See, e.g.*, 42 U.S.C. § 1320a-7 (requiring "reasonable notice" before termination); 42 U.S.C. § 405(b) (mandating the notice include a "discussion of the evidence" and the "reason or reasons upon which [termination] is based"); 1 TEX. ADMIN. CODE § 371.1703(f) (requiring a provider be given notice of termination as part of due process); *Id.* 371.1703(e) (mandating notice of termination include "the basis for termination").

Consequently, the Court will not consider bases for termination not included in the notice of termination.[4]

It is undisputed the Inspector General individually made the decision to terminate the Plaintiff Providers' enrollment in Medicaid and the Final Notice sets forth the bases for that decision. Hr'g Tr. Vol. 2 at 88:2–16, 18:8–14. Thus, the Court looks to see whether the Inspector General had prima facie evidence sufficient to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified.

The Inspector General had three overarching bases for termination: (1) video evidence indicating PPGC violated medical and ethical standards; (2) evidence PPGC misrepresented activity related to fetal tissue procurement; and (3) evidence the other Provider Plaintiffs were affiliated with PPGC. *See* Final Notice; Hr'g Tr. Vol. 2 at 18:11–22:7, 31:6–35:9, 37:16–41:4.[5]

In short, the Court finds the Inspector General did not have any factual support to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified. Rather, in light of the current record, it appears the termination decision had nothing to do with the Provider Plaintiffs' qualifications. As a result, the Court finds the Individual Plaintiffs met their burden of proof showing a substantial likelihood of success on the merits of their claim under § 1396a(a)(23).

---

[4] In its pleadings and at the evidentiary hearing, HHSC alleged bases for termination such as the Provider Plaintiffs' failure to obtain informed consent, but, as discussed above, the Court will not consider reasons for termination not included in the Final Notice and not part of the Inspector General's termination decision. *See, e.g.,* Defs.' Resp. [#70] at 13–14; Hr'g Tr. Vol. 1 at 129:17–132:6.

[5] Notwithstanding the Inspector General's sworn testimony he reviewed the Select Panel's report in making the decision to terminate the Provider Plaintiffs from Texas Medicaid, Hr'g Tr. Vol. 2 at 35:12–36:21, the Court notes the Select Panel's report was published on December 30, 2016, ten days after the Inspector General sent the Final Notice to the Provider Plaintiffs. *See* Select Panel Report. Additionally, the validity of the Select Panel Report remains in question as six out of the thirteen committee members declined to endorse the report. *see id.*

     *a.*     *Video evidence indicating PPGC violated medical and ethical standards*

In essence, the Inspector General alleges the CMP Video demonstrates PPGC violated medical and ethical standards in three ways. First, the Inspector General concluded, based on consultation with HHSC's Chief Medical Officer, the CMP Video shows PPGC has "a history of" altering and "a willingness" to alter abortion procedures for research purposes. *See* Final Notice at 2; Hr'g Tr. Vol. 2 at 28:22–31:24. Second, the Inspector General determined the CMP Video demonstrates researchers at PPGC performed and possibly altered abortions to procure fetal tissue for their own research. *See* Final Notice at 2; Hr'g Tr. Vol. 2 at 31:25–33:1. And third, the Inspector General found PPGC had "a willingness" to profit from procuring fetal tissue. *See* Final Notice at 3; Hr'g Tr. Vol. 2 at 28:22–32:21. After reviewing the CMP Video in its entirety and considering the Inspector General's testimony, the Court finds there is no evidence in the record PPGC violated any medical or ethical standard.

As a threshold matter, the CMP Video is the only evidence the Inspector General relied upon to conclude PPGC violated medical and ethical standards. *See* Hr'g Tr. Vol. 2 at 28:22–32:21 (reviewing the video clips the Inspector General relied upon to conclude PPGC violated ethical and medical standards). While the Chief Medical Officer did provide the Inspector General with his opinion, that opinion was only offered as an analysis of what the CMP Video showed, not whether a violation occurred. *Id.* at 18:24–20:8.

Ultimately, the quality and strength of the evidence the CMP Video provides is suspect. While the record shows the Inspector General knew there were multiple versions of the video available on the internet, Hr'g Tr. Vol. 2 at 24:7–5, HHSC offered no evidence the Inspector General

took steps to authenticate the CMP Video he relied upon or verify it had not been altered.[6] Indeed, HHSC offered no evidence to authenticate the CMP Video at all.

Despite concerns about the authenticity of the video, the Court nevertheless examines the CMP Video to evaluate whether it provided the Inspector General with prima face evidence to conclude PPGC violated medical and ethical standards. To summarize the CMP Video for those not blessed with eight free hours to watch it, the vast majority of the footage concerns conversations between Ms. Farrell and the two anti-abortion activists during the April 9, 2015 site visit. CMP Video at 7:41:15–13:57:03, 14:30:03–14:49:50.[7] A thirty-minute section of the CMP Video features a tour of the Ambulatory Surgical Center (ASC), which includes conversations with the ASC Director and Ms. Farrell and a visit to a laboratory. *Id.* at 13:57:03–14:28:30.

Turning now to the first allegation—PPGC has both a history of altering and a willingness to alter abortion procedures for research purposes—the Court finds the Inspector General had no evidence to support this allegation. In particular, the Inspector General had no evidence any PPGC doctor altered an abortion procedure and the video he relied upon, the CMP Video, features unclear and ambiguous dialogue, statements by Ms. Farrell who had no personal knowledge of abortion procedures, and conversations exploring theoretical possibilities.

Most significantly, the Inspector General admitted he had no evidence any PPGC doctor altered the medical procedure of an abortion, for research purposes or for any other reason, when he

---

[6] HHSC only offers evidence that other versions of the CMP Video posted on YouTube were verified as authentic by independent digital forensic professionals. Resp. [#70] at 21. As the Inspector General testified he did not rely on videos available via YouTube, the authentication of such videos is not relevant here. *See* Hr'g Tr. Vol. 2 at 24:7–25:25.

[7] The Court uses the time stamps from the CMP Video to reference sections of footage.

issued the Final Notice (nor did he have such evidence at the hearing). Hr'g Tr. Vol. 2 at 50:14–21, 69:17–70:13.

Rather, in support of his determination, the Inspector General pointed to CMP Video clips he claims show Ms. Farrell admitted PPGC doctors previously altered abortion procedures. Hr'g Tr. Vol. 2 at 29:1–31:24 (citing CMP Video at 7:59:00–8:00:43, 8:00:54–8:01:50); see also Defs.' Ltr. Br. [#92] at 2–5 (citing CMP Video at 8:04:08–8:05:35, 8:11:25–8:11:53, 11:59:30–12:01:40). After reviewing these clips in the context of the full video, the Court notes the conversations in the CMP ideo shift quickly between discussing changes to clinical processes necessary to incorporate research into a health center's operations and discussing changes to the medical procedures of abortion. Even viewing these conversations in the light most favorable to the Inspector General, the Court sees nothing more than confused and ambiguous dialogue, open to interpretation. *Compare* Pls.' Ltr. Br.[#91] *with* Defs.' Ltr. Br. [#93] (citing the same or adjacent clips of the CMP Video for opposite propositions).

In addition to Ms. Farrell's statements captured in the CMP Video, the Inspector General indicated he relied on the section of the CMP Video depicting the tour of the ASC. Hr'g Tr. 2 29:1–31:24 (citing CMP Video at 13:56:54–13:59:10, 14:03:11–14:03:50, 14:17:03–14:17:55, 14:20:10–14:20:56, 14:24:57–14:25:26). HHSC argues this section of the CMP Video demonstrates PPCG doctors altered abortion procedures to remove intact fetuses, or would be willing to do so, for research. Plaintiffs, however, offer the uncontradicted testimony of Dr. Fine, an experienced OB/GYN who has performed numerous abortions, that it is always clinically desirable to remove the fetus as intact as possible to minimize entries into the uterus. Hr'g Tr. Vol. 1 at 156:17–157:3.

By comparison, the Inspector General, a lawyer with no medical training, testified he relied on the Chief Medical Officer, to determine if the CMP Video included any medically unethical conduct. Hr'g Tr. Vol. 2 at 6:19–7:19, 19:3–20:15, 58:16–25. Yet, the Chief Medical Officer, an orthopedic surgeon who practices sports medicine, admitted he would have to defer to an OB/GYN to evaluate abortion procedures. *Id.* at 91:18–93:2. He also admitted that he and the Inspector General would have a similar understanding of the abortion terms and procedures discussed in the CMP Video, the understanding of a lay person. *Id.*

Furthermore, the Court discounts the secretly recorded statements by Ms. Farrell, especially as the CMP Video repeatedly shows Ms. Farrell had no personal knowledge of the medical aspects of abortion procedures or PPGC's abortion procedures. For example, Ms. Farrell simply shrugged when asked if PPGC's doctors could convert a fetus to breech position and later indicated she would have to ask why converting to breech would be medically necessary. CMP Video at 8:05:23–8:06:00, 11:53:53–11:54:45. Similarly, when confronted with questions from the anti-abortion activists concerning potential changes to abortion procedures, Ms. Farrell admitted she was unsure how the gestational age for a fetus is determined or how second-trimester procedures differ. *E.g.*, CMP Video at 11:50:39–11:54:35. While Ms. Farrell previously worked as a nurse, she has never seen an abortion performed or even been in the room when an abortion was performed. Hr'g Tr. Vol. 1 at 64:2–11.

Rather, Ms. Farrell's day-to-day role involves managing clinical operations and is unrelated to the medical procedures of abortion. Farrell Decl. ¶¶ 4–5. Statements from the CMP Video demonstrate how Ms. Farrell indicated she would have to discuss changes to medical procedures with the doctors. *See, e.g.*, CMP Video at 8:01:25–8:01:34; 8:05:16–8:05:42. Plaintiffs also

-28-

emphasize that the site visit featured in the video is only a preliminary step in a research partnership; more approval, from senior clinical staff and PPFA, would be required before any research project could be undertaken. Hr'g Tr. Vol. 1 at 161:7–12; Fine Decl. ¶ 23. After evaluating the CMP Video, PPGC's prior research partnerships, and Ms. Farrell's experience, it appears more likely Ms. Farrell believed she was discussing changes to clinical operations rather than changes to the medical procedures of abortion. *See, e.g.*, Hr'g Tr. Vol. 1 91:5–92:14, 97:4–15.

The theoretical nature of the conversations recorded in the CMP Video further undermines the support for the Inspector General's allegation. The last study even relating to fetal tissue ended in 2011. Farrell Decl. ¶ 9. During that study, PPGC abortion doctors were unaware of whether a patient consented to donate fetal tissue. PPGC clinical staff maintained separate files for a patient's clinical information and any research involvement. Hr'g Tr. Vol. 1 at 76:22–77:3. Doctors were not involved in obtaining a patient's consent for donation. Hr'g Tr. Vol. 1 at 77:21–78:13, 177:1–6; Fine Decl. ¶ 22.

Overall, the context of the CMP Video eliminates the plausibility of interpreting it to show PPGC had a history of and willingness to alter the medical aspects of abortion procedures. Viewing the evidence holistically, the Court concludes the Inspector General had no evidence indicating PPGC ever altered an abortion procedure or would be willing to do so.

Evaluating the Inspector General's second allegation—the CMP Video demonstrates researchers at PPGC performed abortions to procure fetal tissue, possibly altering procedures, for their own research—the Court finds this allegation similarly unsupported by evidence. As discussed above, the Inspector General had no evidence any PPGC doctor ever altered an abortion procedure, for research or for any other purpose. And, again, there is no evidence any PPGC doctor ever knew

if a patient consented to donate to research. Consequently, there is no evidence a PPGC doctor could have altered an abortion procedure for research purposes.

But the Court also notes the Inspector General had no evidence a researcher who performs abortions and collects the fetal tissue after the procedure for her own research purposes violates medical or ethical standards. HHSC cites three sections of federal law as evidence PPGC violated medical and ethical standards, but there is no indication these sections apply to the studies in which PPGC participated. HHSC cites no other source for the medical or ethical standards PPCG allegedly violated. *See* Defs.' Proposed Findings [#94] at ¶¶ 24–28.

Specifically, HHSC cites 45 C.F.R. § 46.204 as prohibiting researchers from performing abortions and collecting fetal tissue for their own research. Resp. [#70] at 11; Defs.' Proposed Findings [#94] at ¶ 24. This regulation, however, imposes a condition on federal funding for research on fetuses in utero, not research performed on tissue collected after an abortion. *See* § 46.204; Consolidated Appropriations Act, Pub. L. No. 111-117, § 509(a)(2), 123 Stat. 3034, 3280–81 (2010) ("None of the funds made available in this Act may be used for— . . . research in which a human a human embryo . . . [is] knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 C.F.R. § 46.204(b) . . . ."); *see also* Hr'g Tr. Vol. 3 at 39:25–40:18. Furthermore, HHSC does not contend the Inspector General had any evidence the studies with which PPGC partnered received federal funding.

HHSC also cites 42 U.S.C. § 289g-1(c)(4) and (b)(2)(C)(I) as evidence a researcher cannot play a role in the decision to terminate a pregnancy and must disclose if she has an interest in research conducted with the tissue. Defs.' Proposed Findings [#94] at ¶¶ 25–26. Yet, again, these two sections pertain to conditions on federal research funding. *See* 42 U.S.C. § 289g-1(a)(1).

Relatedly, the two prior studies PPGC engaged in received IRB approval, which means an IRB panel validated the studies' plans for managing legal and ethical issues. Hr'g Tr. Vol. 1 at 75:13–76:15. The Inspector General presented no evidence suggesting the IRB review and approval was insufficient. In conclusion, the Court finds the Inspector General had little to no evidence a doctor who performed abortion procedures and subsequently conducted research on the tissue collected violated medical or ethical standards.

Finally, the Court examines the Inspector General's third allegation for how PPGC violated medical and ethical standards—PPGC had "a willingness" to profit from procuring fetal tissue. As an initial matter, the Court is unconvinced mere willingness, without any evidence of attempt, is enough to deprive a Medicaid beneficiary of the right to her otherwise qualified provider. *See Gee*, 837 F.3d at 495, 499 (warning that a state cannot simply label an exclusionary rule as a qualification). The Inspector General offered no evidence indicating PPGC ever made a profit from procuring fetal tissue for research. Specifically, the Inspector General could not point to a single payment PPGC ever received that exceeded its expenses incurred. Instead, the Inspector General again relied on the conversations between Ms. Farrell and the two anti-abortion activists from the CMP Video. The Inspector General testified Ms. Farrell's use of the term "financially beneficial" led him to conclude PPGC was willing to procure fetal tissue for valuable consideration. Hr'g Tr. Vol. 2 at 34:2–12. Yet, it is undisputed that it is a financial benefit to receive reimbursement for actual, reasonable expenses. Hr'g Tr. Vol. 2 at 75:1–75:10. And no PPGC employee, in the CMP Video or otherwise, represented that PPGC sought to make a profit on fetal tissue research. *Id.* at 74:15–25.

Therefore, to summarize, the Inspector General relied on an unauthenticated video and the advice of an orthopedic surgeon to conclude PPGC violated medical and ethical standards related to abortion procedures. The video in question offers, at most, theoretical conversations concerning what might be possible in a research partnership between a health care provider and a tissue procurement company. The Inspector General had no evidence any PPGC doctor ever altered an abortion procedure, for research or for any other purpose. The Inspector General also possessed no evidence any researcher ever knowingly performed or altered an abortion to procure fetal tissue for his or her own research. And even if a doctor did collect fetal tissue for her own research after performing an abortion, the Inspector General had no evidence such activity violates medical or ethical standards. Lastly, the Inspector General possessed no evidence PPGC ever profited, or even sought to profit, from procuring fetal tissue. Thus, the Court finds there is no factual support in the record for the conclusion PPGC violated medical and ethical standards or would be willing to do so.

> b.    *Evidence PPGC misrepresented activity related to fetal tissue procurements*

The Final Notice stated the Inspector General had evidence the Provider Plaintiffs "engaged in misrepresentations about your activity related to fetal tissue procurements, as revealed by evidence provided by the [Select Panel]." Final Notice at 3. At the evidentiary hearing, the Inspector General testified he only considered evidence of one alleged misrepresentation in making his termination decision: evidence a Texas Ranger was told the IRB had not yet approved a proposed research project between Baylor and PPGC. Hr'g Tr. Vol. 2 at 36:12–21, 51:6–14.

Under Texas law, "[a] person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to: . . . [a law enforcement employee] conducting the investigation . . . ." TEX. PENAL CODE § 37.08(a).

Such an offense is a program violation. *See* Provider Agreement at 13 (indicating the failure to follow any applicable law is grounds for termination from Texas Medicaid).

In determining PPGC made a misrepresentation, the Inspector General relied on the letter Representative Blackburn emailed the Attorney General of Texas. Hr'g Tr. Vol. 2 at 34:18–35:7 (discussing the Referral Letter). That letter called the Inspector General's attention to an email chain between Ms. Farrell and the Baylor researchers where the subject line included "IRB approval obtained." *Id.* The Referral Letter cited the email chain and a subsequent report by a Texas Ranger issued as part of the investigations into PPCG. Referral Letter at 7–9 (discussing Defs.' Hr'g Ex. 79 (Email Chain) and Defs.' Hr'g Ex. 81 (Texas Ranger Report)). The Texas Ranger Report states, "The Institutional Review Board had not yet given approval for the Baylor [study]." Texas Ranger Report at 4.

While the Inspector General reviewed the Referral Letter and the documents it cites, specifically the Email Chain and the Texas Ranger Report, the Inspector General conducted no additional interviews or investigations of the alleged misrepresentation. Hr'g Tr. Vol. 2 at 52:2–10. Yet, the Inspector General acknowledged he did not know whether the statement indicating the Baylor study had not yet obtained IRB approval was a mistake or misrepresentation. Hr'g Tr. Vol. 2 at 52:1–23. Admittedly, he had no evidence on whether the statement's speaker had the required intent to deceive.[8] *Id.*

At the same time, evidence in the record suggests IRB approval for the Baylor study, in truth, may not have been obtained or it was at least reasonable to believe IRB approval had not been

---

[8] The Court is also unconvinced the Inspector General had any evidence showing the statement concerning IRB approval for the Baylor study was material to a criminal investigation. *See* TEX. PENAL CODE § 37.08(a); Hr'g Tr. Vol. 2 at 53:5–54:6.

secured. Pls.' Hr'g Ex. 207 (July 7, 2015 Emails) at 1 (indicating IRB approval would have to specify if the study involved DNA). Given the lag in negotiations following the initial IRB approval in November 2014, the fact a contract had not yet been confirmed in July 2015, and the lack of clarity on the study's details, an additional IRB approval process could have been necessary. *See* Farrell Decl. ¶ 38 (noting the IRB process is an ongoing process requiring annual re-submission and additional approvals when project modifications are made).

Without any evidence that a single allegedly incorrect statement was a misrepresentation rather than a mistake, the Court finds it likely the Inspector General did not have sufficient evidence to conclude PPGC made a misrepresentation.

      *c.*     *Evidence the other Provider Plaintiffs were affiliated with PPGC*

Most importantly, to find the Provider Plaintiffs, other than PPGC, should be terminated from Texas's Medicaid program because of their affiliation with PPGC, the Inspector General needed prima facie evidence PPGC committed a violation. *See* 1 TEX. ADMIN. CODE § 371.1703(c). Yet, as discussed above, the Inspector General had no evidence PPGC violated any medical or ethical standards and no evidence PPGC engaged in misrepresentations. Thus, the Inspector General had no evidence the other Provider Plaintiffs could be terminated on the basis of affiliation. However, even if the Inspector General could establish prima facie evidence PPGC committed a violation, the Inspector General would likely be unable terminate the other Provider Plaintiffs' enrollment in Medicaid on the basis of affiliation alone.

To reiterate, the Fifth Circuit confirmed states retain board authority to define provider qualifications and to exclude providers on that basis, but that authority is limited by the meaning of qualified. *Gee,* 837 F.3d at 495. The Fifth Circuit has expressly defined qualified in the Medicaid

context as meaning "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Id.*

The Final Notice relies on indicia of affiliation such as "common identifying information," "individual providers working across affiliates,"[9] and the Provider Plaintiffs' relationship with PPFA to find all the Provider Plaintiffs are affiliates. Thus, applying this line of logic, the Inspector General concluded if one Planned Parenthood provider could be terminated from Medicaid, all Planned Parenthood providers could be terminated as affiliates. Hr'g Tr. Vol. 2 at 38:23–41:3.

Yet, indicia of affiliation are likely unconnected to a provider's qualifications to provide medical services. *See id.* at 492–95 (discussing the scope of a state's ability to set reasonable standards related to a provider's qualifications). Excluding a provider from Medicaid as not qualified, if the provider is otherwise legally qualified to provide the required medical services within the state, violates Medicaid patients' statutory right to obtain medical care from the qualified provider of their choice. *Id.* at 493 (citing *Planned Parenthood of Ind.,* 699 F.3d at 968 (7th Cir. 2012) and *Planned Parenthood of Ariz. Inc. v. Beadlike,* 727 F.3d 960, 970 (9th Cir. 2013)). HHSC's expansion of a state's power to exclude qualified providers because of organizational associations would likely eviscerate the free-choice-of-provider requirement as an exclusionary rule unrelated to qualification. *See id.* at 494 (restating the principle that allowing a state to define qualified for its own purposes would destroy a Medicaid patient's right to choose his or her own qualified provider).

Generally, Medicaid's statutory scheme suggests the "individual or entity" a state may exclude must be the same individual or entity the state determines is not qualified to provide medical

---

[9] HHSC identified one doctor who worked at two different Provider Plaintiffs but there is no evidence this doctor ever worked at more than one provider at the same time. Hr'g Tr. Vol 2 at 80:7–81:17.

services. 42 U.S.C. § 1396a ("[A] State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude *the* individual or entity from participation in a program . . . .") (emphasis added); *see also Planned Parenthood Se., Inc. v. Bentley,* 141 F. Supp. 3d 1207, 1223 (M.D. Ala. 2015) (similarly holding the entity a state may exclude from Medicaid must be the same entity the state determines is unqualified and not an affiliate).

In contrast, HHSC argues federal law permits the termination of entities based on their affiliation, citing 42 C.F.R. § 1001.1001(a)(i)©. Defs.' Proposed Findings [#94] at ¶ 47. In relevant part, § 1001.1001(a) provides the following:

(1) The [Office of the Inspector General] may exclude an entity if:

 (i) A person with a relationship with such entity—

      . . .

      © Has been excluded from participation in Medicaid or any of the State health care programs, *and*

(ii) Such person—

      (A)(1) Has a direct or indirect ownership interest (or any combination thereof) of 5 percent or more in the entity;

      (2) Is the owner of a whole or part interest in any mortgage, deed of trust, note or other obligation secured (in whole or in part) by the entity or any of the property assets thereof, in which whole or part interest is equal to or exceeds 5 percent of the total property and assets of the entity;

      (3) Is an officer or director of the entity, if the entity is organized as a corporation;

      (4) Is partner in the entity, if the entity is organized as a partnership;

      (5) Is an agent of the entity; or

(6) Is a managing employee, that is, an individual (including a general manager, business manager, administrator or director) who exercises operational or managerial control over the entity or part thereof, or directly or indirectly conducts the day-to-day operations of the entity or part thereof, or

(B) Was formerly described in paragraph (a)(1)(ii)(A) of this section, but is no longer so described because of a transfer of ownership or control interest to an immediate family member or a member of the person's household . . . .

(emphasis added).[10]

The Court disagrees with HHSC's interpretation. Section 1001.1001(a)(i)© allows discretionary exclusion of an entity in a narrow circumstance, when a sanctioned person has an ownership or control interest in the entity or is an officer, director, agent, or managing employee of the entity. In such a situation the individual is an alter ego of the entity. Here, the Provider Plaintiffs are separate entities, with no evidence of an ownership or control interest. Consequently, the Court holds the Inspector General would likely be unable to terminate the other Provider Plaintiffs' enrollment in Medicaid on the basis of affiliation alone.

  d.    HHSC's Course of Conduct

Plaintiffs offer evidence HHSC seeks to terminate the Provider Plaintiffs for reasons other than their qualifications.

Most significantly, Plaintiffs emphasize how HHSC began its effort to terminate the Provider Plaintiffs from the state's Medicaid system in the fall of 2015 with the Initial Notice. *See* Initial Notice [#58-1]. The Inspector General even admitted he had not reviewed the CMP Video before the Initial Notice was issued. Hr'g Tr. Vol. 2 49:2–15. Only after Plaintiff filed this suit to challenge termination did HHSC concede it was not ready to move forward with termination. Mot. Prelim. Inj.

---

[10] HHSC misquotes 42 C.F.R. § 1001.1001(a)(1)(i)©, neglecting the "and" emphasized above and failing to explore how the other requirements of the section apply. *See* Defs.' Proposed Findings [#94] at ¶ 47.

[#58] at 2. Despite being unwilling to proceed with termination, HHSC did not rescind the Initial Notice, causing this case to languish on this Court's docket for over a year. *Id.*

When HHSC ultimately decided to issue the Final Notice, it did so five days before Christmas, forcing Plaintiffs to renew their efforts to challenge termination in the middle of the holiday season.[11] *Id.* Without explanation, the Final Notice abandons the majority of the bases for termination alleged in the Initial Notice and asserts new grounds for termination. *Compare* Initial Notice *with* Final Notice.

In addition, the general lack of evidence supporting the Inspector General's termination decision, discussed above, implies HHSC seeks to terminate the Provider Plaintiffs for reasons other than their qualifications.[12] Moreover, there is no evidence in the record of any effort to revoke the license or any other qualification needed to render medical services of any Provider Plaintiff. *See Gee*, 837 F.3d at 499 (considering the fact Louisiana made no effort to revoke the license of PPGC or limit its entitlement to render medical services to the general population as evidence the termination decision had nothing to do with PPGC's qualifications).

The Individual Plaintiffs have met their burden to establish a likelihood of success on the merits. The Inspector General did not have prima facie of evidence, or even a scintilla of evidence, to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff

---

[11] Almost simultaneously with HHSC's issuance of the Final Notice, the Texas Department of State Health Services adopted new rules restricting disposal methods for fetal tissue; the new rules were published on December 9, 2016, and intended to take effect on December 18th. *See* Mot. Prelim. Inj., *Whole Woman's Health et al. v. Hellerstedt*, No. 1:16-cv-01300 (W.D. Tex. Dec. 12, 2016), ECF No. 6. The Court notes the coincidental timing of the Final Notice and the intended effective date of fetal tissue disposal rules.

[12] It appears the letter to the Texas Attorney General recommending further investigation of Planned Parenthood was sent by Representative Blackburn in her individual capacity, *see* Referral Letter at 11, and only half of the Select Panel is recognized in the author block of the Report. *See* Select Panel Report.

Providers were not qualified. The Inspector General relied on an unauthenticated video and the advice of an orthopedic surgeon to conclude PPGC violated medical and ethical standards related to abortion procedures. Likewise, the Inspector General concluded PPGC made a misrepresentation following the identification of a single allegedly incorrect statement, without any evidence the statement was a misrepresentation rather than a mistake. Simply put, the Inspector General did not have any basis to conclude PPGC warranted termination from the Medicaid program as unqualified.

Even if the Inspector General could establish by prima facie evidence PPGC was unqualified, the Inspector General would likely be unable terminate the other Provider Plaintiffs' enrollment in Medicaid because organizational affiliation is unrelated to fitness to provide medical services. Finally, the evidence currently in the record implies HHSC was motivated by reasons other than qualifications to terminate the Provider Plaintiffs from Medicaid.  For all these reasons, the Court holds the Individual Plaintiffs are substantially likely to succeed in showing HHSC violated their rights under § 1396a(a)(23).

## B.      Threat of Irreparable Injury

HHSC argues the Individual Plaintiffs will not be harmed because they can seek medical care through other Medicaid providers and through Texas's other health care programs such as Texas Healthy Women. Defs.' Proposed Findings [#94] at ¶¶ 14–18, 58–59. HHSC's argument fails to appreciate that § 1396a(a)(23) provides Medicaid beneficiaries the right to their chosen qualified provider, not just access to any qualified provider.

In *Gee*, the Fifth Circuit concluded the district court did not err in finding the individual plaintiffs would be irreparably harmed if they were unable to receive medical care from the qualified Medicaid provider of their choice. 837 F.3d at 500–01.The same reasoning applies here. Each of the Individual Plaintiffs submitted a declaration stating her preference for continuing to receive health care

from her chosen Planned Parenthood provider. The declarations collectively show the Individual Plaintiffs do not know where they would get the same kind and quality of care, each citing the nonjudgmental service the Provider Plaintiffs offer, the flexible hours, and the short wait times.

Consequently, because the Individual Plaintiffs in this case would be deprived of their legal right to the qualified health care provider of their choice, the Court finds the Individual Plaintiffs would suffer an irreparable injury if not granted a preliminary injunction.

**C.    Threatened Injury Outweighs Alleged Harms to Texas**

On one side of the harm scale, HHSC claims denying the injunction is necessary to protect patients, and granting the injunction would allow an unqualified provider to continue "engag[ing] in behavior that violates medical and ethical standards." Resp. [#70] at 40. However, as discussed above, the current record does not include sufficient evidence to support Texas's claim PPGC violated any ethical and medical standards. There is also no claim the other Provider Plaintiffs violated any standards.

On the other side of the scale, as previously stated, the Individual Plaintiffs have proven a substantial likelihood of success on their claim terminating the Provider Plaintiffs from Medicaid violates their right to their chosen provider and would cause irreparable harm. If the termination were allowed to proceed, the Individual Plaintiffs would, at minimum, see their health care disrupted.

This Court is not convinced all of the Provider Plaintiffs' patients would be able to quickly and easily find new providers if they were prevented from seeing their chosen provider, a harm in and of itself. Terminating the Provider Plaintiffs would eliminate thirty health centers across Texas from the Medicaid program. These centers are the only family planning specialists in the state and provide a wide variety of services in a manner specifically designed to be convenient for vulnerable populations.

For these reasons, the Court holds injuries suffered by the Individual Plaintiffs outweigh any harm to HHSC.

## D.     Public Interest Favors Injunction

Finally, like the district court in *Kliebert*, this Court finds an injunction in this case serves the public interest by ensuring Medicaid recipients in Texas will continue to have access to medical care at their chosen providers. 141 F. Supp. 3d at 651. Because HHSC's termination of the Provider Plaintiffs' provider agreements likely violates federal law, there is no legitimate public interest in allowing Texas to complete its planned terminations based on the current facts. *See Gee*, 837 F.3d at 502. Instead, the public interest favors enforcing the Individual Plaintiffs' rights and avoiding disrupting the health care of some of Texas's most vulnerable individuals.

## E.     No Bond Required

Federal Rule of Civil Procedure 65 allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A court may waive this requirement, however, at its discretion. *See, e.g., Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

Here, HHSC requested a bond, arguing if it were enjoined from terminating the Provider Plaintiffs' enrollment in Medicaid then it would have to continue to reimburse Planned Parenthood. Resp. [#70] at 41–42. HHSC contends forcing the continuation of payment would be a violation of Texas's authority over the Medicaid program within its borders. *Id.*

Regardless of whether this Court enjoined the termination of the Provider Plaintiffs, Texas would still have an obligation to reimburse some providers for the services the Individual Plaintiffs and other Medicaid beneficiaries require. The Court therefore finds the injunction will not harm

Texas's budget. Furthermore, as noted above, Texas does not have an interest in administering the state's Medicaid program in a manner that violates federal law. As a result, the Court finds no reason to require Plaintiffs to provide security for the preliminary injunction.

### Conclusion

Because the Individual Plaintiffs have met their burden on the elements for a preliminary injunction, the Court GRANTS Plaintiffs' Motion for a Preliminary Injunction. With this injunction, the Court preserves its ability to render a meaningful decision on the merits.

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for a Preliminary Injunction [#58] is GRANTED;

IT IS FURTHER ORDERED that Defendants, their employees, agents, and successors, and all others acting in concert or participating with them are PRELIMINARILY ENJOINED from terminating the Provider Plaintiffs' Medicaid Provider Agreements. No bond is required. The preliminary injunction will remain in force until further ordered; and

IT IS FINALLY ORDERED that the parties confer and submit a proposed scheduling order specifying the time period requested for necessary discovery for the Court's consideration within THIRTY (30) DAYS from the entry of this order. The Court will then schedule a trial date. A form scheduling order is available at http://www.txwd.uscourts.gov/USDC%20Rules/StandingOrders/Austin/sched-ss.pdf.

SIGNED this the ___21st___ day of February 2017.

_____

SAM SPARKS

UNITED STATES DISTRICT JUDGE