# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 17-50282

_____

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2020

Lyle W. Cayce
Clerk

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INCORPORATED; PLANNED PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON COUNTY; PLANNED PARENTHOOD GULF COAST, INCORPORATED; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE DOE, I; JANE DOE 2; JANE DOE 4; JANE DOE 7; JANE DOE 9; JANE DOE 10; JANE DOE 11,

                                        Plaintiffs—Appellees,

v.

SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Inspector General of HHSC; CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of HHSC,

                                        Defendants—Appellants.

—————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:15-CV-1058

—————————————

17-50282

Before OWEN, Chief Judge, and JOLLY, JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is VACATED.

IT IS FURTHER ORDERED that appellees pay to appellants the costs on appeal to be taxed by the Clerk of this Court.

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, WILLETT, HO, DUNCAN, and ENGELHARDT, Circuit Judges, concurring.

JAMES C. HO, Circuit Judge, joined by STUART KYLE DUNCAN, Circuit Judge, concurring.

STEPHEN A. HIGGINSON, Circuit Judge, joined by STEWART and COSTA, Circuit Judges, concurring in part and dissenting in part, partially joined by DENNIS and GRAVES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge, joined by JAMES E. GRAVES, Circuit Judge, dissenting.

Certified as a true copy and issued
as the mandate on Dec 15, 2020

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

---

* JUDGE OLDHAM is recused and did not participate in the decision. JUDGE WILSON joined the court after this case was submitted and did not participate in the decision.

2

REVISED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 17-50282

————

United States Court of Appeals
Fifth Circuit

**FILED**

November 23, 2020

Lyle W. Cayce
Clerk

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING
AND PREVENTATIVE HEALTH SERVICES, INCORPORATED; PLANNED
PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON
COUNTY; PLANNED PARENTHOOD GULF COAST, INCORPORATED;
PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE
DOE, I; JANE DOE 2; JANE DOE 4; JANE DOE 7;
JANE DOE 9; JANE DOE 10; JANE DOE 11,

                    Plaintiffs–Appellees,

v.

SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Inspector
General of HHSC; CECILE ERWIN YOUNG, in her official capacity as
Executive Commissioner of HHSC,

                    Defendants–Appellants.

————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:15-CV-1058

————

Before OWEN, Chief Judge, and JOLLY, JONES, SMITH, STEWART,
DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON,
COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, Circuit Judges.[*]

————

[*] JUDGE OLDHAM is recused and did not participate in the decision. JUDGE WILSON
joined the court after this case was submitted and did not participate in the decision.

No. 17-50282

PRISCILLA R. OWEN, Chief Judge, joined by JOLLY, JONES, SMITH, ELROD, SOUTHWICK, HAYNES, WILLETT, HO, DUNCAN and ENGELHARDT, Circuit Judges:[**]

In this interlocutory appeal of a preliminary injunction, the dispositive issue is whether 42 U.S.C. § 1396a(a)(23) gives Medicaid patients a right to challenge, under 42 U.S.C. § 1983, a State's determination that a health care provider is not "qualified" within the meaning of § 1396a(a)(23). Our decision rests primarily on two independent bases: (1) the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center*,[1] and (2) the text and structure of § 1396a(a)(23), which does not unambiguously provide that a Medicaid patient may contest a State's determination that a particular provider is not "qualified"; whether a provider is "qualified" within the meaning of § 1396a(a)(23) is a matter to be resolved between the State (or the federal government) and the provider. We overrule the decision by a panel of this court[2] that the district court duly followed in the present case. Accordingly, we vacate the preliminary injunction.

**I**

Five Medicaid providers were among the plaintiffs in the district court and are appellees in this court. They are Planned Parenthood Gulf Coast, Inc. (PP Gulf Coast), headquartered in Houston; Planned Parenthood Greater Texas, Inc., headquartered in Dallas and providing services in parts of north and central Texas; and three providers—Planned Parenthood of Cameron County, Planned Parenthood San Antonio, and Planned Parenthood South

---

[**] JUDGE HAYNES concurs in the judgment and joins in the reasoning of Sections I, II, and V.

[1] 447 U.S. 773 (1980).

[2] *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 408 (2018).

No. 17-50282

Texas Surgical Center—that the district court described as operating "under the umbrella of Planned Parenthood South Texas." We will refer to the Medicaid providers collectively as the Providers. Seven individuals, to whom we will refer collectively as the Individual Plaintiffs, received or sought services from one or more of the Providers. The two defendants in the district court and the appellants in this court are the Executive Commissioner of the Texas Health and Human Services Commission, and that Commission's Inspector General (OIG), in their respective official capacities. We will refer to the defendants collectively as HHSC.

The Providers provide family planning and other health services to approximately 12,500 Medicaid patients at thirty health centers each year. Their services include examinations, cancer screenings, testing and treatment for sexually transmitted diseases, as well as basic healthcare for both men and women. Each of the Providers is a member of Planned Parenthood Federation of America (Planned Parenthood); they must adhere to certain medical and organizational standards to operate under the name "Planned Parenthood."

As participants in the Texas Medicaid program, the Providers entered into Medicaid provider agreements under which they are required to comply with all Texas Medicaid policies and applicable state and federal regulations. The OIG oversees compliance with state Medicaid policies. Texas law authorizes the OIG to conduct investigations and to terminate Medicaid provider agreements for noncompliance.[3] The OIG may terminate a Medicaid provider agreement when "prima facie evidence" establishes that a provider has committed a "program violation" or is "affiliated with a person who

---

[3] 1 TEX. ADMIN. CODE §§ 371.3, 371.1703(c) (2020).

No. 17-50282

commits a program violation."[4]  A "program violation" includes any violation of federal law, state law, or the Texas Medicaid program policies.

In 2015, the Center for Medical Progress (CMP), a pro-life organization, released video recordings of conversations that occurred at PP Gulf Coast headquarters.  The CMP videos depict two individuals posing as representatives from a fetal tissue procurement company discussing the possibility of a research partnership with PP Gulf Coast.  The release of these videos prompted congressional investigations.  The Senate Judiciary Committee released a report,[5] as did a House Select Investigative Panel of the Committee on Energy and Commerce.[6]  An alternative report to the House Committee's report was issued by committee members in the minority.[7]

In October 2015, the OIG sent each Provider a Notice of Termination of its respective Medicaid provider agreement, stating that each was "no longer capable of performing medical services in a professionally competent, safe, legal, and ethical manner."  The Notice listed the bases for termination and stated that, unless the Providers responded within thirty days, a Final Notice of Termination would issue.

The Providers and Individual Plaintiffs sued in federal court to block the terminations.  They asserted that the terminations violated rights conferred

---

[4] *Id.* §§ 371.1703(c), (c)(6)-(7).

[5] MAJORITY STAFF OF S. COMM. ON THE JUDICIARY, 114TH CONG., MAJORITY REPORT ON HUMAN FETAL TISSUE RESEARCH: CONTEXT AND CONTROVERSY (Comm. Print 2016), https://www.grassley.senate.gov/sites/default/files/judiciary/upload/22920%20-%20FTR.pdf.

[6] SELECT INVESTIGATIVE PANEL OF THE ENERGY & COM. COMM., 114TH CONG., FINAL REPORT xviii-xix (Comm. Print 2017), https://www.govinfo.gov/content/pkg/CPRT-114HPRT24553/pdf/CPRT-114HPRT24553.pdf.

[7] DEMOCRATIC MEMBERS, SELECT INVESTIGATIVE PANEL OF THE ENERGY & COM. COMM., 114TH CONG., SETTING THE RECORD STRAIGHT: THE UNJUSTIFIABLE ATTACK ON WOMEN'S HEALTH CARE & LIFE-SAVING RESEARCH (Comm. Print 2016), https://www.stemexpress.com/wp/wp-content/uploads/2018/01/20161228-Full-Dem-Report.pdf.

No. 17-50282

by 42 U.S.C. § 1396a(a)(23) and sought relief under § 1983. They also contended that the OIG's actions violated their Fourteenth Amendment Equal Protection rights.

The OIG sought a stay of proceedings, which the district court granted, pending the issuance of a Final Notice of Termination. The OIG then sent the Final Notice. The Final Notice stated that the Inspector General had determined that the Providers were "not qualified to provide medical services in a professionally competent, safe, legal[,] and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers." The OIG based this conclusion on the CMP videos, evidence provided by the United States House of Representatives' Select Investigative Panel, and the OIG's consultation with its Chief Medical Officer. The Final Notice stated that "numerous violations of generally accepted standards of medical practice" had occurred and asserted that PP Gulf Coast had engaged in misrepresentations. The Notice also stated that under the OIG's regulations, affiliates of a terminated entity are subject to termination.[8] The Providers and Individual Plaintiffs thereafter filed an amended complaint and a new motion for a preliminary injunction.

The district court conducted a three-day evidentiary hearing, during which it reviewed the CMP videos and heard testimony from medical and ethics experts. The OIG introduced evidence that, it asserts, shows PP Gulf Coast violated federal regulations relating to fetal tissue research by altering abortion procedures for research purposes or allowing the researchers themselves to be involved in performing abortions.[9]

---

[8] See 1 TEX. ADMIN. CODE § 371.1703(c)(7).

[9] See 42 U.S.C. § 289g-1(b)(2)(A)(ii) (requiring researchers to certify that "no alteration of the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue"); id. § 289g-1(c)(4) (requiring researchers to certify that

5

No. 17-50282

Following the hearing, the district court issued a memorandum and order granting the Providers and Individual Plaintiffs' motion for a preliminary injunction and prohibiting the termination of the Providers' Medicaid provider agreements.[10]  The district court held that § 1396a(a)(23) granted rights to the Individual Plaintiffs upon which a § 1983 action challenging the OIG's termination decision could be based.[11]  The district court concluded from the evidence adduced at the preliminary injunction hearing that the Individual Plaintiffs were likely to succeed on the merits of their § 1983 claim because the OIG "did not have prima facie . . . evidence, or even a scintilla of evidence, to conclude the bases of termination set forth in the Final Notice merited finding the . . . Providers were not qualified."[12]  This appeal ensued.

A three-judge panel of this court held, based on *Planned Parenthood of Gulf Coast, Inc. v. Gee*,[13] that the Individual Plaintiffs could maintain a § 1983 suit.[14]  The panel also held that the district court abused its discretion by reviewing the agency's decision de novo rather than applying the arbitrary and capricious standard and by considering factual matters beyond those contained

---

they "had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy made solely for the purposes of the research"); 45 C.F.R. § 46.204(i) (requiring that "[i]ndividuals engaged" in research involving "[p]regnant women or fetuses" "have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy").

[10] *Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 1000 (W.D. Tex. 2017).

[11] *Id.* at 988.

[12] *Id.* at 998.

[13] 862 F.3d 445 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 408 (2018).

[14] *See Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Smith*, 913 F.3d 551, 554, 559-62 (5th Cir. 2019).

6

No. 17-50282

in the administrative record that was before the HHSC.[15]  We granted en banc review.[16]

The preliminary injunction issued by the district court was based solely on the claims of the Individual Plaintiffs.  The district court did not consider whether the Providers were entitled to a preliminary injunction.[17]  The question before us is whether the Individual Plaintiffs may bring a § 1983 suit to contest the State's determination that the Providers were not "qualified" providers within the meaning of 42 U.S.C. § 1396a(a)(23).  We hold that they may not.  We accordingly vacate the preliminary injunction.

Because the district court did not consider the Providers' claims, no aspect of those claims is before us in this interlocutory appeal.  Accordingly, we do not reach an issue addressed by JUDGE HIGGINSON's opinion concurring in part and dissenting in part, which is whether the Medicaid agreements of entities affiliated with PP Gulf Coast were properly terminated.[18]

---

[15] *Id.* at 569.

[16] *Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Smith*, 914 F.3d 994, 996 (5th Cir. 2019) (mem.).

[17] *Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 988 (W.D. Tex. 2017) ("The Court need not conclude all Plaintiffs have a substantial likelihood of prevailing on the Medicaid Act claim for a preliminary injunction to issue at this time.  If Plaintiffs satisfy the elements needed to show a substantial likelihood of success on the Individual Plaintiffs' § 1396a(a)(23) claim only, so long as the other factors are met, a preliminary injunction is appropriate.  Accordingly, because this Court [hold]s the Individual Plaintiffs have a right of action, it need not decide whether the Provider Plaintiffs also have such a right, either on their own behalf or on the behalf of their patients." (citations omitted)).

[18] *See* HIGGINSON, J., concurring in part and dissenting in part, *post* at 65.

7

No. 17-50282

## II

"A preliminary injunction is an 'extraordinary remedy' . . . ."[19] Applicants must show:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[20]

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law de novo."[21] When a district court applies incorrect legal principles, it abuses its discretion.[22]

We first consider whether the Individual Plaintiffs have a right under § 1396a(a)(23) to challenge a determination that a Medicaid provider is not "qualified." If they do not have such a right, then our inquiry is at an end because without a right that can be vindicated by a § 1983 action, the Individual Plaintiffs cannot bring this suit.

Section 1983 supplies remedies for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[23] The Supreme Court's seminal decision in *Gonzaga University v. Doe*[24] explained, repeatedly, that "[s]ection 1983 provides a remedy only for the deprivation of

---

[19] *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

[20] *Id.* at 537 (quoting *Byrum*, 566 F.3d at 445).

[21] *Id.* (emphasis omitted) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)).

[22] *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

[23] 42 U.S.C. § 1983.

[24] 536 U.S. 273 (2002).

8

No. 17-50282

rights" and that "it is *rights*, not the broader or vaguer benefits or interests, that may be enforced under the authority of that section."[25]

The Individual Plaintiffs rely upon 42 U.S.C. § 1396a(a)(23) as the source of their right to challenge the termination of the Providers' Medicaid agreements. This provision is sometimes referred to as the "any-qualified-provider" or "free-choice-of-provider" provision.

Under subpart 23(A) of the statute, a State Medicaid plan must permit an individual eligible for medical assistance to obtain that assistance from any "qualified" provider who undertakes to provide such services:

> (a) Contents
> A State plan for medical assistance must—
>> . . . .
>> (23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services . . . .[26]

The statute provides in subpart 23(B) that a State's Medicaid plan must also provide that an individual eligible for medical assistance who is enrolled in certain managed care systems or organizations cannot be restricted from obtaining "family planning services and supplies"[27] from the "qualified person" of his or her choice:

---

[25] *Id.* at 283 (emphasis in original) (internal quotation marks omitted); *see also id.* at 285 (explaining that the inquiry "is to determine whether . . . a statute 'confer[s] rights on a particular class of persons'" (alteration in original) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981))).

[26] 42 U.S.C. § 1396a(a)(23)(A).

[27] *Id.* at § 1396d(a)(4)(C) (defining eligible costs and services to include "family planning services and supplies furnished (directly or under arrangements with others) to

No. 17-50282

(a) Contents
A State plan for medical assistance must—

> . . . .
> (23) provide that . . . (B) an enrollment of an individual
> eligible for medical assistance in a primary care case-
> management system (described in section 1396n(b)(1) of this
> title), a medicaid managed care organization, or a similar
> entity shall not restrict the choice of the qualified person
> from whom the individual may receive services under section
> 1396d(a)(4)(C) of this title, except as provided in subsection
> (g), in section 1396n of this title, and in section 1396u-2(a) of
> this title, except that this paragraph shall not apply in the
> case of Puerto Rico, the Virgin Islands, and Guam, and
> except that nothing in this paragraph shall be construed as
> requiring a State to provide medical assistance for such
> services furnished by a person or entity convicted of a felony
> under Federal or State law for an offense which the State
> agency determines is inconsistent with the best interests of
> beneficiaries under the State plan or by a provider or
> supplier to which a moratorium under subsection (kk)(4) is
> applied during the period of such moratorium . . . .[28]

Both subparts (A) and (B) use the term "qualified" as a modifier in describing a provider from whom a person eligible for Medicaid assistance may obtain care or supplies. In *O'Bannon v. Town Court Nursing Center*,[29] the Supreme Court determined that individuals who are Medicaid beneficiaries do not have a right under 42 U.S.C. § 1396a(a)(23) to contest a state or federal agency's determination that a Medicaid provider is not "qualified."[30]

The question addressed by the Supreme Court in *O'Bannon* was whether Medicaid beneficiaries residing in a nursing home "have a constitutional right

---

individuals of child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies").

[28] *Id.* at § 1396a(a)(23)(B).

[29] 447 U.S. 773 (1980).

[30] *Id.* at 785-86.

No. 17-50282

to a hearing before a state or federal agency may revoke the home's authority to provide them with nursing care at government expense."[31]  The Department of Health, Education and Welfare had notified the nursing home that it "no longer met the statutory and regulatory standards for skilled nursing facilities and that, consequently, its Medicare provider agreement would not be renewed."[32]  A state agency followed suit.[33]  The nursing home and residents who were Medicaid beneficiaries brought an action in federal court contending that, under the Due Process Clause, they "were entitled to an evidentiary hearing on the merits of the decertification decision before the Medicaid payments were discontinued."[34]  In addressing this claim, the Supreme Court confirmed that the Due Process Clause does not confer a "right to a hearing" in the abstract; rather, it does so only as a prerequisite to a deprivation of "life, liberty, or property."[35]  Accordingly, for the *O'Bannon* beneficiaries to prevail on their due process claim, they had to show that the termination of the nursing home's Medicaid agreement "amount[ed] to a deprivation of an[] interest in life, liberty, or property."[36]

---

[31] *Id.* at 775; *see also id.* at 784 (explaining that the "question is whether the patients have an interest in receiving benefits for care in [the nursing home] that entitles them, as a matter of constitutional law, to a hearing before the Government can decertify that facility").

[32] *Id.* at 776.

[33] *Id.*

[34] *Id.* at 777; *see* Brief for Respondents at 26, *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773 (1980) (No. 78-1318) ("The Patients' right to pre-termination process is based upon their right not to be deprived of 'life, liberty, or property, without due process of law . . .' as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution." (alteration in original)).

[35] *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 788, 790 (1980); *see* U.S. CONST. amend. XIV, § 1.

[36] *O'Bannon*, 447 U.S. at 787; *see also Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." (citations omitted) (first citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 (1972); and then citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983))).

No. 17-50282

The *O'Bannon* Medicaid beneficiaries contended that because 42 U.S.C. § 1396a(a)(23) granted them the right to obtain services from any qualified provider, they had a property right to remain in the home of their choice and, therefore, they had a right to a hearing to challenge whether cause existed for the termination of their preferred providers' Medicaid agreements.[37]

The Supreme Court rejected the beneficiaries' argument.[38]  The Court held that "the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations."[39]  The Court specifically identified the any-qualified-provider provision, § 1396a(a)(23), holding that "while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified."[40] Therefore the patients did not have the right to question a state or federal agency's determination that an institution was unqualified.  The any-qualified-provider provision, the Court explained, was among statutes and regulations that "involve[] the Government's attempt to confer an indirect benefit on Medicaid patients by imposing and enforcing minimum standards of care on facilities like" the nursing home.[41]  The Court reasoned that "[w]hen enforcement of those standards requires decertification of a facility, there may be an immediate, adverse impact on some residents.  But surely that impact,

---

[37] *O'Bannon*, 447 U.S. at 779, 779 n.8, 784 (explaining that the Court of Appeals had identified Medicaid provisions, including 42 U.S.C. § 1396a(a)(23), that gave "Medicaid recipients the right to obtain services from any qualified facility," and that the nursing home patients contended these provisions "g[a]ve them a property right to remain in the home of their choice absent good cause for transfer and therefore entitle[d] them to a hearing on whether such cause exist[ed]").

[38] *Id.* at 785.

[39] *Id.* at 786.

[40] *Id.*

[41] *Id.* at 787.

12

No. 17-50282

which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property."[42]  Consequently, the patients had no right under § 1396a(a)(23)(A) to challenge the decertification decision.[43]

In *O'Bannon*, the Court explained that § 1396a(a)(23) "gives [Medicaid] recipients the right to choose among a range of *qualified* providers, without government interference" and "[b]y implication, . . . also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified."[44]  The Court juxtaposed these granted rights with those that § 1396a(a)(23) "clearly does not confer," beginning with the right "to enter an unqualified home and demand a hearing to certify it."[45]  Most relevant here, the Court explicitly stated that § 1396a(a)(23) does not grant Medicaid beneficiaries the right "to continue to receive benefits for care in a home that has been decertified."[46]  In reaching this conclusion, the Court noted that "decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility."[47]

The *O'Bannon* beneficiaries also argued that being transferred to another nursing home "may have such severe physical or emotional side effects that it is tantamount to a deprivation of life or liberty."[48]  The Court rejected this argument as well.  The Court compared Medicaid beneficiaries whose preferred provider has been decertified to patients without Medicaid whose preferred provider's license has been revoked, reasoning that, while "[b]oth

---

[42] *Id.*
[43] *Id.* at 775, 785.
[44] *Id.* at 785 (emphasis in original).
[45] *Id.*
[46] *Id.*
[47] *Id.* at 785-86.
[48] *Id.* at 784.

13

No. 17-50282

may be injured by the closing of a [provider] due to revocation of [the provider's] state license or [the provider's] decertification as a Medicaid provider[,] . . . [neither patient] would have any claim against the responsible governmental authorities for the deprivation of an interest in life, liberty, or property."[49]

Having concluded that the termination of the nursing home's Medicaid provider agreement "did not directly affect the patients' legal rights or deprive them of any constitutionally protected interest in life, liberty, or property,"[50] the Court determined that the Medicaid beneficiaries did not have a due process right to a hearing on whether the federal and state agencies were justified in terminating the nursing home's Medicaid provider agreement.[51]

The Supreme Court's decision in *O'Bannon* resolves this case.[52]  It establishes that § 1396a(a)(23) does not give Medicaid beneficiaries a right to question a State's determination that a provider is unqualified.  Medicaid beneficiaries have an "absolute right" under § 1396a(a)(23) to receive services from a provider whom the State has determined is "qualified," but beneficiaries have no right under the statute to challenge a State's determination that a provider is unqualified.

Because the Individual Plaintiffs do not have a right to continued benefits to pay for care from the Providers, they are not likely to prevail on the merits of their § 1983 claims and, as a result, are not entitled to a preliminary

---

[49] *Id.* at 787.
[50] *Id.* at 790.
[51] *Id.* at 775, 785.
[52] *Accord Does v. Gillespie*, 867 F.3d 1034, 1047 (8th Cir. 2017) (SHEPHERD, J., concurring) ("*O'Bannon* controls the outcome of this case.  The plaintiffs are asserting a right—the absolute right to a particular provider of their choosing—that § 23(A) does not grant them.").

14

No. 17-50282

injunction.[53]   Accordingly, the injunction issued by the district court, which was based entirely on the § 1983 claims of the Individual Plaintiffs,[54] must be vacated.

## III

Even absent *O'Bannon*'s holding, the text of § 1396a(a)(23) does not unambiguously grant Medicaid patients the right to be involved in or to contest a state agency's determination that a provider is not "qualified." The any-qualified-provider provision expressly contemplates that the chosen provider is both "qualified" and willing to provide the services sought.[55] The two requirements cannot be divorced from one another. It is a chicken-and-egg proposition. A provider is not eligible to be chosen unless both conditions are met—that it is qualified and willing to provide services.

The most natural reading of § 1396a(a)(23) is that it is up to the provider to establish that it is both "qualified" and willing to provide the services. A Medicaid patient is not involved in a provider's willingness to accept Medicaid procedures, regulations, and reimbursement rates. Additionally, whether a provider is "qualified" is largely a factual determination with the facts more readily available to the provider, not the Medicaid patient. If a state agency or actor determines that a particular provider is not qualified, in most if not all cases, it is the provider who has the most incentive to contest such a finding and to seek a resolution. It requires a strained reading of § 1396a(a)(23) to conclude that a Medicaid patient has the *independent right* to have a particular provider declared "qualified" when the provider itself does not challenge a

---

[53] *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (quoting *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252 (5th Cir. 2009)).

[54] *See Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 987-88 (W.D. Tex. 2017).

[55] *See* 42 U.S.C. § 1396a(a)(23)(A).

finding that it is not qualified.  It requires an equally strained reading of § 1396a(a)(23) to conclude that it is only when a provider itself contests a finding that it is not "qualified" that a Medicaid patient has the *right* to have that particular provider declared "qualified" in the face of the contrary finding. Where is the language in § 1396a(a)(23) that grants a right to a Medicaid patient, either independent of the provider's right or exercised in tandem with the provider, to have a particular provider declared "qualified"?  It is not there,[56] and that is why the Supreme Court held as it did in *O'Bannon*.  A Medicaid patient may choose among qualified and willing providers but has no right to insist that a particular provider is "qualified" when the State has determined otherwise.

In *Gonzaga University*, the Supreme Court "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983."[57]  The Court explained that "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context."[58]  In determining "whether Congress *intended to create a federal right*" the Supreme Court has held that "the question . . . is definitively answered in the negative whe[n] a statute by its terms grants no private rights to any identifiable class."[59]  The inquiry when determining if a statute grants a right "is to determine whether or not a statute 'confer[s] rights on a particular class of persons.'"[60]  "Accordingly, whe[n] the

---

[56] *See id.*

[57] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

[58] *Id.* at 285.

[59] *Id.* at 283-84 (emphasis in original) (internal brackets and quotation marks omitted) (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979)).

[60] *See id.* at 285 ("[T]he initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the

No. 17-50282

text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."[61]

The *Gonzaga* decision also re-emphasized "that it is only violations of *rights*, not *laws*, which give rise to § 1983 actions."[62]  The Court explained, to "seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."[63]

The Supreme Court's opinion in *Armstrong v. Exceptional Child Center, Inc.*[64] also supports the conclusion that Congress did not intend to create a right under § 1396a(a)(23) such that Medicaid patients could contest a State's determination that a particular provider is not "qualified."  While the statute unambiguously provides that a Medicaid beneficiary has the right to obtain services from the qualified provider of her choice, § 1396a(a)(23) does not unambiguously say that a beneficiary may contest or otherwise challenge a determination that the provider of her choice is unqualified.  In *Armstrong* the Supreme Court disavowed, in part, its decision in *Wilder v. Virginia Hospital Ass'n*[65] declaring in *Armstrong* that "our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified.  *See Gonzaga Univ. v. Doe* . . . (expressly 'reject[ing] the notion,' implicit in *Wilder*, 'that our

---

express purpose of which is to determine whether or not a statute 'confer[s] rights on a particular class of persons.'" (alteration in original) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981))).

[61] *Id*. at 286.

[62] *Id*. at 283 (emphasis in original) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

[63] *Id*. at 282 (emphasis and alteration in original) (quoting *Freestone*, 520 U.S. at 340).

[64] 575 U.S. 320 (2015) (plurality opinion).

[65] 496 U.S. 498 (1990).

cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983').”[66]

The right asserted by the Individual Plaintiffs is not unambiguously conferred. Section 1396a(a)(23) says that State Medicaid plans must "provide that . . . any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services, and . . . an enrollment of an individual eligible for medical assistance in [certain entities] shall not restrict the choice of the qualified person from whom the individual may receive services.”[67]  The only unambiguous directives are that a State must include such a provision in its Medicaid plan and that beneficiaries have the right to choose among qualified providers.  This subsection does not say that a Medicaid patient has a right to contest a State's determination that a provider is not "qualified."  The Individual Plaintiffs can only *infer*, at best, that if they have a right to obtain assistance from a "qualified" provider, then they have a right to contest a State's determination that a particular provider is not "qualified" to perform the necessary services.  But such an inference is not "an unambiguously conferred right.”[68]

Neither the text nor the structure of § 1396a(a)(23) indicates that Congress intended to give Medicaid beneficiaries the right to intervene or otherwise interject themselves into state or federal administrative or court proceedings whose purpose is to determine whether a particular provider is

---

[66] *Armstrong*, 575 U.S. at 330 n.* (citing *Gonzaga*, 536 U.S. at 283).

[67] 42 U.S.C. § 1396a(a)(23).

[68] *Gonzaga*, 536 U.S. at 283 ("We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.").

No. 17-50282

"qualified." Nor does the text or structure of § 1396a(a)(23) suggest that while state or federal administrative or court proceedings are ongoing to resolve the issue of a provider's qualification, or after there is a final determination by the State that the provider is not "qualified," a Medicaid patient has the right to litigate separately or anew whether her provider is "qualified." If Congress had intended such a scheme with its inherent potential for conflict, that intent must have been plainly—unambiguously—expressed.[69] It was not.

This conclusion is borne out by the text and structure of other closely related federal statutes. Statutory provisions, including other subsections of § 1396a, permit a State to exclude providers from Medicaid plans for a host of reasons,[70] while other statutory provisions, also including other subsections of § 1396a, *mandate* exclusion for various reasons.[71] Section 1396a(p)(3) provides that "the term 'exclude' includes the refusal to enter into or renew a participation agreement or the termination of such an agreement."[72] None of these statutes suggest that Medicaid patients have a right to challenge whether, as either a factual or legal matter, a State's exclusion or removal of a provider is permitted or mandated by these statutes.

The any-qualified-provider provision is not analogous to the provision of the Medicaid Act at issue in *Wilder v. Virginia Hospital Ass'n*.[73] The Supreme

---

[69] *See id.* at 290 ("In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.").

[70] *See, e.g.*, 42 U.S.C. § 1396a(p)(1) ("In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."); *id.* § 1320a-7(b).

[71] *See, e.g.*, *id.* §§ 1396a(p)(2), 1320a-7(a).

[72] *Id.* § 1396a(p)(3).

[73] 496 U.S. 498 (1990).

19

No. 17-50282

Court reasoned in *Suter v. Artist M.*[74] that "the Boren Amendment [the subject of *Wilder*] actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the providers."[75]    The Court continued, "[w]e relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates."[76]

The language at issue in the present case is more akin to the statute under consideration in *Suter v. Artist M.*, which was a provision in the Adoption Assistance and Child Welfare Act of 1980 (Adoption Act).[77]    "The Adoption Act establishe[d] a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services."[78]    To participate, a State was required to submit a plan to the Secretary of Health and Human Services for approval.[79]    The Adoption Act required the plan to provide that "in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home."[80]    The plaintiffs sought, and the district court granted, injunctive relief requiring a state agency to assign a caseworker to each child placed in the agency's custody within three working days of the time the case was first heard in state court, and to reassign a caseworker within three working days of the date any caseworker relinquished responsibility for

---

[74] 503 U.S. 347 (1992).
[75] *Id.* at 359.
[76] *Id.* (citing *Wilder*, 496 U.S. at 519 n.17).
[77] *Id.* at 350.
[78] *Id.* at 350-51.
[79] *Id.* at 351 (citing 42 U.S.C. §§ 670, 671).
[80] *Id.* (quoting 42 U.S.C. § 671(a)(15) (1980) (amended 1997)).

20

No. 17-50282

a particular case.[81]   Though the language of § 671(a)(15) would seemingly satisfy the first factor identified in *Blessing v. Freestone*, which is that "Congress must have intended that the provision in question benefit the plaintiff,"[82] the Supreme Court held that it did not confer rights upon which a § 1983 suit could be based.[83]   The Court reasoned that the "reasonable efforts" directive "will obviously vary with the circumstances of each individual case. How the State was to comply with this directive, and with the other provisions of the Act, was, within broad limits, left up to the State."[84]   The Court then observed that "[o]ther sections of the Act provide enforcement mechanisms for the 'reasonable efforts' clause," including the Secretary's "authority to reduce or eliminate payments to a State on finding that the State's plan no longer complies with § 671(a) or that 'there is a substantial failure' in the administration of a plan such that the State is not complying with its own plan."[85]   The Court observed that while these enforcement provisions "may not provide a comprehensive enforcement mechanism so as to manifest Congress' intent to foreclose remedies under § 1983," the Court concluded that "they do show that the absence of a remedy to private plaintiffs under § 1983 does not make the 'reasonable efforts' clause a dead letter."[86]

---

[81] *Id*. at 352-53.

[82] *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 430 (1987)).

[83] *Suter*, 503 U.S. at 363 ("Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the 'reasonable efforts' language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term 'reasonable efforts' in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner previously discussed . . . . [We] conclude[] that § 671(a)(15) does not create a federally enforceable right to 'reasonable efforts' under § 1983 . . . .").

[84] *Id*. at 360.

[85] *Id*. (citing 42 U.S.C. § 671(b) (1980) (amended 1994)).

[86] *Id*. at 360-61.

No. 17-50282

The same can be said of the any-qualified-provider provision in § 1396a(a)(23). Whether a particular provider is "qualified" "will obviously vary with the circumstances of each individual case,"[87] and though courts are equipped to determine if a particular provider is qualified in the broad sense of that term, just as they are equipped to determine whether a child protective agency made "reasonable efforts" in a particular case, the fact that the courts could make such determinations if called upon by Congress is not dispositive. There must be a grant of a right to beneficiaries.[88] Further, the Medicaid Act leaves it up to a State to determine if a particular provider's Medicaid agreement should be terminated because the provider is not "qualified" or terminated on other grounds.[89] There are enforcement mechanisms in the Medicaid Act analogous to those in the Adoption Act referenced by the Supreme Court in *Suter*. The Medicaid Act provides that the Secretary may reduce or eliminate payments to a state agency if the Secretary finds that state agency's plan does not comply with 42 U.S.C. § 1396a[90] or "that in the administration of the plan there is a failure to comply substantially with any such provision" of § 1396a.[91] Though a Medicaid beneficiary does not have the right to contest, through a § 1983 suit, a determination that a particular provider is not qualified, that does not render the any-qualified-provider provision a "dead letter" for the same reasons that the "reasonable efforts" provision in *Suter* was not a "dead letter."

Under federal regulations promulgated under the Medicaid Act, a state Medicaid agency must provide an avenue for a provider to appeal a

---

[87] *Id.* at 360.
[88] *See supra* note 69.
[89] *See supra* notes 68-69 and accompanying text.
[90] *See supra* text accompanying note 85.
[91] 42 U.S.C. § 1396c.

determination that it is not "qualified."[92]    Texas has provided an
administrative procedure for such appeals.[93]  There is no analogous provision
for Medicaid beneficiaries when a particular provider is deemed unqualified,
indicating that there is no such right.

If a Medicaid beneficiary is denied medical assistance, the Medicaid Act
does provide some remedy.  A State's plan must "provide for granting an
opportunity for a fair hearing before the State agency to any individual whose
claim for medical assistance under the plan is denied or is not acted upon with
reasonable promptness."[94]  We do not address today whether the Medicaid Act
"provide[s] a comprehensive enforcement mechanism so as to manifest
Congress' intent to foreclose remedies under § 1983"[95] in a case in which a
Medicaid beneficiary seeks care or services from a provider whom the State
has determined is "qualified."  We do not reach that question for the same
reason that the Supreme Court did not reach a similar question in *Suter*: "We
need not consider this question today due to our conclusion that the [Medicaid]
Act does not create the federally enforceable right asserted by respondents."[96]

Though the Medicaid Act, in § 1396a(a)(23), does give a Medicaid
beneficiary the right to receive care or services from a provider that a State
has determined is "qualified," that provision does not unambiguously provide
that a Medicaid beneficiary has the right to contest a State's termination of a

---

[92] 42 C.F.R. § 455.422 ("The State Medicaid agency must give providers terminated or denied under § 455.416 any appeal rights available under procedures established by State law or regulations.").

[93] *See* 1 TEX. ADMIN. CODE § 371.1703(f)(2) (2020) ("A person may request an administrative hearing after receipt of a final notice of termination in accordance with § 371.1615 of this subchapter (relating to Appeals) unless the termination is required under 42 C.F.R. § 455.416.").

[94] 42 U.S.C. § 1396a(a)(3).

[95] *Suter v. Artist M.*, 503 U.S. 347, 360 (1992).

[96] *Id.* at 360 n.11.

No. 17-50282

provider's Medicaid agreement on the basis that the provider is not "qualified" or the State's determination that the agreement should be terminated on other grounds permissible under the Medicaid Act.

## IV

At least six other circuit courts have considered whether § 1396a(a)(23) confers a right upon Medicaid beneficiaries that can be enforced under 42 U.S.C. § 1983,[97] and there is a conflict.[98] The Eighth Circuit has concluded, as do we today, that § 1396a(a)(23) "does not unambiguously create a federal right for individual patients that can be enforced under § 1983."[99]

The Eighth Circuit recognized that the Medicaid Act is legislation enacted under the Spending Clause[100] that directs the Secretary of Health and Human Services to approve a State's Medicaid plan if it "fulfills the conditions specified in subsection (a)" of § 1396a.[101] Subsection 23 is among "some eighty-three conditions" set forth in § 1396a(a).[102] The Eighth Circuit observed that the Medicaid Act is "a directive to the federal agency charged with approving state Medicaid plans,"[103] and "[e]ven whe[n] a subsidiary provision includes mandatory language that ultimately benefits individuals, a statute phrased as

---

[97] *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687 (4th Cir. 2019); *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 638 (2018); *Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 571 U.S. 1198 (2014); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2013); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006).

[98] *See Gee v. Planned Parenthood of Gulf Coast, Inc.*, 139 S. Ct. 408, 408 (2018) (THOMAS, J., dissenting from denial of writ of certiorari).

[99] *Does*, 867 F.3d at 1037.

[100] *Id.* at 1039.

[101] *Id.* at 1040 (quoting 42 U.S.C. § 1396a(b)).

[102] *Id.*

[103] *Id.* at 1041 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 331 (2015) (plurality opinion)).

a directive to a federal agency typically does not confer enforceable federal rights on the individuals."[104]

Like the Eighth Circuit, we also see the potential for parallel litigation and conflicting results if Medicaid patients could bring a § 1983 suit challenging termination of a provider's contract after state appellate proceedings had determined that the termination was proper and permissible.[105] If Congress contemplated such a regime, it must have created it in unambiguous terms.[106] In a health care system that is massive and costs taxpayers billions of dollars each year, it is difficult to conclude from so thin a read of § 1396a(a)(23) that Congress envisioned States spending additional millions of dollars defending suits in courts across the country brought by Medicaid *patients* when particular providers are excluded or terminated.

We further agree with the Eighth Circuit that "[t]he absence of a remedy for patients under § 1983 . . . does not make the [any-qualified]-provider provision an empty promise."[107] A Medicaid *provider* who wishes "to continue providing services ha[s] an obvious incentive to pursue administrative appeals and judicial review in state court if the alternative avenue of recruiting patients to sue in federal court is not available."[108] Additionally, both providers and patients "may urge the Secretary to withhold federal funds from a State that fails to comply substantially with the conditions of § 23(A)."[109] The assertion in JUDGE DENNIS's dissenting opinion that our holding today means that Medicaid beneficiaries "must meekly accept what choices the state allows"

---

[104] *Id.* (citing *Univs. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 756 n.1, 772-73 (1981)).
[105] *Id.* at 1041-42.
[106] *See supra* note 69.
[107] *Does*, 867 F.3d at 1046.
[108] *Id.*
[109] *Id.*

No. 17-50282

rings particularly hollow.[110]  Providers like the Planned Parenthood plaintiffs in the present case surely have the resources and motivation to contest termination of their Medicaid agreements through the state administrative process.[111]  Individual providers, as noted earlier in this opinion, can contest termination of a Medicaid agreement if they remain willing to provide services to Medicaid recipients.

However, five other circuits, the Fourth, Sixth, Seventh, Ninth, and Tenth, have held that § 1396a(a)(23) bestows a private right that Medicaid beneficiaries can vindicate through a § 1983 claim.[112]  To the extent that these cases hold that a Medicaid patient has a right to contest, by means of a § 1983 suit or otherwise, a State's determination that a provider is not "qualified" within the meaning of § 1396a(a)(23), we disagree that § 1396a(a)(23) unambiguously grants such a right for the reasons already considered in this opinion.

In three cases from other circuits, a state actor or agency terminated a provider agreement or sought to exclude a provider *solely* on the basis that the provider or an affiliate performed abortions.[113]  It is not clear whether any or

---

[110] *See* DENNIS, J., dissenting, *post* at 81.

[111] 1 TEX. ADMIN. CODE § 371.1703(f)(2) (2020).

[112] *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687 (4th Cir. 2019); *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 638 (2018); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 571 U.S. 1198 (2014); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2013); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006).

[113] *Baker*, 941 F.3d at 692 ("PPSAT was terminated solely because it performed abortions outside of the Medicaid program."); *Betlach*, 727 F.3d at 962 ("The Arizona law extends the ineligibility [for the State's Medicaid program] to non-abortion services such as gynecological exams and cancer screenings unless the patient's provider agrees to stop performing privately funded elective abortions."); *Planned Parenthood of Ind., Inc.*, 699 F.3d at 967 ("The new law goes a step further [than forbidding federal funds to pay for most non-therapeutic abortions] by prohibiting abortion providers from receiving *any* state-

No. 17-50282

all of those circuits would permit a Medicaid patient to pursue a § 1983 claim asserting that a State's finding that a provider was not "qualified" was erroneous, an abuse of discretion, arbitrary and unreasonable, or violated a statutory or constitutional provision.[114]

Some of the circuits' opinions have sought to distinguish the Supreme Court's decision in *O'Bannon* by perceiving a right within § 1396a(a)(23) upon which Medicaid patients may sustain a suit against a state agency or actor. In *Planned Parenthood South Atlantic v. Baker*, the Fourth Circuit characterized *O'Bannon* as "sp[eaking] to the narrow question whether residents of a nursing home had a right to a pre-termination hearing before the state could close a home that all parties agreed was professionally 'unqualified' to render patient care."[115]  Similarly, the Tenth Circuit asserted that "*O'Bannon* addressed a . . . situation . . . [in which] no one contested that the nursing home was unqualified to perform the services."[116]

With great respect for our sister courts, those statements are demonstrably incorrect.  Though the *O'Bannon* opinion reflects that Medicaid

---

administered funds, even if the money is earmarked for other services. The point is to eliminate the indirect subsidization of abortion." (emphasis in original)).

[114] *See Baker*, 941 F.3d at 705 (recognizing that States "retain discretionary authority to disqualify providers as professionally incompetent for nonmedical reasons such as fraud and for any number of unprofessional behaviors," but not addressing whether a Medicaid patient could sue under § 1983 to challenge a State's particular qualification determination, nor what level of deference, if any, would be accorded to the State's determination in such a suit); *Betlach*, 727 F.3d at 962, 972 (noting that § 1396a(p)(1) provides "states with authority to exclude providers on specified grounds," but not addressing whether a Medicaid patient could sue under § 1983 to challenge a State's particular qualification determination, nor what level of deference, if any, would be accorded to the State's determination in such a suit); *Planned Parenthood of Ind., Inc.*, 699 F.3d at 967-68, 979-80 (noting that the Medicaid Act outlines "specific grounds upon which states may bar providers from participating in Medicaid," but not addressing whether a Medicaid patient could sue under § 1983 to challenge a State's particular qualification determination, nor what level of deference, if any, would be accorded to the State's determination in such a suit).

[115] *Baker*, 941 F.3d at 704.

[116] *Andersen*, 882 F.3d at 1231.

27

entities had decertified the nursing home based on findings that the home
failed to meet numerous standards for skilled nursing facilities,[117] neither the
nursing home nor its residents agreed with those assessments.  The residents,
who were Medicaid beneficiaries, along with the nursing home, filed suit in
federal court contending "that both the nursing home and the patients were
entitled to an evidentiary hearing *on the merits of the decertification decision*
before the Medicaid payments were discontinued."[118]  Clearly, the Medicaid
patients sought to challenge the agencies' determination that the nursing
home was no longer "qualified" to provide services within the meaning of
§ 1396a(a)(23).[119]  The Medicaid beneficiaries in *O'Bannon* did not take the
position, as the Fourth and Tenth Circuits' decisions necessarily imply, that
the nursing home was "professionally unqualified,"[120] but that the Medicaid
residents nevertheless had a right to remain at the home, and Medicaid must
continue paying for services performed by an unqualified provider.  Instead,
the Medicaid residents sought to challenge the determination that the nursing
home was not a "qualified" provider.

Several circuits, including a panel in our circuit, have attempted to
distinguish *O'Bannon* by declaring that it involved only whether there was a
right to due process and that it did not address whether the individuals
receiving Medicaid assistance had substantive rights under § 1396a(a)(23).[121]

---

[117] *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 775-76, 776 n.3 (1980).

[118] *Id. at* 777 (emphasis added).

[119] *See id.*

[120] *See Baker*, 941 F.3d at 704 (internal quotation marks omitted).

[121] *See id.* ("In point of fact, the patients [in *O'Bannon*] did not bring a substantive
claim seeking to vindicate their rights under the [any-qualified]-provider provision, but
rather sued for violation of their procedural due process rights." (citing *O'Bannon*, 447 U.S.
at 775)); *Andersen*, 882 F.3d at 1231 ("[W]e note that the nursing home residents in *O'Bannon*
asserted procedural due-process rights, not substantive rights, as the patients do here.");
*Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 460 (5th Cir. 2017) ("[*O'Bannon*]
is inapposite. There, the patient-plaintiffs' injuries were alleged to stem from a deprivation

No. 17-50282

But this, too, is demonstrably incorrect. The Supreme Court made plain in *O'Bannon* that in order to resolve whether the right to due process entitled the Medicaid nursing home residents to a hearing on the merits of whether the provider was "qualified," the Court had to determine whether § 1396a(a)(23) granted an underlying *substantive* right that would permit the residents to challenge a State's determination that a provider is not qualified.[122] The Court held that there is no such substantive right.[123] The fact that the claim in *O'Bannon* was brought as a constitutional challenge rather than under § 1983 does not permit us to ignore the Supreme Court's construction of § 1396a(a)(23), and it is not a basis for distinguishing *O'Bannon*, as the dissenting opinion of JUDGE DENNIS asserts in the present case.[124]

An individual eligible for Medicaid assistance may have the right based on § 1396a(a)(23) that the Supreme Court identified in *O'Bannon* in dicta: "By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified."[125] But in each of the three sentences that follow the one just quoted,

---

of due process rights, specifically, the right to a hearing to contest the state's decertification of a health care provider, not just its Medicaid qualification. . . . In contrast, the Individual Plaintiffs here assert the violation of a substantive right." (citing *O'Bannon*, 447 U.S. at 776 n.3)); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 977 (7th Cir. 2012) (asserting that *O'Bannon* is a "due-process case" and that by contrast "Planned Parenthood and its patients are not suing for violation of their *procedural* rights; they are making a *substantive* claim that Indiana's defunding law violates § 1396a(a)(23)" (emphasis in original)); *see also* DENNIS, J., dissenting, *post* at 86-87.

[122] *O'Bannon*, 447 U.S. at 786 ("In holding that these provisions create a substantive right to remain in the home of one's choice absent specific cause for transfer, the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations. As indicated above, while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified.").

[123] *See id.* at 785-86.

[124] *See* DENNIS, J., dissenting, *post* at 86-87.

[125] *O'Bannon*, 447 U.S. at 785.

the Supreme Court made clear that § 1396a(a)(23) *does not confer a right to contest, collaterally attack, or litigate a State's determination that a provider is not "qualified."* The Court said:

> [First, § 1396a(a)(23)] clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.
>
> Second, although the regulations do protect patients by limiting the circumstances under which a home may transfer or discharge a Medicaid recipient, they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility.
>
> Finally, since decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility, regulations granting recipients the right to a hearing prior to a reduction in financial benefits are irrelevant.[126]

The central holding in *O'Bannon* was that regardless of whether the State's qualification decision was correct, the individual beneficiaries did not have a right that would allow them to "demand a hearing" to challenge that determination.[127]

The Sixth Circuit's conclusion in *Harris v. Olszewski* that § 1396a(a)(23) creates a private right[128] was unnecessary to the judgment that it issued. In *Harris*, as a cost-savings measure, a Michigan agency contracted with only one provider of incontinence products after a competitive-bidding process.[129] A Medicaid beneficiary who used incontinence products filed suit seeking to certify a class and to enjoin enforcement of the single-source-provider contract

---

[126] *Id.* at 785-86 (emphasis omitted).
[127] *Id.* at 785.
[128] *Harris v. Olszewski*, 442 F.3d 456, 461-65 (6th Cir. 2006).
[129] *Id.* at 460, 463.

so the class could obtain supplies from other qualified providers.[130]  The Sixth Circuit rendered judgment against the beneficiaries because it held that incontinence products are "medical devices" within the meaning of 42 U.S.C. § 1396n(a)(1)(B), and "medical devices" are excepted from the "freedom-of-choice provision" in § 1396a(a)(23) when a State acquires them through a competitive bidding process.[131]  The Sixth Circuit addressed the threshold issue of whether § 1396a(a)(23) bestowed a right upon individuals receiving Medicaid assistance upon which a § 1983 suit could be based, even though it was not required to decide that issue in order to render the judgment that it did.

Regardless, the Sixth Circuit's conclusion that § 1396a(a)(23) confers a right upon which a § 1983 suit could be based is inapposite in the present context.  The Medicaid beneficiaries in *Harris* sued to obtain access to additional qualified providers, not to contest the qualifications of the sole provider with whom Michigan's Department of Community Health had contracted to obtain all incontinence supplies for Medicaid beneficiaries.[132] The Michigan agency had never determined that the suppliers from which the beneficiaries sought products were not "qualified" providers.[133]  The qualifications of the existing supplier and the sought-after suppliers were simply not at issue.  The Sixth Circuit's conclusion that the Medicare beneficiaries had enforceable rights under § 1396a(a)(23) is consistent with the dicta in *O'Bannon*, which said that under § 1396a(a)(23), "a patient has a right to continued benefits to pay for care in the qualified institution of his choice."[134]

---

[130] *Id.* at 460.

[131] *Id.* at 465-69.

[132] *Id.* at 460.

[133] *See id.* at 459-60.

[134] *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 786 (1980).

No. 17-50282

It does not contradict *O'Bannon*'s conclusion that § 1396a(a)(23) does not grant Medicaid beneficiaries a right to payments for care at institutions that a State has determined to be unqualified.

## V

In concluding that 42 U.S.C. § 1396a(a)(23) does not give Medicaid patients the right to challenge a State's determination that a particular Medicaid provider is unqualified, we expressly overrule *Planned Parenthood of Gulf Coast, Inc. v. Gee*.[135]  The *Gee* case arose out of a Louisiana agency's termination of the Medicaid provider agreements of two Louisiana clinics affiliated with PP Gulf Coast.[136]  PP Gulf Coast and several Medicaid patients of the Louisiana clinics bypassed state administrative procedures and sued the Louisiana agency charged with managing its Medicaid program, the Louisiana Department of Health and Hospitals (LDHH), under 42 U.S.C. § 1983, arguing that the clinics were "qualified" and that LDHH had failed to identify any valid ground under federal or state law for terminating their provider agreements.[137]  After concluding that Medicaid patients had the right under § 1396a(a)(23) to bring a § 1983 suit to contest the termination of the providers, a divided panel of this court upheld a preliminary injunction enjoining LDHH from terminating the provider agreements.[138]  The *Gee* opinion conflicts with the import of the Supreme Court's decision in *O'Bannon* and whether § 1396a(a)(23) confers a private right of action upon Medicaid patients seeking

---

[135] 862 F.3d 445 (5th Cir. 2017).
[136] *Id.* at 450-52.
[137] *Id.* at 450-53.
[138] *Id.* at 459, 473.

No. 17-50282

to challenge a State's determination that a Medicaid provider is not "qualified" within the meaning of that statute.

We also disavow the conclusion in *Gee* that a state agency or actor cannot legitimately find that a Medicaid provider is not "qualified" unless under state or federal law the provider would be unqualified to provide treatment or services to the general public, including Medicaid patients who paid for the care or services with private funds. Federal law expressly allows States to terminate a provider's Medicaid agreement on many grounds, including those articulated in the Medicaid Act, none of which contemplate that the provider must also be precluded from providing services to all non-Medicaid patients before termination is permissible.[139] For example, termination can occur because of a provider's excessive charges;[140] fraud, kickbacks, or other prohibited activities;[141] failure to provide information;[142] failure to grant immediate access under specified circumstances;[143] or default on loan or scholarship obligations.[144] These provisions make clear that a state agency may determine that a Medicaid provider is unqualified and terminate its Medicaid provider agreement even if the provider is lawfully permitted to provide health services to the general public. Medicaid patients would

---

[139] *See, e.g.*, <u>42 U.S.C. § 1396a(p)(1)</u> ("In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."); *id.* § 1320a-7(b)(6) (permitting exclusion for excessive charges or unnecessary services); *id.* § 1320a-7(b)(7) (permitting exclusion for "an act which is described in section 1320a-7a, 1320a-7b, or 1320a-8 of this title"); *id.* § 1320a-7a(a)(1)(A) (permitting exclusion for presenting a claim "for a medical or other item or service that the person knows or should know was not provided as claimed").

[140] *Id.* § 1320a-7(b)(6).

[141] *Id.* § 1320a-7(b)(7).

[142] *Id.* § 1320a-7(b)(9)-(11).

[143] *Id.* § 1320a-7(b)(12).

[144] *Id.* § 1320a-7(b)(14).

33

No. 17-50282

nevertheless be foreclosed from challenging the termination decision based on the holding in *O'Bannon* and the lack of unambiguous provisions in § 1396a(a)(23) conferring a right to challenge a State's determination that a provider is not "qualified."

## VI

JUDGE DENNIS's dissenting opinion asserts that this court is ignoring stare decisis.[145] An opinion of a panel does not bind the en banc court. Our court adheres to what we sometimes call the "rule of orderliness." "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court."[146] "Indeed, even if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void."[147] But the court sitting en banc may overrule or abrogate a panel's decision if the en banc court concludes that panel opinion's holding was indeed flawed. No decision of this court has held that the court sitting en banc cannot overrule a prior panel decision unless it considers all the elements and principles embodied in the doctrine of stare decisis.

That does not mean that principles underpinning the doctrine of stare decisis have no place in the en banc court's decision about whether to overturn or abrogate a panel's prior decision. But the analysis is not as exacting as that undertaken by the Supreme Court of the United States in applying the stare decisis doctrine, as it must, in deciding whether to overturn its own precedent.

---

[145] *See* DENNIS, J., dissenting, *post* at 102-04.

[146] *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (emphasis omitted).

[147] *Id.*

34

No. 17-50282

Nor does the failure of the en banc court to grant rehearing of a panel's decision impart greater precedential value to that decision than it would have if no vote of the en banc court had occurred.  A vote not to rehear a case en banc is no different in terms of stare decisis than the Supreme Court's denial of a petition for certiorari.  The Supreme Court is not precluded by stare decisis from considering the same issue, presented in a subsequent case, even though it previously declined to consider the precise issue by denying a petition for certiorari in a prior case.

The en banc court is today overruling the decision of a panel of this court in *Planned Parenthood of Gulf Coast, Inc. v. Gee.*[148]  The vote to grant rehearing in that case failed in an evenly divided vote (7 to 7).[149]  The same issue has now been presented in the present case.  The en banc court has concluded that the panel's decision in *Gee* seriously misunderstood the import of the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center*[150] and failed to apply the Supreme Court's construction of § 1396a(a)(23) in *O'Bannon*.  That determination alone warrants overruling or abrogating the *Gee* decision, even were the doctrine of stare decisis fully applicable when a court of appeals sitting en banc weighs whether to overturn existing precedent established by a panel's decision.

\*       \*       \*

The preliminary injunction issued by the district court is VACATED.

---

[148] 862 F.3d 445 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 408 (2018).

[149] *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 699 (5th Cir. 2017) (mem.) (per curiam).

[150] 447 U.S. 773 (1980).

35

No. 17-50282

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, WILLETT, HO, DUNCAN, and ENGELHARDT, Circuit Judges, concurring:

I concur in full with Chief Judge Owen's excellent majority opinion. First, as she observed, a conclusion that the qualified-provider provision confers a private right to contest a state's termination of a Medicaid agreement would be inconsistent with the Supreme Court's decision in *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773 (1980). Second, as Chief Judge Owen also noted, even without *O'Bannon*, the qualified-provider provision does not unambiguously provide that a Medicaid patient may contest a State's determination that a particular provider is not "qualified." Thus, the preliminary injunction entered in this case must be vacated.

I write separately to further explicate why the Supreme Court's Spending Clause opinions in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), and *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) foreclose any contention that the Medicaid Act's qualified-provider provision confers such a private right. I also provide a third reason why the preliminary injunction must be vacated: even if the qualified-provider provision *did* confer a private federal right—enforceable through 42 U.S.C. § 1983—to contest a state's qualification determination, the plaintiffs' claims would fail on the merits.

I.

Congress may prescribe the terms on which it gives federal money to the states, but "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Spending Clause legislation is "much in the nature of a contract": the states receive federal funds in exchange for compliance with concomitant conditions. *Id.* By "insisting that Congress speak with a clear voice," *Pennhurst*'s clear-statement rule "enable[s] the States to exercise their choice [to enter that quasi-contract] knowingly,

36

cognizant of the consequences of their participation." *Id.*; *see also Will v. Mich. Dep't of State Police*, <u>491 U.S. 58, 65</u> (1989) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (quoting *Atascadero State Hosp. v. Scanlon*, <u>473 U.S. 234, 242</u> (1985))).

For a time, the Supreme Court interpreted *Pennhurst*'s clear-statement rule to mean that statutes create a "'federal right' that is enforceable under § 1983" whenever "the provision in question was intend[ed] to benefit the putative plaintiff." *Wilder v. Va. Hosp. Ass'n*, <u>496 U.S. 498, 509</u> (1990) (quoting *Golden State Transit Corp. v. City of Los Angeles*, <u>493 U.S. 103, 106</u> (1989)).  In *Blessing v. Freestone*, the Court distilled that standard into a three-factor inquiry, asking: (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether "the provision giving rise to the asserted right [is] couched in mandatory, rather than precatory, terms." <u>520 U.S. 329, 340</u>–41 (1997).

But the Supreme Court has since changed course.  In *Gonzaga*, the Court abandoned the lenient *Wilder*/*Blessing* framework, instead requiring "an unambiguously conferred right" to support enforceability through § 1983.[1]

---

[1] As the partially dissenting opinion notes, *Gonzaga* did not expressly state that the *Wilder*/*Blessing* framework had been overruled.  Nevertheless, the Court explicitly "reject[ed] the notion that [Supreme Court] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983," and then listed features of statutes that do not confer such a right.  *Gonzaga*, <u>536 U.S. at 283</u>.  Moreover, Justice Stevens, dissenting in *Gonzaga*, noted that the majority opinion had adopted a "'new' approach to discerning a federal right." <u>536 U.S. at 302</u> (Stevens, J., dissenting).  And the Supreme Court's later decision in *Armstrong*—the controlling opinion, not just a plurality—made

*Gonzaga*, 536 U.S. at 283; *see also id.* ("[I]t is only violations of *rights*, not *laws*, which give rise to § 1983 actions."). In that case, the Supreme Court held that the Federal Education Rights and Privacy Act's (FERPA) "nondisclosure provision"—which denies federal funding to schools that permit the release of students' education records without their parents' written consent—did not "confer enforceable rights." *Id.* at 278–79, 289. Instead of evaluating this provision under the three *Wilder/Blessing* factors, the Court observed that the statute merely told a federal agency when to grant funding and when to withhold it. *Id.* at 282–83, 289. The nondisclosure provision defined one of many prohibited "polic[ies] or practice[s]," and the statute established that "[n]o [Department of Education] funds shall be made available" to a school that maintained these policies or practices. *Id.* at 287 (quoting 20 U.S.C. § 1232g(b)(1)). The nondisclosure provision thus had an "aggregate, not individual, focus." *Id.* at 290. The provision spoke "only to the Secretary of Education['s]" transactions with schools wanting federal funding, and was thus "two steps removed" from the students and parents whom the statute ultimately benefitted. *Id.* at 287. The statute's references to these benefitted individuals were made only "in the context of describing the type of 'policy or practice' that triggers a funding prohibition." *Id.* at 288.

The Court also recognized that Congress chose tools other than private lawsuits to enforce the statute's terms. The statute "expressly authorized the Secretary of Education to 'deal with violations' of the Act . . . and required the

---

explicit what *Gonzaga* held implicitly: the *Wilder/Blessing* framework no longer controls. *Armstrong*, 575 U.S. at 330 n* ("[The plaintiffs] do not assert a § 1983 action, since our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified."). We therefore must follow the Supreme Court's lead and apply the "'new' approach to discerning a federal right" exemplified by *Gonzaga* and *Armstrong*. *Gonzaga*, 536 U.S. at 302 (Stevens, J., dissenting).

No. 17-50282

Secretary to 'establish or designate [a] review board' for investigating and adjudicating such violations." *Id.* at 289 (quoting 20 U.S.C. § 1232g(f)–(g)). Congress thus expressly empowered the executive branch—not the judiciary—to keep schools from disclosing education records without parental consent.

The Court also observed that the enforcement mechanism—the withholding of federal funds—was triggered only if a recipient institution "fail[ed] to comply *substantially* with any requirement" of FERPA. *Id.* at 279 (emphasis added); *see also id.* at 288–89. This indicated that the statute was concerned less with the protection of each individual person benefitted by the statute—and therefore did not contemplate enforcement through lawsuits for each individual violation—than it was about general compliance enforced holistically by the Secretary of Education. *Id.* at 288–89.

Hitting even closer to the qualified-provider provision at issue in the instant case, four Supreme Court Justices applied *Gonzaga* to the Medicaid Act in a plurality opinion in *Armstrong*. In that case, a provider sued, alleging that the reimbursements it received from the state of Idaho were too low to comply with 42 U.S.C. § 1396a(a)(30)(A), which required Idaho's Medicaid plan to "assure that payments are consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of . . . care and services." *Armstrong*, 575 U.S. at 323 (quoting 42 U.S.C. § 1396a(a)(30)(A)). The plurality opined that the provider had no private right of action because 42 U.S.C. § 1396c, like the statute in *Gonzaga*, merely told a federal agency when to withhold funding and explicitly contemplated that withholding of funding was the statute's enforcement mechanism. *Id.* at 331–32 (plurality).

Here, just like the statutes in *Gonzaga* and *Armstrong*, the qualified-provider provision does not create an "unambiguously conferred right." *Gonzaga*, 536 U.S. at 283; *see also Armstrong*, 575 U.S. at 331–32 (plurality).

39

As a starting matter, like the provisions at issue in *Gonzaga* and *Armstrong*, the qualified-provider provision is "two steps removed" from the individuals that it ultimately benefits, more directly governing the federal government's interactions with the states. *Gonzaga*, <u>536 U.S. at 287</u>; *see also Armstrong*, <u>575 U.S. at 331</u>–32 (plurality). The clause appears in a long list—the exact same list as the provision in *Armstrong*—of what "State plan[s] for medical assistance must" have. <u>42 U.S.C. § 1396a(a)</u>. And the statute expressly directs the Secretary of Health and Human Services (HHS) to "approve any plan which fulfills the conditions" set out in that list. <u>42 U.S.C. § 1396a(b)</u>. The provision is thus "phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." *Armstrong*, <u>575 U.S. at 331</u> (plurality); *see also Gonzaga*, <u>536 U.S. at 287</u>. The provision's references to the individuals whom the statute ultimately benefits are made only in the context of what the states must do to receive federal funding.[2] *See Gonzaga*, <u>536 U.S. at 288</u>.

Moreover, just as in *Gonzaga* and *Armstrong*, Congress expressly provided for other enforcement mechanisms. Congress gave the Secretary of Health and Human Services the power to withhold federal funds from a state that fails to comply with the codified conditions. <u>42 U.S.C. § 1396c</u>; *Gonzaga*, <u>536 U.S. at 282</u>–83, 289; *Armstrong*, <u>575 U.S. at 331</u>–32 (plurality). Congress

---

[2] As Judge Duncan observed at en banc oral argument, the words "individual" and "individuals" are used a total of over 400 times in <u>42 U.S.C. § 1396a</u>. *See* Oral Argument at 34:14–34:31. The mere existence of this word, then, can hardly confer an individual right. *See Does v. Gillespie*, <u>867 F.3d 1034, 1042</u> (8th Cir. 2017) ("The reference to an 'individual' is nested within one of eighty-three subsections and is two steps removed from the Act's focus on which state plans the Secretary 'shall approve . . . .'" (emphasis omitted) (quoting <u>42 U.S.C. § 1396a(b)</u>)).

No. 17-50282

also gave the Secretary the power to promulgate any other rules necessary for the "proper and efficient" operation of a state plan, *id.* § 1396a(a)(4), and the Secretary has used that authority to require states to give providers the right to appeal their exclusion from the Medicaid program. 42 U.S.C. § 1396a(a)(4)(A); 42 C.F.R. § 1002.213. The statute thus does not contemplate—either by its express terms or its administrative implementation—enforcement through private-patient lawsuits. Indeed, as Judge Colloton of the Eighth Circuit observed, allowing these lawsuits would create "a curious system for review of a State's determination that a Medicaid provider is not 'qualified'" and risk "parallel litigation and inconsistent results." *Does v. Gillespie*, 867 F.3d 1034, 1041–42 (8th Cir. 2017).

Furthermore, the qualified-provider provision is part of a "substantial compliance" regime, just like the provisions in *Gonzaga* and *Armstrong*. The Medicaid Act directs the Secretary to withhold Medicaid funding from a state only if the Secretary determines that "in the administration of the plan there is a failure to comply *substantially*" with a provision of the statute. 42 U.S.C. § 1396c(2) (emphasis added). Substantial-compliance regimes like these have an "aggregate focus," are "not concerned with whether the needs of any particular person have been satisfied," and thus do not "give rise to individual rights." *Gonzaga*, 536 U.S. at 288 (internal quotation marks and citations omitted). Even if Texas unlawfully terminated a qualified provider within the meaning of the qualified-provider provision,[3] it would not necessarily lead to the state's loss of Medicaid funds. Texas would lose Medicaid funds only if the

---

[3] For the reasons explained in Part II of this concurring opinion, Texas has not done so.

41

No. 17-50282

Secretary determined that this single failure to comply—in tandem with any other unlawful terminations of "qualified" providers—amounted to "substantial[]" noncompliance.  42 U.S.C. § 1396c(2).

Converting this substantial-compliance regime, holistically evaluated and enforced by the Secretary, to a system allowing plaintiffs to sue for each and every individual violation would conflict with the statute's text and structure as well as Supreme Court precedent.  And as *amici* Louisiana and Mississippi point out, it could also have drastic consequences, opening the floodgates of litigation against states that make hundreds of routine Medicaid termination decisions every year.[4]  State officials would potentially "not even [be] safe doing nothing" because recognizing a private right to challenge a state's qualification determinations "may enable Medicaid recipients to challenge the *failure* to list particular providers, not just the removal of former providers." *Gee v. Planned Parenthood of Gulf Coast, Inc.*, 139 S. Ct. 408, 409 (2018) (Thomas, J., dissenting from denial of certiorari).

In sum, the qualified-provider provision is "two steps" removed from the patients it ultimately benefits, expressly contemplates other enforcement mechanisms, and is part of a substantial-compliance regime.  These same three features prevented the provisions in *Gonzaga* and *Armstrong* from creating an "unambiguously conferred right."  They should do the same here.  Indeed, the Eighth Circuit, looking at these same three features of the qualified-provider provision, came to this same conclusion.  *See Gillespie*, 867 F.3d at 1046.

The plaintiffs' arguments against this conclusion are unavailing.  The plaintiffs, along with the dissenting opinions, state that this case differs from

---

[4] Louisiana, for example, asserts in its amicus brief that it took 182 disqualification actions in fiscal year 2017.

*Armstrong* because *Armstrong* was an implied-right-of-action case whereas the instant case arises under § 1983.  But the *Armstrong* plurality expressly considered whether "the Medicaid Act itself" is a "source of a cause of action," and answered in the negative because the provision in question "lack[ed] the sort of *rights-creating language* needed to imply a private right of action." 575 U.S. at 331 (emphasis added) (plurality).  The analysis for determining whether Congress "intended to create a federal right" is the same regardless of whether the lawsuit is brought under the statute itself or through § 1983. *Gonzaga*, 536 U.S. at 283 (emphasis omitted); *see also id.* at 285–86 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.").  The *Armstrong* plurality's persuasive reasoning thus extends into the § 1983 context.  *See id.* at 283 ("[W]e further reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases.  To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.").

    The plaintiffs also argue that *Gonzaga* and *Armstrong* merely "clarified the application of the first *Wilder*/*Blessing* factor: the determination of whether a provision contains individual rights-granting language."  This ignores *Armstrong*'s recognition—one made by a majority of the Court, not just a plurality—that *Gonzaga* "plainly repudiate[d]" *Wilder*.  *See Armstrong*, 575 U.S. at 330 n* ("[The plaintiffs] do not assert a § 1983 action, since our later

No. 17-50282

opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified.").[5]

The plaintiffs do no better by insisting—in an argument echoed by Judge Higginson's partially dissenting opinion—that this court recently "recognized *Wilder*'s vitality" in *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358 (5th Cir. 2018). Of course, it is the en banc court's prerogative to overrule any contrary panel decision. *See, e.g.*, *Hogue v. Johnson*, 131 F.3d 466, 491 (5th Cir. 1997). Here, however, there is no need. As the partially dissenting opinion properly points out, *Gonzaga* characterized *Wilder* as turning on the relevant statute's "explicit[] conferr[al]" of "specific monetary entitlements upon the plaintiffs." *Gonzaga*, 536 U.S. at 280. *Legacy*, like *Wilder*, was a case about specific monetary entitlements. *See Legacy*, 881 F.3d at 363, 371–72. This case, like *Gonzaga*, is not. *See Gonzaga*, 536 U.S. at 288 n.6 (concluding that a provision did not create an enforceable federal right when it was "a far cry from the sort of individualized, concrete monetary entitlement found

---

[5] Tellingly, three of the five circuit courts that have held that the qualified-provider provision creates an enforceable private right to challenge a state's qualification determination relied on the *Wilder/Blessing* framework before *Armstrong* clarified in 2015 that *Wilder* had been repudiated. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 966 (9th Cir. 2013) (relying on the three-factor inquiry set out in *Blessing*, though never actually citing *Wilder* itself; *Planned Parenthood of Ind. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 976 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456, 463 (6th Cir. 2006). Another two circuit courts rely on *Wilder* even post-*Armstrong*, which, as explained above, seems to misread the repudiation of *Wilder* joined by five justices in *Armstrong*. *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018); *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 699 (4th Cir. 2019). The Eighth Circuit, by contrast, correctly observed that it is no longer "enough, as *Wilder* and [*Blessing*] might have suggested, to show simply that a plaintiff 'falls within the general zone of interest that the statute is intended to protect.'" *Gillespie*, 867 F.3d at 1039–40 (quoting *Gonzaga*, 536 U.S. at 283). "In the final analysis, the resolution of this dispute will be determined not by arithmetic, but rather, by the strength and persuasiveness of the several decisions." *New York v. U.S. Dep't of Justice*, 960 F.3d 150, 153 (2d Cir. 2020) (Cabranes, J., concurring in denial of rehearing en banc).

enforceable in . . . *Wilder*"). Thus, even assuming *arguendo* that vestiges of the *Wilder/Blessing* framework still remain in certain contexts, the qualified-provider provision's close similarity to the provisions in *Gonzaga* and *Armstrong*—which ultimately did not create private enforceable rights—demonstrates that the qualified-provider provision would not create such a right even within that framework.

Finally, the plaintiffs point to 42 U.S.C. § 1320a-2 as evidence that Congress contemplated enforcement of the qualified-provider provision through private lawsuits. Congress enacted this provision in response to the Supreme Court's decision in *Suter v. Artist M.*, 503 U.S. 347, 364 (1992), which held that the Adoption Assistance and Child Welfare Act (AACWA) did not contain an implied private right of action or confer a private right enforceable via § 1983. The provision states:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a-2.

Other circuits have observed that this provision is "hardly a model of clarity." *Sanchez v. Johnson*, 416 F.3d 1051, 1057 n.5 (9th Cir. 2005); *see also Gillespie*, 867 F.3d at 1044. The first sentence "disapproves one portion of *Suter*: the Court had suggested that when a provision of the [AACWA] required a state plan and specified the mandatory elements of a plan, it required only

45

that a State have a plan approved by the Secretary which contained those features, not that the plan actually be in effect." *Gillespie*, 867 F.3d at 1044 (citing *Suter*, 503 U.S. at 358).  No one in the instant case complains that Texas's Medicaid plan is not actually in effect.  The provision's second sentence states (vaguely) that the provision's purpose is narrowly drawn to overturn portions of the Court's reasoning in *Suter* and was not intended to limit or expand private rights of action in any other manner—or even to alter the ultimate holding in *Suter* itself.  Indeed, the provision expressly acknowledges that it does not touch any other Supreme Court decisions concerning private rights of action prior to *Suter*.  As the Eighth Circuit noted, the "other points discussed in *Suter*, including the requirement of unambiguous notice to states about conditions on the receipt of federal funds and the significance of an alternative enforcement mechanism, were relevant considerations before *Suter* and are beyond the scope of § 1320a-2." *Id.* at 1045.  Moreover, the provision was adopted well before *Gonzaga* and *Armstrong* and did not inform the analysis in either of those cases.

Our task is to determine whether the qualified-provider provision unambiguously confers an individual right—enforceable through private-patient lawsuits—to contest a state's qualification determination.  In that endeavor, we are bound by *Gonzaga* and guided by the *Armstrong* plurality, and for the reasons explained above, we must conclude that the statute does not.

* * *

The providers in the instant case—by launching a lawsuit brought by their patients instead of going through the appropriate administrative appeals processes—attempt to make "an end run around" the enforcement tools that Congress, HHS, and the state of Texas have chosen. *Gee,* 139 S. Ct. at 409

No. 17-50282

(Thomas, J., dissenting from denial of certiorari) (quoting *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 702 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc)).  *Gonzaga* and *Armstrong* make clear that this attempt must fail.

## II.

The court's judgment in the instant case is also correct for an additional reason: even assuming that the Supreme Court's decisions in *O'Bannon*, *Gonzaga*, and *Armstrong* did not apply and private plaintiffs could sue states under the qualified-provider provision, the private plaintiffs in the instant case would fail on the merits of that claim.  Judge Jones's excellent panel opinion correctly identified the appropriate substantive legal standard and the correct standard of judicial review that would apply to these lawsuits, if they could be brought.  Under those standards, the Office of Inspector General's (OIG) decision to terminate Planned Parenthood's Medicaid agreement would be permissible.  *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 913 F.3d 551 (5th Cir. 2019), *reh'g granted*, 914 F.3d 994 (2019).

## A.

To begin, the statute only allows Medicaid patients access to providers who are "qualified."   42 U.S.C. § 1396a(a)(23)(A).   The majority correctly concludes, consistent with *O'Bannon*, that a provider is qualified if and only if the state has deemed that provider qualified to participate in Medicaid.

But even if "qualified" did limit a state's discretion on what providers may participate in its Medicaid plan, that limit must be, as Judge Jones explained, one that is "an easy standard for the state to meet."  *Smith*, 913 F.3d at 565.  Otherwise, it would be inconsistent with Medicaid regulations that "allow states to set reasonable standards relating to the qualifications" of

47

providers.  *Id.* at 563 (quoting 42 C.F.R. § 431.51(c)(2)).  Indeed, the previously prevailing standard in this circuit acknowledged that "states retain broad authority to define provider qualifications and to exclude providers on that basis."  *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 465 (5th Cir. 2017); *see also Detgen ex rel. Detgen v. Janek*, 752 F.3d 627, 631 (5th Cir. 2014) (explaining that states possess "broad discretion to implement the Medicaid Act").

Other circuits have interpreted "qualified" more favorably to providers, finding that a state agency errs anytime it terminates the Medicaid agreement of a provider that is simply "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner."  *See Planned Parenthood of Ind. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012).  But, as Judge Jones explained, this vague definition is susceptible to more-specific interpretations that would conflict with the Medicaid Act's text and structure.  *Smith*, 913 F.3d at 564.

For starters, being "capable of" something merely denotes "the ability to perform a function."  *Id.* at 563.  The "capable of" definition could be interpreted to allow providers to stay in the Medicaid program as long as they *could have* operated safely, even if they were not actually doing so.  But the use of "qualified" in the statute's text requires more: "qualified" means "[h]aving qualities or possessing accomplishments which fit one for a certain . . . function" and, often, it means that this fitness is "officially recognized."  *Id.* at 563–64 (alteration in original) (quoting *The Oxford English Dictionary* (online ed. 2017)).  The appropriate question, then, is not whether a provider has the potential to operate safely, legally, and ethically, but whether it is actually doing so.

48

No. 17-50282

Furthermore, as Judge Jones explained, a "literal understanding" of the "capable of" definition could posit that a provider is "qualified" until the state has totally barred that provider from operating entirely. *Id.* at 564. But that definition would conflict with the many Medicaid Act provisions that expressly allow states to decertify providers for reasons wholly unrelated to the provider's license to provide care at all. *Id.* States can, for example, terminate providers for "excessive charges; fraud, kickbacks, or other prohibited activities; failure to provide information; failure to grant immediate access under specified circumstances; default on loan or scholarship obligations; or false statements or material misrepresentations of fact in certain circumstances." *Gee*, 862 F.3d at 477–78 (Owen, J., dissenting) (citing 42 U.S.C. §§ 1396a(p)(1)–(3), 1320a–7, 1395cc(b)(2)); *see also Gee*, 876 F.3d at 701 (Elrod, J., dissenting from denial of rehearing en banc) (explaining that Medicaid providers may be terminated for reasons that would not require them to shut down completely). This definition of "qualified" would also straitjacket state agencies like the OIG that can decertify a provider from the Medicaid program, but not from practicing in general. *See Smith*, 913 F.3d at 564; Tex. Occ. Code Ann. §§ 151.003(2), 152.001(a); 25 Tex. Admin. Code § 139.1(a).

Moreover, *Pennhurst*'s clear-statement rule permits states to interpret and implement a Spending Clause statute unless the statute "plainly prohibit[s]" that interpretation. *Detgen*, 752 F.3d at 631. Texas has interpreted "qualified" to mean that the OIG may terminate a Medicaid provider's agreement when the OIG establishes "by prima facie evidence" that a provider has committed a "program violation"; is "affiliated" with a provider that commits a program violation; or commits "an act for which sanctions, damages, penalties, or liability could be assessed or are assessed by the OIG." 1 Tex. Admin. Code § 371.1703(c)(6)–(8). Texas law further provides that those

49

No. 17-50282

sanctions can be imposed when the provider "fails to provide an item or service to a recipient in accordance with accepted medical community standards or standards required by statute, regulation, or contract, including statutes and standards that govern occupations." *Id.* § 371.1659(2).

Nothing in the Medicaid Act "plainly prohibits" this interpretation. If Congress wanted a more precise definition of "qualified," it could have said so. But the contract that Congress entered with the states contained no such definition. *United States v. Young*, 458 F.3d 998, 1007 (9th Cir. 2006) (O'Scannlain, J.) ("Congress knows how to define terms when it wants to give them specific definitions . . . ."). Because the states have not committed to a federal definition of "qualified," they have wide latitude in determining who is "qualified" and who is not, so long as they identify a regulation implicating safety, legality, or ethics and rely on substantial evidence showing that the provider violated that regulation.

## B.

Again, even assuming *arguendo* that the private plaintiffs have an enforceable federal right to challenge the state's qualification determination,[6] the panel also correctly identified the standard of judicial review under which these claims would be evaluated: the arbitrary-and-capricious standard, limited to the state administrative record. *Smith*, 913 F.3d at 565. This circuit has consistently applied this standard when reviewing the "substantive adequacy and reasonableness" of a state agency's determinations in the Medicaid context. *Abbeville General Hosp. v. Ramsey*, 3 F.3d 797, 804 (5th Cir. 1993). In *Abbeville*, we held that the deferential arbitrary-and-capricious standard applied to a state agency's rate-setting action under the Medicaid

---

[6] And again, they do not.

50

No. 17-50282

Act's Boren Amendment. *Id.* at 803.   Under this deferential standard, an agency's finding may be overturned only if it fails to satisfy "minimum standards of rationality." *La. Envtl. Action Network v. U.S. E.P.A.*, <u>382 F.3d 575, 582</u> (5th Cir. 2004).   Courts may consider only "whether the agency action bears a rational relationship to the statutory purposes and [whether] there [is] substantial evidence in the record to support it." *Id.* (quoting *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, <u>161 F.3d 923, 934</u> (5th Cir. 1998) (internal quotation marks removed)).   In determining whether the agency had "substantial evidence" for its action, the reviewing court looks only to the evidentiary record that was before the agency when it made its decision. *Luminant Generation Co. v. U.S. E.P.A.*, <u>675 F.3d 917, 925</u> (5th Cir. 2012).

The *Abbeville* rule is deeply rooted in the longstanding precedent of this court. *Smith*, <u>913 F.3d at 566</u>. *Abbeville* itself recognized that the applicability of this standard to state agency determinations is an "indisputable proposition" supported by a "litany of cases." *Abbeville*, <u>3 F.3d at 802</u> & n.6 (citing cases); *see also Miss. Hosp. Ass'n, Inc. v. Heckler*, <u>701 F.2d 511, 517</u> (5th Cir. 1983) (reviewing a state agency's Medicaid reimbursement plan under the arbitrary-and-capricious standard).   Other courts have followed this approach as well. *See Smith v. Rasmussen*, <u>249 F.3d 755, 760</u> (8th Cir. 2001); *Brown v. Day*, <u>434 F. Supp. 2d 1035, 1041</u> (D. Kan. 2006); *Friedman v. Perales*, <u>668 F. Supp. 216, 221</u> (S.D.N.Y. 1987), *aff'd*, <u>841 F.2d 47</u> (2d Cir. 1988).

The *Abbeville* rule is also comity enhancing, consistent with the Medicaid Act's system of "cooperative federalism." *Harris v. McRae*, <u>448 U.S. 297, 308</u> (1980) (quoting *King v. Smith*, <u>392 U.S. 309, 316</u> (1968)).   If HHS—rather than Texas's OIG—had terminated Planned Parenthood's Medicaid agreement, the decision would undoubtedly be reviewed under the arbitrary-and-capricious standard. *See* <u>5 U.S.C. § 706(2)(A)</u>; *see also Honey Grove Nursing Ctr. v. U.S.*

51

No. 17-50282

*Dep't of Health & Human Servs.*, 606 F. App'x 164, 167 (5th Cir. 2015) (reviewing whether the Secretary's decision imposing sanctions on Medicaid provider was arbitrary and capricious). In a "federal-state cooperative" like Medicaid, it would make little sense to review federal termination decisions at one level of judicial review and state termination decisions at a less deferential level. *Smith*, 913 F.3d at 567. Especially in light of *Pennhurst*'s clear-statement rule, we should not infer that Congress intended to relegate states to the position of distrusted, second-class decisionmakers without an express indication in the statute saying as much.

The *Abbeville* standard also incentivizes providers to use the state-level administrative appeal process that the Medicaid Act and its accompanying regulations require. *See Smith*, 913 F.3d at 568 (describing the arbitrary-and-capricious standard as "a feature—not a bug"). Without arbitrary-and-capricious review limited to the state administrative record, providers would be encouraged to do exactly what they did here—refuse to schedule an informal resolution meeting to address the state's concerns and refuse to submit evidence and argument to the state agency—knowing full well that they could simply hit the reset button once they got to court. This would render the state's administrative review processes largely meaningless, further undermining the "federal-state cooperative" that the Medicaid Act contemplates and further constraining the states with limitations that were not clearly stated in the quasi-contract that they entered into with the federal government.

C.

Even under these standards—which, again, would apply only if the private plaintiffs had an enforceable federal right[7]—the OIG did not act

---

[7] Again, they do not.

arbitrarily or capriciously in evaluating whether Planned Parenthood was "qualified." In its Final Notice sent to the Planned Parenthood affiliates, the OIG identified a number of "regulations concerning the 'safe, legal, and ethical manner' of furnishing healthcare services." *Smith*, 913 F.3d at 565. And based on the record before it, the OIG pointed to "substantial evidence" of the provider's violations of these regulations.

Some of those regulations forbid researchers from taking "part in any decisions as to the timing, method, or procedures used to terminate [a] pregnancy made solely for the purposes of the research." 42 U.S.C. § 289g-1(c)(4); *see also* 45 C.F.R. § 46.204(i). The OIG relied on video footage[8] showing

---

[8] The district court concluded, as PPGC alleged, that "the quality and strength of the evidence [that the video] provides is suspect." But the plaintiffs entered no evidence into the administrative record or the district court record indicating that this video was deceptively edited or otherwise unreliable. On appeal, the plaintiffs do not identify any evidence in the district court record showing that the videos are unreliable, and they admitted at oral argument that they provided no such evidence. *See* Oral Argument at 58:50-59:30. Even if courts could consider evidence outside the administrative record—as the district court seemed to believe—the district court erred on this point. The OIG provided the district court with a declaration as to authenticity from the individual who filmed the footage. The OIG also provided the district court with a report from a highly regarded forensic firm concluding that both videos were authentic and not deceptively edited. The district court did not address this evidence and does not identify any evidence in the district court record to the contrary.

PPGC's allegation that the video is unreliable is further undermined by its equivocation on whether it had access to the full video. In their preliminary injunction motion, the plaintiffs said that the OIG's "justification for termination is especially inadequate when this video—the supposedly unedited version of which the Attorney General has yet to provide to Plaintiffs—is the only 'evidence' of wrongdoing defendants can come up with." That conflicts with the cross-examination of Farrell, in which she admits that PPGC had the full footage "sometime in January of 2016."

The dissenting opinion's mystifying digression about whether the video was "authenticated" under Federal Rule of Evidence 901 is even further off the mark, which is why no party bothered to brief it. The video's connection to this case is that it informed the OIG's disqualification decision—a decision the district court was required to defer to so long as it satisfied "minimum standards of rationality." *La. Envtl. Action Network*, 382 F.3d at 582. It should go without saying that the Federal Rules of Evidence do not apply to Texas state agency decision-making. Whether the video was "authenticated" under the federal

that Planned Parenthood Gulf Coast (PPGC) has permitted doctors involved in fetal-tissue research to perform abortions to secure that fetal tissue.  As just one example, in the video, PPGC Research Director Melissa Farrell mentions a doctor who performed abortions and collected tissue for her own research. Farrell reports that the doctor would pick the abortion patients she wanted based on how beneficial that tissue would be for her own research.  The doctor would then collect her own specimens and "take it home with her in her cooler."

The OIG also points to other regulations that expressly forbid the alteration of the timing or method of an abortion for research purposes.  *See* 42 U.S.C. § 289g-1(b)(2)(A)(ii).  Many statements in the video support a finding that PPGC doctors had done this.  For example, Farrell stated that researchers connected to PPGC have targeted specific fetal tissue in the past and that PPGC is willing to alter the abortion procedures to meet the needs of those researchers.  Farrell also remarked that PPGC can get "creative" and alter a procedure to obtain a high volume of intact liver, thymus, and neural tissue.

Still other regulations also prohibit the receipt of valuable consideration in exchange for fetal tissue.  *See* 42 U.S.C. § 289g-2(a); Tex. Penal Code Ann. § 48.02(a)-(b).  On the video, Farrell asserted that even though PPGC was "already set up" to do the fetal-tissue procurement, PPGC needed to "work out, you know, something in terms of covering additional costs for additional . . . things related to it."  Farrell discussed how she uses a contract's language to make it appear that payments are going only to "administrative costs" rather than compensation for specimens, which she admits is "touchy" under federal law.  On the video, she says, "I'm very particular about working with the

rules during the district court proceedings is irrelevant to whether the video supported the OIG disqualification decision, which—as explained above the line—it clearly did.

54

language of the budget and contract to where the language is specific to covering the administrative costs and not necessarily the per specimen. Because that borders on some language in the federal regs, it's a little touchy." Farrell also discussed how she creates a profit margin in a budget, even discussing how researchers can buy meals for the staff as a bonus for enrolling patients to donate fetal tissue under the vague category of "meeting cost."

Other regulations prohibit misrepresentations to law-enforcement officials. *See, e.g.*, 1 Tex. Admin. Code § 371.1661(8). The OIG received evidence from the U.S. House of Representatives Selective Investigation Panel. That evidence documented a visit by the Texas Ranger Division and discussions relating to PPGC's transactions with a researcher who was interested in obtaining fetal tissue. The U.S. House Panel's evidence shows that PPGC, at that time, had been informed that the Baylor College of Medicine's Independent Review Board had approved the researcher's fetal-tissue research proposal, but PPGC's General Counsel told the Texas Rangers that approval had not yet been obtained.

Texas's Medicaid rules also allow termination of any entity affiliated with an entity that has committed a program violation. 1 Tex. Admin. Code § 371.1703(c)(7); *id.* § 371.1605(a). Federal law expressly allows states to do this. *See* 42 C.F.R. § 1001.1001(a)(1)(iii) (States "may exclude an entity . . . if a person with a relationship with such entity . . . [h]as been excluded from participation in Medicare or any State health care program."). Here, the OIG pointed to significant evidence—both from the video and elsewhere—that Planned Parenthood South Texas (PPST) and Planned Parenthood of Greater Texas (PPGT) were affiliated with PPGC. That evidence showed, for example, that these entities had common identifying information, individual providers that worked across affiliates, common control exercised by Planned

No. 17-50282

Parenthood Federation of America, and shared participation in research agreements.[9]  Though these entities argue on appeal that this conclusion was unwarranted, they point to no evidence that was before the OIG that undermines the agency's conclusion.  Indeed, these entities did not provide any such evidence to the OIG.

Despite admitting that the OIG permissibly disqualified PPGC, the partially dissenting opinion states, without elaboration, that the "legal affiliat[ion]" between PPGC, PPST, and PPGT "ha[s] no bearing on whether PPST or PPGT were qualified."  While it is unclear why even a solely legal relationship between the three entities could be so easily dismissed, the facts recited above show that the entities' relationship is also functional.  It would be difficult to understand under *any* framework why an entity's significant overlap in leadership, personnel, and resources with an unqualified entity could be thought to have "no bearing" on that entity's own qualifications.  But the framework applicable here dispels any doubt: the OIG has "broad discretion to implement the Medicaid Act" unless its interpretation is "plainly prohibit[ed]" by "the statutory language."  *Detgen*, 752 F.3d at 631; *see Smith*, 913 F.3d at 563 ("[S]tates retain broad authority to define provider

---

[9] In discussing what is required for affiliation, Judge Higginson compares this case to *Andersen*, 882 F.3d at 1205.  That comparison is misplaced.  *Andersen* involved a federal statute that required proof of ownership or control before a Medicaid contract could be terminated.  *See id.* at 1234.  Here, Texas relies on a state regulation which permits termination based on "affiliat[ion] with a person who commits a program violation."  1 Tex. Admin. Code § 371.1703(c)(6)–(8).  Notably, Planned Parenthood calls the provider plaintiffs "affiliates" throughout its own brief and acknowledges that they share membership in the national Planned Parenthood Federation of America which "promulgates medical and other standards to which . . . affiliates . . . must adhere."  Inexplicably, Planned Parenthood asserts just two lines later that the provider plaintiffs are not affiliates.  And, as I explain above the line, other "legal and financial 'functional' overlaps" showing affiliation were never refuted in the administrative process.

qualifications and exclude providers on that basis." (quoting *Gee*, 862 F.3d at 462)). Unsurprisingly, neither the partially dissenting opinion nor the plaintiffs can point to any provision of the Medicaid Act plainly prohibiting Texas's affiliate rule—a rule the OIG permissibly applied to PPST and PGGT.

The Texas Inspector General reviewed this vast body of evidence thoroughly, considering the U.S. House Panel's evidence and watching the full eight-hour video five times in addition to reviewing the video's transcript.[10] The Inspector General also consulted with the OIG's Chief Medical Officer, who reviewed the video and informed the Inspector General that, in his opinion, the video demonstrated that PPGC violated accepted medical and ethical standards, in violation of Texas's Medicaid program requirements. 1 Tex. Admin. Code § 371.1659(2). This entire review process lasted well over a

---

[10] The entire video, which the state divided into 17 parts for ease of transmission, is attached here. Some faces have been blurred due to patient privacy concerns. *See* Record on Appeal at DX-2; (1) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409071822-Redacted.mp4; (2) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409074648.mp4; (3) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409081515.mp4; (4) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409084341.mp4; (5) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409091208.mp4; (6) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409094034.mp4; (7) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409100901-Redacted.mp4; (8) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409103727.mp4; (9) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409110553.mp4; (10) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409113420.mp4; (11) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409120246.mp4; (12) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409123112-Redacted.mp4; (13) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409125940-Redacted.mp4; (14) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409131657.mp4; (15) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409134524-Redacted.mp4; (16) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409141350.mp4; (17) http://www.ca5.uscourts.gov/opinions/pub/17/17-50282-vids/FNND0569_20150409144217.mp4

No. 17-50282

year.  After this review, the OIG sent a Notice of Termination to the provider plaintiffs, requesting evidence and argument about whether termination was justified.

PPGC could have used this opportunity to dispute the validity of the evidence that the agency had received, or to introduce new evidence showing that the OIG's concerns were unfounded.  But PPGC did none of these things; it instead went immediately to the courts.  The record before the agency, therefore—the relevant touchstone for our analysis—substantially supported the conclusion that Planned Parenthood had violated state and federal regulations concerning the safe, legal, and ethical furnishing of medical care. On this record, the OIG gave much more than the "minimal consideration to relevant facts contained in the record" that arbitrary-and-capricious review requires.  *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (quoting *State of Louisiana ex. rel Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988)).

\* \* \*

For the reasons explained both by the court's opinion and Part I of this concurring opinion, the qualified-provider provision does not confer an enforceable private right to challenge a state's termination of a Medicaid agreement.  But even if it did, the plaintiffs' claims in the instant case would fail under the appropriate standards that would apply to that action.[11]

### III.

Dissatisfied with the teachings of *Gonzaga* and *Armstrong*, Judge Dennis's dissenting opinion misinterprets the Supreme Court's rulings in those cases so as to avoid the result their application would have here.   The

---

[11] Although only the individual plaintiffs' claims are before the court on this appeal, the analysis in Part II would apply with equal force to the provider plaintiffs' claims.

dissenting opinion also includes a lengthy peroration castigating the majority for its purported failure to adhere to precedent.

With its remonstrance that *stare decisis* applies "even in abortion-related cases," the dissenting opinion implicitly accuses the judges in the majority of reaching a desired result because the provider plaintiffs in this case provide abortions. The reader may decide whether, in a run-of-the-mill implied cause of action dispute, the dissenting opinion would have *sua sponte* scoured the record to see whether a video entered into the administrative record had been authenticated under Federal Rule of Evidence 901. One might also query whether the opinion would invoke "autonomy," "freedom of choice," and the death of "the principles of *stare decisis*" if this case had involved patients who wanted to stay with a disqualified rheumatologist.

The dissenting opinion also takes issue with the fact that the majority opinion overrules panel precedent.[12]  Yet our dissenting colleague has not hesitated to vote to overrule circuit precedent in the past based on nothing more than the belief that our precedent was incorrect. For instance, our dissenting colleague did not lament the demise of *stare decisis* when, twice in the past year, our dissenting colleague voted with the unanimous *en banc* court to overrule panel precedent. *See Williams v. Catoe*, 946 F.3d 278, 281 (5th Cir. 2020) (en banc) (overruling *Robbins v. Maggio*, 750 F.2d 405 (5th Cir. 1985) and addressing *stare decisis* in a single sentence "in the event that [it] is a concern"); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 465 (5th Cir. 2020) (en banc) (overruling *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910 (5th Cir. 1996) without mentioning *stare decisis*).

---

[12] It was no secret that the issues addressed in that panel decision were far from settled in this circuit. *See Gee*, 876 F.3d at 700–02 (Elrod, J., joined by Jolly, Jones, Smith, Clement, Owen, and Southwick, JJ., dissenting from denial of rehearing en banc).

No. 17-50282

Indeed, reconsideration of circuit—especially panel—precedent is one of the main purposes of *en banc* rehearings. *See, e.g.*, *United States v. Anderson*, 885 F.2d 1248, 1255 (5th Cir. 1989) (en banc) (Gee & Garwood, JJ.) (noting that "our en banc court [has not] hesitated" to overturn a precedent when "convinced it was a mistaken one"); *United States v. Games-Perez*, 695 F.3d 1104, 1124 (10th Cir. 2012) (Gorsuch, J., dissenting from denial of rehearing en banc) ("[I]t is surely uncontroversial to suggest that the point of the *en banc* process, the very reason for its existence, is to correct grave errors in panel precedents when they become apparent, even if the panel precedents in question happen to be old or involve questions of statutory or regulatory interpretation.").

Contrary to the dissenting opinion's portrayal, this is not a case about abortion. It is a case about whether patients whose care is paid for under the Medicaid Act can challenge a state's disqualification of a provider under that Act. In evaluating that question, a majority of this court keeps "the scale of justice even and steady, and not liable to waver with every new judge's opinion" by taking the Supreme Court's decisions in *O'Bannon*, *Gonzaga*, and *Armstrong* at their word. *June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring in the judgment) (quoting 1 W. Blackstone, *Commentaries on the Laws of England* 69 (1765)). It is the dissenting opinion—perhaps because of its insistence on treating this as an abortion issue—that fails to faithfully apply the precedents that would apply in any other case and thereby fails to adhere to our duty to "treat like cases alike." *Id.* at 2141. I therefore join the majority opinion in full.

60

No. 17-50282

JAMES C. HO, Circuit Judge, joined by STUART KYLE DUNCAN, Circuit Judge, concurring:

The dissent scolds the majority for "fail[ing] to heed" our "duty [as] judges to adhere to the principles of *stare decisis*"—principles that "must be respected," the dissent feels compelled to remind us, "even in abortion-related cases." *Post*, at 103–04 (Dennis, J., dissenting).  I offer this brief response.

## I.

First, regarding precedent: There is nothing untoward about reconsidering a previous decision of our circuit that turns out to be wrong as a matter of both Supreme Court precedent and statutory text—no matter how "well written" our earlier decision may be.  *Id.* at 104.  "Wrong—but at least well written" is not the legal standard we endeavor to achieve.  Revisiting circuit precedent does not signal disrespect for the precedent's author, but rather respect for the rule of law.  Indeed, the ability to reevaluate circuit precedent is precisely why rehearing en banc is available in every circuit in the country.

To be sure, people can and do react in different ways when others disagree with them.  One option is to be offended.  But another is to be thankful.  Thankful that, as human beings, judges sometimes make mistakes, but strive to do better.  Thankful that our Constitution not only tolerates disagreement, but celebrates it—because we believe in debate, the adversarial process, and issue percolation, both within and across the courts of appeals.  Thankful that our legal system affords us the opportunity to make course corrections, because we all agree that it is more important to get the law right than to guard our self-esteem.

So I see nothing inappropriate about the majority's decision today.  Nor should the dissent, for that matter.  Recall when the shoe was on the other foot

61

No. 17-50282

in *Alvarez v. City of Brownsville*, <u>904 F.3d 382</u> (5th Cir. 2018) (en banc).  The dissenters there sought to overturn circuit precedent—with nary a word about the importance of *stare decisis.  See, e.g., id.* at 402 (Dennis, J., dissenting).  In response, the majority in *Alvarez* ultimately disagreed with the dissenters— but not because it was improper to revisit circuit precedent.  The majority simply concluded that our precedent was already consistent with the relevant Supreme Court precedents and legal texts.  Moreover, a number of us went out of our way to *endorse* the dissenters' right to reconsider previous circuit decisions "to better align our precedents" with "conflicting Supreme Court precedent, or (where the Supreme Court has not yet ruled) . . . with the text and original understanding of the Constitution or the plain language of United States statutes." *Id.* at 401 (Ho, J., concurring).

Yet now the dissent returns the favor by accusing the majority of "fail[ing] to heed" *stare decisis*—ignoring the fact that the dissenters did precisely the same thing in *Alvarez.  Post*, at 104.

## II.

In addition, the dissent's admonition that *stare decisis* applies "even in abortion-related cases" plainly implies that our court is somehow bending the law to disfavor abortion.  That is rich, considering how far the federal judiciary has bent over backwards to *protect* abortion.

There is broad consensus that nothing in the text of the Constitution privileges abortion over other health care matters. *See, e.g., Jackson Women's Health Org. v. Dobbs*, <u>945 F.3d 265, 277</u> & n.1 (5th Cir. 2019) (Ho, J., concurring in the judgment) (collecting cases).  The federal judiciary has nevertheless established abortion as an unenumerated right. *See id.*  And we have dutifully abided by those precedents in case after case. *See, e.g., id.* at 268 (majority opinion); *see also Jackson Women's Health Org. v. Dobbs*, 951

62

No. 17-50282

F.3d 246 (5th Cir. 2020). What's more, abortion has been accorded uniquely favorable treatment across a wide range of legal doctrines. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 742 (2000) (Scalia, J., dissenting) ("[L]ike the rest of our abortion jurisprudence, today's decision is in stark contradiction of the constitutional principles we apply in all other contexts."); *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2171 (2020) (Gorsuch, J., dissenting) (same).[1]

So if the judiciary is biased when it comes to abortion, it's been decidedly in its favor.

All of the court's opinions today are scholarly and rigorous. They analyze the law faithfully, without fear or favor. Members of our court simply disagree over the best reading of the law. That's fine. It's why we have multi-member panels. We're expected to disagree on occasion. And when we do, it should go without saying that we all do so in good faith.

But if the dissent is going to charge anyone with selectively invoking legal doctrine in abortion cases, it should ask why it chooses to bring up *stare decisis* today, but not in cases outside the abortion context like *Alvarez*.

\* \* \*

The dissent's stated objective is to uphold the "integrity of the judicial process." *Post*, at 104. A worthy goal, to be sure. But following precedent only when you like it—and ignoring it when you don't—is not judicial integrity. It

---

[1] It's even been suggested that our court went too far in *In re Abbott*, 954 F.3d 772, 778 n.1 (5th Cir. 2020), by effectively equating the unenumerated right to abortion with express rights like the free exercise of religion. *See S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 943 n.2 (9th Cir. 2020) (Collins, J., dissenting). I agree that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), involved substantive due process—not the Free Exercise Clause—and thus does not set the controlling standard in religious exercise cases. *See also Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting from denial of application for injunctive relief) (same). That said, Judge Collins's criticisms helpfully illustrate that our court hardly needs reminding that courts are duty-bound to follow the law, and not to distort it to disfavor abortion.

is not principled judging. It is the very definition of "WILL instead of JUDGMENT"—*stare decisis* "only when *I* say so."

No. 17-50282

STEPHEN A. HIGGINSON, Circuit Judge, joined by STEWART and COSTA, Circuit Judges, concurring in part and dissenting in part, partially joined by DENNIS and GRAVES, Circuit Judges:

In *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 785 (1980), the Supreme Court held that Section 23(A) confers on Medicaid recipients a right to receive care from any qualified provider, but not a right to receive care from a decertified provider. In light of *O'Bannon*, as well as Section 23(A)'s unmistakable focus on Medicaid recipients, I agree with the Fourth, Sixth, Seventh, Ninth, and Tenth Circuits that patients may sue to enforce Section 23(A) under 42 U.S.C. § 1983. I further agree with these circuits that a provider is "qualified to perform the service or services required" so long as it is "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." I would therefore find that a Medicaid recipient may sue under § 1983 to continue receiving care from a provider that has been terminated for reasons that are not related to the provider's medical qualifications.

I nevertheless join the en banc majority's judgment as to Planned Parenthood Gulf Coast (PPGC).[1] Texas's Health and Human Services Commission's Inspector General (OIG's) notice of termination to PPGC set forth multiple concerns related to PPGC's qualifications under Section 23. OIG alleged, for instance, that PPGC had a "policy of agreeing to procure fetal tissue even if it means altering the timing or method of an abortion" and that PPGC staff violated "minimum standards" in "infection control and barrier precautions with regard to the handling of fetal blood and tissue." Allegations of this nature, which we must accept at this stage as valid on their face, go to

---

[1] Judges Dennis and Graves do not join this paragraph of the opinion.

65

whether PPGC provides Medicaid services in a safe, competent, legal, and ethical manner. *O'Bannon* does not permit Medicaid beneficiaries to litigate OIG's professional competency termination of PPGC, when PPGC itself had the opportunity to pursue administrative remedies into state court and potentially into federal court.[2]

However, I depart from the judgment as to PPST and PPGT. Texas terminated PPST and PPGT based solely on their "legal affiliat[ion]" with PPGC. To me, that fails to determine that these providers are not qualified; indeed, as the panel majority in the instant case observed, "whether OIG could terminate Medicaid funding for all of the Provider Plaintiffs" based on "regulations authorizing action against 'affiliates'" is a "separate issue" from whether OIG could terminate Medicaid funding for PPGC itself. *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 913 F.3d 551, 569 n.18 (5th Cir. 2019), *reh'g granted sub nom.*, *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs. Inc. v. Phillips*, 914 F.3d 994 (2020). Texas's stated basis for termination, its affiliate rule encompassing entities which "share[] any identifying information, including . . . corporate or franchise name,"[3] had no

---

[2] *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 484 (5th Cir. 2017) (Owen, J., dissenting) (noting that PPGC "may also have a § 1983 claim based on rights under provisions of the Medicaid statutes and regulations (other than § 1396a(a)(23) and regulations promulgated under it)" and finding it "doubtful" that "PPGC is limited to state administrative proceedings and state-court review").

[3] Judge Elrod's concurring opinion seeks to discern other legal and financial "functional" overlaps not identified by Texas. Indeed, Texas's only other observation was to speculate about a possible Planned Parenthood Federation of America (PPFA) "national policy." Notably, neither Texas nor the majority and concurring opinions point to any evidence that specific affiliates had themselves participated in alleged improper conduct. I would hold that the "individual" or "entity" a State may exclude must be the same individual or entity that the State determines is not qualified to provide services. *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1235 (10th Cir. 2018) (that "affiliates

No. 17-50282

bearing on whether PPST or PPGT were qualified to provide care to Medicaid beneficiaries. *See Planned Parenthood S. Atlantic v. Baker*, 941 F.3d 687, 697 n.3, 702, 705 (4th Cir. 2019), *petition for cert. filed* (U.S. Mar. 27, 2020) (No. 19-1186); *see also Planned Parenthood of Kan. v. Andersen,* 882 F.3d 1205, 1227, 1230 & n.17 (10th Cir. 2018) (states' broad discretion to remove Medicaid providers ties to "qualifications only for professional competency and patient care"); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 966–68 (9th Cir. 2013).

## I.

Whether Section 23(A) confers a federal right enforceable through § 1983 depends on "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). In *Gonzaga*, the Supreme Court clarified that federal spending legislation gives rise to enforceable rights under § 1983 only when the right is "unambiguously conferred" by Congress. *Id.* at 279–83.

Before *Gonzaga*, the Court had applied a three-factor test to determine whether a statutory provision creates a federal right enforceable through § 1983. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). These three *Blessing* factors were:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

---

aggregate their finances, share executives, and share legal counsel . . . do[es] nothing to show that PPFA exercises control over its affiliates' daily operations").

*Id.* at 340–41.

Five years later, *Gonzaga* disavowed lower court decisions that had interpreted *Blessing* as "allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." 536 U.S. at 283. The Court clarified,

> For a statute to create such private rights [enforceable under § 1983], its text must be "phrased in terms of the persons benefited." We have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefited class."

*Id.* (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691–92 & n.13 (1979)). *Gonzaga*, then, recognized that statutory text with an "unmistakable focus on the benefited class" "manifests an unambiguous intent to confer individual rights." *Id.* at 280, 284. Taken together, *Blessing* and *Gonzaga* instruct that Congressional intent to create an individual right is unambiguous where a statute (1) is phrased with an unmistakable focus on the benefited class, (2) may be enforced without straining judicial competence, and (3) is mandatory on states. "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284. "The State may rebut this presumption by showing that Congress specifically foreclosed a remedy under § 1983," for instance, "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (quoting *Blessing*, 520 U.S. at 341).

### A.

The parties' dispute over whether Section 23(A) confers an individual right centers on the first *Gonzaga*/*Blessing* factor: whether the text of the statute indicates an unmistakable focus on the benefited class. Section 23(A)

states in relevant part, "A State plan for medical assistance must provide that any individual eligible for medical assistance . . . may obtain such assistance from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A). *Gonzaga*'s teachings do not undermine *O'Bannon*'s observation that Section 23(A) "gives recipients the *right* to choose among a range of *qualified* providers, without government interference." *O'Bannon*, 447 U.S. at 785 (first emphasis added).

Imagine that Congress had written Section 23(A) without the prefatory phrase, "A State plan for medical assistance must provide that." This hypothetical version of Section 23(A) might state, "Any individual eligible for medical assistance under a State plan may obtain such assistance from any institution qualified to perform the service required." Such a provision would unambiguously confer a federal right on Medicaid patients, because it would be indistinguishable from other statutory provisions which the Court has held *do* create federal rights. The Court has found it "beyond dispute," for instance, that Section 601 of Title VI contains "'rights-creating' language," because it "decrees that '[n]o person . . . shall . . . be subjected to discrimination.'" *Alexander v. Sandoval*, 532 U.S. 275, 280, 288 (2001) (quoting 42 U.S.C. § 2000d). Similarly, Section 901(a) of Title IX "expressly identifies the class Congress intended to benefit" by providing, "No person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Cannon*, 441 U.S. at 690 (citing 20 U.S.C. § 1681). Likewise, *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 430 (1987), found "undeniable" Congressional intent to benefit tenants in a rent-ceiling provision of the Public Housing Act stating,

"A family shall pay as rent for a dwelling unit assisted under this chapter . . . the highest of the following amounts."

Yet the en banc majority finds that Section 23(A) does not confer a federal right on Medicaid patients. The en banc majority concludes that the basic focus of Section 23(A) is shifted away from Medicaid patients and towards state obligations. However, as I read the opening "state plan" phrase, it converges with what the third *Gonzaga/Blessing* factor requires: it "unambiguously impose[s] a binding obligation on the States." That a statute directly addresses state obligations does not imply that it fails to confer individual rights; otherwise, the *Gonzaga/Blessing* framework requiring both an "unmistakable" focus on benefited individuals (factor one) and an "unambiguous" directive to states (factor three) makes little sense.[4]

---

[4] In *Does v. Gillespie*, 867 F.3d 1034, 1041 (8th Cir. 2017), the Eighth Circuit stated, "Even where a subsidiary provision includes mandatory language that ultimately benefits individuals, a statute phrased as a directive to a federal agency typically does not confer enforceable federal rights on the individuals." This is faulty for several reasons. First, as further discussed below, Section 23(A) itself is not phrased as a directive to a federal agency. Section 23(A) is phrased as a directive to states, with statutorily separate enforcement provisions of the Medicaid Act imposing duties on the Secretary. Under *Blessing*, Medicaid's enforcement scheme goes to whether a state can rebut a presumption of enforceability through § 1983, rather than the threshold issue of whether a right is conferred at all.

Second, the Eighth Circuit stated that such statutes "typically" do not confer enforceable rights, yet cited only *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754 (1981). *Coutu* does not say that such statutes "typically" fail to confer enforceable rights. *Coutu* addressed whether a private right of action was implied by a minimum wage provision in the Davis-Bacon Act. As relevant here, the provision stated that certain federal contracts were required to "contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor." *Id.* at 756 n.1. The Court concluded narrowly that this language did not create a "private right of action for back wages under a contract that has been administratively determined not to call for Davis-Bacon work," i.e., a contract not subject to the minimum wage provision. *Id.* at 756. The Court expressly declined to resolve "whether the Act creates an implied private right of action to enforce a contract that contains specific Davis-Bacon Act stipulations." *Id.* at 768–69.

Moreover, *Coutu* largely focused on whether a private remedy could be inferred, not on whether the provision conferred a private right. *See id.* at 772–73 (finding the provision's

No. 17-50282

Here, Section 23(A)'s attentiveness to state obligations does not diminish its unmistakable focus on Medicaid patients. Of course, Section 23(A) *could* have been drafted without such a direct focus on Medicaid patients. Section 23(A) could have been phrased as, "The Secretary shall not approve a State plan for medical assistance absent assurances satisfactory to the Secretary that the plan will reimburse any institution's provision of services for an individual eligible for assistance, so long as the institution was qualified to perform the services required." *See Cannon*, <u>441 U.S. at 693</u> (contrasting the actual text of Section 901(a) with an alternative proposal framing Section 901(a) as a "simple directive to the Secretary" prohibiting the Secretary from granting various benefits to institutions absent "assurances satisfactory to the Secretary" that the institution "will not discriminate on the basis of sex"). This alternative version of Section 23(A) arguably would not contain an "unmistakable" focus on individuals. A fair reading of this hypothetical alternative might indicate that Congress drafted the statute to regulate the Secretary's conduct and with the primary intention of benefiting providers, perhaps with incidental benefits for individuals.

But Congress opted for a direct approach. To repeat, Section 23(A) provides, "A State plan for medical assistance must provide that any individual eligible for medical assistance . . . may obtain such assistance from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him such services." <u>42 U.S.C. § 1396a(a)(23)(A)</u>. This is

---

"language provides no support for the implication of a private *remedy*" and "less reason to infer a private *remedy* . . . where Congress . . . has framed the statute simply as . . . a command to a federal agency" (quotations omitted) (emphasis added)). "Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, <u>536 U.S. at 284</u>.

not reconcilable with the conclusion that *none* of the mandatory provisions listed under § 1396a confers federal rights enforceable through § 1983. Such logic gives short shrift to the Court's long-standing advice that courts and litigants should prudently focus on "specific statutory provision[s]" and conduct "methodical inquir[ies]," rather than address a federal program "as an undifferentiated whole." *Blessing*, 520 U.S. at 342–43.

I therefore disagree with the en banc majority's disavowal of *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), a decision that has been criticized but not clearly overruled, as well as what I believe must be an implicit rejection of our own recent decision in *Legacy Community Health Services, Inc. v. Smith*, 881 F.3d 358 (5th Cir. 2018).

In *Legacy*, we joined at least five other circuits in concluding that 42 U.S.C. § 1396a(bb) confers enforceable rights on Federally Qualified Health Centers (FQHC's) because that Medicaid provision "shows the potential 'rights-creating language' that *Gonzaga* calls for." 881 F.3d at 371. We highlighted § 1396a(bb)(5)(A)'s directive that, "the State plan shall provide for payment to the center or clinic by the State of a supplemental payment," and § 1396a(bb)(1)'s requirement that "the State plan shall provide for payment for services . . . furnished by a [FQHC] . . . in accordance with the provisions of this subsection." *Id.* This language, we found, was "mandatory and has a clear focus on the benefitted FQHCs." *Id.* at 372 (quotation omitted). We did not consider the provision's opening references to state health plans to be evidence that the provision does not focus on benefiting FQHC's. To the contrary, we held that "[t]he language 'the State plan shall provide' is precisely the same language that this court has said is binding [on the States]," relevant to the third *Blessing* factor, and therefore favored our conclusion that § 1396a(bb) provides enforceable rights.

72

No. 17-50282

*Legacy* explicitly and correctly declined Texas's invitation to "overrule cases such as *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 512 (1990), in which the Court found other provisions of the Medicaid Act to be enforceable by health care providers through § 1983." *Id.* at 372. In *Wilder*, the Court concluded that a reimbursement provision of the Medicaid Act, the Boren Amendment, created federal rights enforceable through § 1983. The Boren Amendment, like Section 23(A), was codified under 42 U.S.C. § 1396a(a) and therefore "require[d] a state plan to provide for 'payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.'" *Wilder*, 496 U.S. at 510 (quoting 42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V)) (emphases removed). The Court reasoned textually that the Boren Amendment "establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers." *Id. Wilder*'s holding, according to *Gonzaga*, turned on the fact that the Boren Amendment "explicitly conferred specific monetary entitlements upon the plaintiffs . . . requir[ing] States to pay an 'objective' monetary entitlement to individual health care providers." *Gonzaga*, 536 U.S. at 280.

Our prerogative to overrule, explicitly or implicitly, *Legacy* does not extend to the authority to declare that *Wilder* is no longer good law. Texas argues that *Wilder* itself was implicitly overruled in *Gonzaga,* then explicitly in *Armstrong*. I disagree.[5] *Gonzaga* rejected "the notion that our implied private right of action cases have no bearing on the standards for discerning whether a statute creates rights enforceable by § 1983," which "*Wilder* appears

---

[5] I commend the thoughtful, comprehensive discussion of caselaw offered in the Fourth Circuit's opinion in *Planned Parenthood South Atlantic v. Baker*, 941 F.3d 687 (4th Cir. 2019).

No. 17-50282

to support." 536 U.S. at 283 (citing *Wilder*, 496 U.S. at 508–509 n. 9). But at no point did *Gonzaga* call into question *Wilder*'s holding that the Boren Amendment conferred an enforceable right on providers.

Likewise, the Court made only a passing reference to *Wilder* in *Armstrong Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), in a concise footnote unrelated to the arguments presented to the Court or the ultimate resolution of that case. In *Armstrong*, providers of habilitation services argued that they were entitled to higher reimbursement rates under Section 30(A) requiring state Medicaid plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan." 135 S. Ct. at 1382 (quoting 42 U.S.C. § 1396a(a)(30)(A)). Section 30(A) directed states to "safeguard against unnecessary utilization" and "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers." *Id.* The provider plaintiffs argued that Section 30(A) could be enforced either through an implied right of action under the Supremacy Clause, or in equity. *Id.* at 1383–87. A majority held that the Supremacy Clause does not confer a right of action to enforce federal law, and further rejected the providers' contention that a suit to enforce Section 30(A) could proceed in equity. The providers did not argue that the Medicaid Act itself contained an implied private right of action, or that Section 30(A) was enforceable through § 1983. *See id.* at 1387.

*Armstrong*'s footnote, relied on by the en banc majority to reject *Wilder*, stated, "[The providers] do not claim that *Wilder* establishes precedent for a private cause of action in this case. They do not assert a § 1983 action, since our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified." *Id.* at 1387 n.*. The footnote then cited *Gonzaga* as "expressly 'reject[ing] the notion,' implicit in *Wilder*, 'that our cases permit

74

No. 17-50282

anything short of an unambiguously conferred right to support a cause of action brought under § 1983.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 283).

This footnote reaffirms *Gonzaga*'s holding that a private right must be unambiguously conferred and rejects the inference in *Wilder* that suggests otherwise. Notably also, the Court disclaimed notions "implicit" to *Wilder*, not *Wilder*'s holding.[6] Of course, we owe "serious consideration" to "recent and detailed discussion of the law by a majority of the Supreme Court," *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013). Manifestly, the footnote contains no such "detailed discussion" shedding light on whether *Wilder*'s holding continues to bind lower courts.

Finally, not even the *Armstrong* plurality provides a springboard for our en banc majority to anticipate and disregard current Supreme Court law. A plurality of the *Armstrong* Court, citing *Sandoval*, opined that "Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action. It is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." *Armstrong*, 135 S. Ct. at 1387 (plurality op.). These observations do not imply that Section 23(A) fails to create an enforceable right.

First, the plurality's statement that Section 30(A) is "phrased as a directive to the federal agency charged with approving state Medicaid plans" needs careful explication. As a textual matter, the provision is phrased as a directive to states—not as a directive to the Secretary of Health and Human

---

[6] Thus, in *Gee*, the United States took the position that "*Armstrong* was not a Section 1983 case, and it did not purport to alter the framework established by *Gonzaga University* for determining whether a provision of Spending Clause legislation may be enforced in a Section 1983 action." Brief for United States as Amicus Curiae at 8, *Planned Parenthood v. Gee*, 862 F.3d 445 (5th Cir. 2017) (No. 15-30987), 2016 WL 691347.

No. 17-50282

Services. A *separate* enforcement provision of the Medicaid Act "says that the 'Secretary shall approve any plan which fulfills the conditions specified in subsection (a),' the subsection that includes § 30(A)." *Armstrong*, 135 S. Ct. at 1387 (plurality op.) (quoting 42 U.S.C. § 1396a(b)). The Act's textually separate enforcement provisions go to whether the State can rebut a presumption of enforceability under § 1983—not to the threshold question of whether a right is conferred by the specific provision in question.

Second, the plurality discussion focused on whether Section 30(A) creates a private right of action, not whether Section 30(A) confers a federal right enforceable through § 1983. *See, e.g.*, *Armstrong*, 135 S. Ct. at 1387 (plurality op.) (opining that Section 30(A) is not "phrased . . . as a conferral of the *right to sue*" and that its language "reveals no congressional intent to create a *private right of action*") (emphases added). "[W]hether a statutory violation may be enforced through § 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute. . . . Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U.S. at 283–84.

Third, the *Armstrong* plurality dismissed the possibility of an implied right of action for providers because, in its view, providers are likely "mere incidental beneficiaries [] of the Medicaid agreement, which was concluded for the benefit of the infirm whom the providers were to serve." 135 S. Ct. at 1387. Thus, the *Armstrong* plurality would not necessarily disagree that portions of the Medicaid Act do confer rights on individual patients.

76

No. 17-50282

B.

I would also reaffirm precedent that the right conferred by Section 23(A) is enforceable through § 1983. "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981). As the Supreme Court has cautioned, "Only twice have we found a remedial scheme sufficiently comprehensive to supplant § 1983: in *Sea Clammers*, and *Smith v. Robinson*, 468 U.S. 992 (1984)." *Blessing*, 520 U.S. at 347 (citation omitted). Here, the Secretary of HHS is authorized to curtail Medicaid funding to a state that violates Section 23(A). *See* 42 U.S.C. § 1316; 42 U.S.C. § 1396c. Texas contends that this remedial scheme is comparable to the ones discussed in *Sea Clammers* and *Robinson* and is sufficiently comprehensive to supplant § 1983. Texas's argument contradicts the Court's repeated, commonsense holdings that enforcement schemes based primarily on agency withholding of federal funds fail to displace § 1983.

In *Sea Clammers*, the Court found that the Federal Water Pollution Control Act (FWPCA) and Marine Protection, Research, and Sanctuaries Act (MPRSA) contained "unusually elaborate enforcement provisions" conferring authority to sue to "both on government officials and private citizens." 453 U.S. at 13. The private citizens suing in *Clammers* instead sought to proceed through § 1983, thereby failing to "comply with specified procedures . . . including in most cases 60 days' prior notice to potential defendants." *Id.* at 14. Emphasizing that Congress had "set[] out expressly the manner in which private citizens can seek to enjoin violations," the Court found it "hard to believe that Congress intended to preserve the § 1983 right of action when it

77

No. 17-50282

created so many specific statutory remedies, including the two citizen-suit provisions." *Id.* at 20.

In *Robinson*, the Court concluded that the Education of the Handicapped Act (EHA) provided "an elaborate procedural mechanism to protect the rights of handicapped children," including a right to "judicial review of the States' provision of 'free appropriate public education' to handicapped children." *Robinson*, 468 U.S. at 1010, 1022 (citing 20 U.S.C. § 1415). "Allowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme." *Id.* at 1012.

Unlike the FWPCA and MPRSA, the Medicaid Act lacks statutory remedies for individual patients. And unlike the EHA, the Medicaid Act contains no elaborate procedural mechanisms assuring an individual patient's right to receive care from any qualified provider. *Planned Parenthood S. Atlantic*, 941 F.3d at 698. As Texas notes, the Medicaid Act requires states to adopt state administrative remedies through which *providers* may challenge termination decisions. Although the Medicaid Act does require states to provide administrative remedies for "any individual whose claim for medical assistance under the plan is denied," 42 U.S.C. § 1396a(a)(3), Texas has never argued that it is required to (or that it does) provide administrative remedies for individuals alleging violations of Section 30(A).

Rather, federal enforcement of Medicaid relies solely on the Secretary's ability to withhold funds for violations of the Act. But this sort of enforcement mechanism has never been found to indicate a Congressional intent to displace suit through § 1983. *Wright*, for instance, held that the Department of Housing and Urban Development's "generalized powers" to audit and to cut off funds to public housing authorities were not "remedial mechanisms . . . sufficiently comprehensive and effective to raise a clear inference that Congress intended

78

to foreclose a § 1983 cause of action for the enforcement of tenants' rights secured by federal law." *Wright*, 479 U.S. at 424–25.

The Court also acknowledged as much in *Suter v. Artist M.*, 503 U.S. 347, 360 (1992). There, the Court ruled that children beneficiaries of the Adoption Assistance and Child Welfare Act could not sue under § 1983 to enforce certain provisions of the Act. The Court emphasized that the Act did provide some safeguards for children by allowing the Secretary to HHS to reduce or eliminate payments to states failing to comply with the Act's requirements. The Court stressed, however, that such safeguards "may not provide a comprehensive enforcement mechanism so as to manifest Congress' intent to foreclose remedies under § 1983." 503 U.S. at 360.

In *Blessing*, too, the Court again "stressed that a plaintiff's ability to invoke § 1983 cannot be defeated simply by '[t]he availability of administrative mechanisms to protect the plaintiff's interests.'" 520 U.S. at 347 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989)). At issue in *Blessing* was the Aid to Families with Dependent Children (AFDC) program, "which provides subsistence welfare benefits to needy families. To qualify for federal AFDC funds, the State must certify that it will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV–D of the Social Security Act . . . pursuant to a detailed plan that has been approved by the Secretary of Health and Human Services (Secretary)." *Id.* at 333. The plaintiffs in *Blessing* sought a "broad injunction" under § 1983 requiring Arizona to achieve "substantial compliance . . . throughout all programmatic operations." *Id.* at 341. Although the Court found that the plaintiffs had failed to state "analytically" "manageable" claims, the Court expressly rejected Arizona's proposal that Title IV–D's remedial scheme was sufficiently comprehensive to preclude suit under

79

§ 1983. The Court noted that "Title IV–D contains no private remedy—either judicial or administrative—through which aggrieved persons can seek redress," and "[t]he only way that Title IV–D assures that States live up to their child support plans is through the Secretary's oversight." *Id.* at 347. "These limited powers to audit and cut federal funding . . . are not comprehensive enough to close the door on § 1983 liability." *Id.* at 348.

* * *

The Supreme Court held in *O'Bannon* that Section 23(A) "gives recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that *continues to be qualified*." <u>447 U.S. at 785</u> (second emphasis added). A qualified provider that is terminated for reasons unrelated to its qualifications "continues to be qualified." In keeping with *O'Bannon*, and Section 23(A)'s unmistakable textual focus on Medicaid patients, I would allow the individual plaintiffs to proceed with their claims as to PPST and PPGT. I therefore would affirm in part and reverse in part.

No. 17-50282

JAMES L. DENNIS, Circuit Judge, joined by JAMES E. GRAVES, Circuit Judge, dissenting:

The individual Medicaid patient plaintiffs in this case allege that the state terminated their health care providers from the Medicaid program under the pretext that the providers were "unqualified," when in fact the providers remain both qualified and willing to provide services to their Medicaid patients. Plaintiffs brought a § 1983 action on the grounds that the state's wrongful action deprived them of their federal statutory right, secured by the Medicaid Act, 42 U.S.C. § 1396a(a)(23)(A), to choose their own qualified and willing health care provider without unlawful state interference. The district court determined that plaintiffs had shown a strong likelihood of success on the merits and granted a preliminary injunction preventing the state from unlawfully interfering with the patients' rights. The state appealed, and a panel of this court affirmed in part, vacated in part, and remanded. En banc rehearing was granted.

In my view, however, the en banc majority egregiously compounds the panel's error. Without reaching the merits of the district court's decision, the en banc majority erroneously overrules circuit precedent and misconstrues three Supreme Court decisions to hold that Medicaid patients never had a federal statutory right secured by the Medicaid Act to choose their own qualified and willing providers or to bring an action under § 1983 to enjoin a state's unlawful interference with, and deprivation of, that federal statutory right. For the reasons hereinafter assigned, I dissent.

The majority's misinterpretations of the Medicaid Act and three Supreme Court cases—*O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980); *Suter v. Artist M.*, 503 U.S. 347 (1992); and *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)—its overruling of our circuit precedent,

81

No. 17-50282

*Planned Parenthood Gulf Coast v. Gee*, 862 F.3d 445 (5th Cir.2017), *cert denied*, 139 S. Ct. 408 (2018) (hereafter "*Gee*"), and its recalcitrance toward the persuasive view of the majority of other circuits discussed herein leave more than 6.7 million Medicaid recipients in Texas, Louisiana, and Mississippi vulnerable to unlawful state interference with their choice of health care providers.[1]  Under the majority's decision, Medicaid patients will lose any semblance of autonomy in choosing their health care providers and must meekly accept what choices the state allows.

## I.

The Medicaid Act's free-choice-of-provider provision states that "[a] State plan for medical assistance *must* . . . provide that *any individual eligible* for medical assistance (including drugs) may obtain such assistance from *any institution*, agency, community pharmacy, or person, *qualified to perform the service or services required . . . who undertakes to provide* him such services[.]" 42 U.S.C. § 1396a(a)(23)(A) (emphases added).

Up until the majority's volte-face today, this court was part of a six-to-one circuit majority holding that the free-choice-of-provider provision confers on each Medicaid recipient an individual right to choose qualified and willing health care providers and the ability to bring suit under § 1983 to challenge unlawful state interference with that right.  *See Gee,* 862 F.3d 445; *Planned Parenthood S. Atl. v. Baker,* 941 F.3d 687 (4th Cir. 2019), *cert. denied sub nom., Baker v. Planned Parenthood,* --- S. Ct. ---, 2020 WL 6037212 (Oct. 13, 2020); *Planned Parenthood of Kan. v. Andersen,* 882 F.3d 1205 (10th Cir.), *cert. denied sub nom. Andersen v. Planned Parenthood of Kan. & Mid-Mo.,* 139 S. Ct. 638

---

[1] Centers for Medicare & Medicaid Services, "July 2020 Medicaid & CHIP Enrollment." https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html.

No. 17-50282

(2018); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006). Only the Eighth Circuit had arrived at a contrary decision. *Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) (holding Medicaid recipients do not have an enforceable federal right to choose their qualified, willing medical providers).

Under the three-step test articulated by the Supreme Court in *Blessing v. Freestone*, 520 U.S. 329 (1997), to determine whether a statutory provision can be enforced under § 1983: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." *Id.* at 340–41 (citations and internal quotation marks omitted). In *Gonzaga University v. Doe*, the Supreme Court further clarified the first *Blessing* factor, stating that only "an unambiguously conferred right" is enforceable through § 1983. 536 U.S. 273, 283 (2002); *see S.D. ex. rel. Dickson v. Hood*, 391 F.3d 581, 602 (5th Cir. 2004) ("In *Gonzaga University v. Doe*, the Supreme Court noted that some courts had misinterpreted the first *Blessing* factor as permitting a § 1983 action whenever the plaintiff fell within the general zone of interests protected by the statute at issue. The Court clarified that nothing short of an unambiguously conferred *right* can support a cause of action under § 1983.") (cite omitted) (emphasis in original). Section 1396a(a)(23) satisfies the requisites of the *Blessing-Gonzaga* framework, as previously held by this court and the majority of federal courts of appeals to consider the question.

First, in guaranteeing the free choice of provider to "any individual eligible for medical assistance," § 1396a(a)(23) employs "the kind of

83

No. 17-50282

'individually focused terminology' that 'unambiguously confers' an 'individual entitlement' under the law" as required by *Gonzaga*. *Harris*, 442 F.3d at 461 (alteration omitted) (quoting *Gonzaga*, 536 U.S. at 283, 287); *see also Andersen*, 882 F.3d at 1225–27; *Betlach*, 727 F.3d at 966–67; *Planned Parenthood of Ind.*, 699 F.3d at 974. "The provision has an 'unmistakable focus' on its intended class of beneficiaries: 'any individual eligible for medical assistance' under the Medicaid Act." *Baker*, 941 F.3d at 697 (quoting *Gonzaga*, 536 U.S. at 284) (citation omitted). "Congress's use of the phrase 'any individual' is a prime example of the kind of 'rights-creating' language required to confer a personal right on a discrete class of persons—here, Medicaid beneficiaries." *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)).

Second, the free-choice-of-provider right is not so "'vague and amorphous' that its enforcement would strain judicial competence." *Andersen*, 882 F.3d at 1226 (quoting *Blessing*, 520 U.S. at 340–41). Plaintiffs need only show that their preferred provider is (1) qualified to perform medical services and (2) undertakes to do so. "These requirements are 'concrete and objective standards for enforcement, which are well within judicial competence to apply.'" *Id.* at 1227 (quoting *Gee*, 862 F.3d at 459); *see also Betlach*, 727 F.3d at 967 ("[W]hether the doctor is qualified . . . may require . . . factual development or expert input, but still falls well within the range of judicial competence. The requirement could be established, for example, by a combination of evidence as to the medical licenses the doctor holds and evidence as to the licenses necessary under state law to perform family planning services."); *Harris*, 442 F.3d at 462 (same); *Baker*, 941 F.3d at 697 (same); *Planned Parenthood of Ind.*, 699 F.3d at 974 (same). Indeed, courts routinely judge the qualifications of experts in a myriad of different fields when choosing whether to admit expert testimony. *See, e.g.* FED. R. EVID. 702.

No. 17-50282

Third, the free-choice-of-provider provision is "couched in mandatory, rather than precatory" language—a state "must" provide recipients the freedom of choice. *Harris*, 442 F.3d at 462 (quoting *Blessing*, 520 U.S. at 341); *see also Baker*, 941 F.3d at 697–98; *Andersen*, 882 F.3d at 1227–28; *Betlach*, 727 F.3d at 967; *Planned Parenthood of Ind.*, 699 F.3d at 974.

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284. Congress may foreclose a remedy under § 1983 "expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341. Again, the clear majority of the courts of appeals to decide this question with respect to § 1396a(a)(23) have found no such bar to suit. *See Betlach*, 727 F.3d at 968 ("Arizona makes no attempt to demonstrate that Congress has expressly or impliedly foreclosed § 1983 remedies for this right, nor would any such attempt succeed."); *Baker*, 941 F.3d at 698–700 (same); *Andersen*, 882 F.3d at 1228–29 (same); *Planned Parenthood of Ind.*, 699 F.3d at 974–75 (same); *Harris*, 442 F.3d at 462–63 (same). The Medicaid Act does not expressly foreclose a private remedy, and the Supreme Court has explicitly held that Congress did not impliedly foreclose a private remedy under § 1983 merely by creating an additional enforcement mechanism in the Medicaid Act—withholding of federal funds by the Secretary of the federal Department of Health and Human Services—as that enforcement mechanism is not a comprehensive scheme. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 521–22 (1990); *see also Anderson*, 882 F.3d at 1229 n.16; *Baker*, 941 F.3d at 699–70 ("[T]he Supreme Court has already held that the Medicaid Act's administrative scheme is not sufficiently

85

comprehensive to foreclose a private right of action enforceable under § 1983." (citation omitted)).

I am persuaded that the remarkably consistent holdings of five of our sister circuits—and of our court just three years ago in *Gee*—are correct and firmly rooted in relevant Supreme Court precedents. The current en banc majority errs in abandoning those teachings today by denying patients the ability to enforce their statutorily conferred individual right to choose their qualified and willing health care provider by challenging state interference with that right in a § 1983 action.

## II.

The majority's opinion relies heavily on a misinterpretation of the Supreme Court's decision in *O'Bannon*, 447 U.S. at 773, to support its strained reading of the Medicaid Act. The majority labels its readings of the Medicaid Act and *O'Bannon* as "independent bases" for its holding, perhaps in hope of glossing over the fact that *O'Bannon* refutes the majority's reasoning. In truth, *O'Bannon* clearly affirms Medicaid recipients' right to choose their qualified, willing providers free from unlawful government interference.

In *O'Bannon*, the federal Department of Health, Education, and Welfare decertified a nursing home following a survey of the facility. Three days later, the Pennsylvania Department of Public Welfare notified the nursing home that its Medicaid provider agreement would not be renewed because of the federal decertification. *O'Bannon*, 447 U.S. at 775–77. The nursing home's residents brought suit in federal court contending that they were entitled under constitutional due process to an evidentiary hearing before decertification of the nursing home forced their transfer to a different facility. *Id.* The Supreme Court disagreed. The Court held that nursing home residents' having to move after decertification of a facility was "an indirect and incidental result of the

Government's enforcement" of minimum standards of care that did "not amount to a deprivation of any interest in life, liberty, or property."[2]  *Id.* at 787.

But there is an overarching feature that distinguishes *O'Bannon* from the present case and therefore undermines the majority's reliance on it: the nature of the claim asserted.  The nursing home residents in *O'Bannon* did not bring a § 1983 action based on a theory that the state violated their federal statutory rights by decertifying the nursing home.  Rather, they unsuccessfully sought to assert a novel constitutional due process right, arguing they were constitutionally entitled to a pretermination hearing before the facility was decertified because (1) they had a property right in continued residence in the nursing home absent good cause for transfer and therefore were entitled to a hearing on whether cause existed, and (2) transfer would cause them severe physical or emotional pain, which constituted a deprivation of life or liberty and thus also necessitated a hearing.  *Id.* at 784.  By contrast, the Medicaid patients in the present case do not rely on novel constitutional theories and instead simply assert the rights granted to them by the Medicaid Act.  *See Baker*, 941 F.3d at 704 ("[T]he patients [in *O'Bannon*] did not bring a substantive claim seeking to vindicate their rights under the free-choice-of-

---

[2] The Court further explained that "[the] simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to all of the cases on which the [nursing home residents] rel[ied]." *O'Bannon*, 447 U.S. at 788.  Thus, the Court distinguished *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978), *Perry v. Sindermann*, 408 U.S. 593 (1972), and *Arnett v. Kennedy*, 416 U.S. 134 (1974), cases in which the Court was concerned with the direct action by a public utility toward its customers or by a public employer towards its employees. *Id.* at 788 & n.21.

provider provision, but rather sued for violation of their procedural due process rights.").

There is a second difference, noted by Judge Wiener in *Gee*, that distinguishes *O'Bannon* from a case like the present one. *See* 862 F.3d at 460–61. In *O'Bannon*, the nursing home facility was decertified, and subsequently its Medicaid agreement was terminated, yet the residents claimed they had a property right to stay in the facility. *O'Bannon*, 447 U.S. at 775–77. Conversely, in the present case, the state is not seeking to revoke the family planning providers' licenses and prevent them from serving all patients in the general population, *including* Medicaid patients. *See Gee*, 862 F.3d at 461. Rather, the state is terminating the providers' Medicaid agreements, thereby preventing the providers from treating *Medicaid* patients. If the providers in actuality remain qualified and willing to provide services to Medicaid patients, as the plaintiffs allege, then the state's deprivation of Medicaid patients of their services is exactly the type of discriminatory treatment that the free-choice-of-provider right is meant to protect against.[3]

Significantly, the Court in *O'Bannon* expressly distinguished that case from one, like the instant matter, in which Medicaid recipients contend the state *unlawfully* interfered with their statutory right to choose their qualified, willing providers. *O'Bannon* stated: "[The free-choice-of-provider provision]

---

[3] This is not to suggest that the only way that a health care provider can be lawfully terminated or excluded from the Medicaid program is to have its license revoked such that it can no longer treat patients in the general population. *See* Maj. Op. at 27-28. Rather, I note this difference to emphasize how the nature of the right asserted in *O'Bannon* and the present case differ: The *O'Bannon* plaintiffs claimed a constitutional property right to stay in the nursing home; the plaintiffs in the current case claim a statutory right to choose among qualified and willing providers. When a state terminates a provider from the Medicaid program for alleged medical and ethical violations, but nonetheless the provider retains its license and continues to treat non-Medicaid patients, this is potentially some evidence that Medicaid patients' free-choice-of-provider right may have been violated.

gives recipients the right to choose among a range of qualified providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified." *Id.* at 785 (emphasis omitted). Thus, the current en banc majority has made an unfortunate choice in citing *O'Bannon* as a basis for its position because *O'Bannon* plainly recognizes the vitality of the very right that the majority undercuts. Although *O'Bannon* dealt with recipients' choice of a nursing home services provider rather than their choice of a family planning services provider, the applicable principles under the Medicaid Act remain the same. *O'Bannon* does not detract from but strongly reinforces Medicaid recipients' rights to bring an action for declaratory and injunctive relief against a state for *unlawfully* interfering with their statutorily conferred freedom of choice as to qualified, willing providers.

The en banc majority makes much of language in *O'Bannon* that patients do not have a right "to enter an unqualified home and demand a hearing to certify it, nor . . . to continue to receive benefits for care in a home that has been decertified." *Id.* But the majority overreaches in twisting the Court's uncontroversial observations that patients lack a right to receive care from an *unqualified* provider into the conclusion that a patient cannot bring a § 1983 suit when a state unlawfully terminates a *qualified and willing* provider's Medicaid agreement. In wrongfully terminating a Medicaid provider agreement under the guise of declaring the provider "unqualified" when in fact the provider remains licensed and qualified to provide the services at issue, the state obviously interferes with plaintiffs' free choice of provider, which *O'Bannon* plainly disallows. *See id.* Judge Wiener, writing in *Gee*, was certainly correct that "[r]eading *O'Bannon* to foreclose every recipient's right to challenge a disqualification decision would render the right guaranteed by

§ 1396a(a)(23) nugatory." 862 F.3d at 460; *see also Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207, 1218 n.7 (M.D. Ala. 2015) ("[*O'Bannon*] does not stand for the proposition that any time a State terminates a Medicaid provider agreement, for any reason or for no reason at all, that decision is insulated from substantive review at the behest of recipients.").  Indeed, the majority's reading of *O'Bannon* will allow for more state interference directed against providers, thereby abrogating "[t]he right to choose among a range of qualified providers, without government interference," which was explicitly recognized by the Supreme Court.  447 U.S. at 785.

Contrary to the majority's claim, *O'Bannon* does not mandate today's holding.  The nursing-home residents in *O'Bannon* did not argue that the decertification of the home was an unlawful interference by the state with their free choice of nursing home providers under the Medicaid Act; they claimed they had a property right to stay in the nursing home.  *See id.* at 775–77.  By contrast, the patients in the present case make precisely the claim that the state's termination of their providers' Medicaid agreements is a violation of their free-choice-of-provider rights because the providers in fact remain qualified.  For these reasons, the majority errs in characterizing *O'Bannon* as supporting its U-turn abrogating Medicaid patients' right to choose among qualified, willing providers under § 1396a(a)(23) of the Medicaid Act and their corresponding right to bring an action under § 1983 to prevent unlawful state interference with that right.

## III.

The en banc majority attempts to bolster its unduly restrictive and peculiar interpretation of the free-choice-of-provider provision by relying on two other Supreme Court cases, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), and *Suter v. Artist M.*, 503 U.S. 347 (1992).  But neither

*Armstrong* nor *Suter* dealt with Medicaid patients' rights, nor do these cases cast any doubt on the well-reasoned principles elucidated by this court in *Gee* and by the five other circuits upholding Medicaid patients' right to bring suit under § 1983 to challenge unlawful state interference with their choice of qualified and willing providers.

## A.

The majority's premise that *Armstrong* somehow weakens or otherwise affects the precedents upholding the enforceability of Medicaid patients' federal statutory rights is totally without foundation. *Armstrong* was an action by Medicaid *providers* against a state seeking increased reimbursement rates under § 1396a(a)(30)(A) (the "equal access" provision), and it has little or nothing to do with Medicaid *patients'* freedom to choose qualified, willing providers under § 1396a(a)(23), relevant here. *See* 575 U.S. at 323–24.[4] *Armstrong* announced no new precedent relevant to the present case, and the provider reimbursement provision at issue in *Armstrong* is thoroughly distinguishable from the patients' free-choice-of-provider provision.

The equal access provision requires state Medicaid plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *Armstrong*, 575 U.S. at 323 (quoting § 1396a(a)(30)(A)).

---

[4] Further, the providers in *Armstrong* were attempting to assert an implied right of action under the Supremacy Clause and in equity, not a § 1983 action based on a federal statutory right. 575 U.S. at 326–27.

No. 17-50282

In addition to the free-choice-of-provider provision being much simpler than the equal access provision, it differs in at least two facets critical to determining whether Congress created a federal statutory right—the issue on appeal in the present case.

First, the equal access provision "'lacks the sort of rights-creating language needed to imply a private right of action,'—that is, just the sort of [rights-creating] language that the free-choice-of-provider provision *does* contain." *Bentley*, 141 F. Supp. 3d at 1216 (quoting *Armstrong*, 575 U.S. at 331) (plurality op.) (citation omitted); *see also Andersen*, 882 F.3d at 1226 ("The free-choice-of-provider provision, in contrast [to the equal-access provision analyzed in *Armstrong*,] is phrased in individual terms that are specific and judicially administrable." (alterations, citations, and internal quotation marks omitted)).   By contrast, as explained in an earlier section, § 1396a(a)(23) confers the free-choice-of-provider right on "any individual eligible for medical assistance" with unambiguous, individually focused terminology. *See Harris*, 442 F.3d at 461 (citing *Gonzaga*, 536 U.S. at 283).

Second, "'[i]t is difficult to imagine a requirement broader and less specific than' the equal-access provision's 'judgment-laden standard.'" *Bentley*, 141 F. Supp. 3d at 1217 (quoting *Armstrong*, 575 U.S. at 328).   "For example, to adjudicate a claim under the equal-access provision, a court might be required to determine whether a particular procedure was 'necessary to safeguard against unnecessary utilization of covered care'—a near-impossible task." *Id.* (quoting § 1396a(a)(30)(A)).   This concern does not apply to the free-choice-of-provider provision.   As this court in *Gee* and the majority of other circuits to have considered the question have recognized, the term "qualified" in the health care provider context is a concrete and objective standard. *Gee*, 862 F.3d at 459–60; *Anderson*, 882 F.3d at 1226; *Betlach,* 727 F.3d at 967;

92

No. 17-50282

*Harris*, <u>442 F.3d at 462</u>; *Baker*, <u>941 F.3d at 697</u>; *Planned Parenthood of Ind.*, <u>699 F.3d at 974</u>. "To decide a claim under the free-choice-of-provider provision . . . does not demand that the court obtain a crash-course in health-systems administration; determining that a provider is qualified to perform a service and undertakes to provide such service is well within a court's competence." *Bentley*, <u>141 F. Supp. 3d at 1217</u> (alterations, quotation marks, and citation omitted).   In short, with respect to judicial administrability courts have observed that "[t]he equal-access provision at issue in *Armstrong* and the free-choice-of-provider provision at issue here could hardly be more different."  *Id.* at 1216.

Nevertheless, the majority opinion boldly declares that *Armstrong* "supports the conclusion that Congress did not intend to create a right under § 1396a(a)(23) such that Medicaid patients could contest a state's determination that a particular provider is not 'qualified.'" Maj. Op. at 16-17. This is so, the majority claims, because the Supreme Court supposedly "declar[ed] in *Armstrong* that 'our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified.  *See Gonzaga Univ. v. Doe* . . . (expressly "reject[ing] the notion," implicit in *Wilder*, "that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983")." Maj. Op. at 17 (alterations in Maj. Op.). The majority's argument results in a critical misdirection.

For starters, the "repudiate" verbiage attributed to *Armstrong* by the majority does not appear in the body of the *Armstrong* text, nor was it relevant to the Court's holding.  It was *dicta* included in Justice Scalia's epigrammatic footnote explaining why the providers in *Armstrong* did not try to press their claim through a § 1983 action.  More importantly, the majority's presentation of the dicta's significance is misleading because in reality the footnote

93

No. 17-50282

announced no new precedent or rule of decision and effected no change in any relevant Supreme Court precedent—the footnote merely re-iterated *Gonzaga*'s clarification that, under the first *Blessing* factor, an unambiguously conferred right is necessary to support a § 1983 action. *See Armstrong*, <u>575 U.S. at 330</u>, n.*. Indeed, the *Armstrong* footnoted dicta, by its own terms, obviously neither adds nor repudiates anything of relevance—the footnote itself clearly states that it was merely summarizing "later [post-*Wilder*] opinions," specifically *Gonzaga*, and therefore broke no new ground. Thus, the *Armstrong* footnote has no impact on the present case. As shown earlier, the free-choice-of-provider provision satisfies the *Gonzaga-Blessing* test—which was true both before and after *Armstrong* was decided, since *Armstrong* did not change the test one iota.

In sum, the majority's reliance on *Armstrong* is as unpersuasive as the case is inapposite. *Armstrong* announced no new precedent relevant to the present case, and it concerned a different statutory provision that is thoroughly distinguishable from the free-choice-of-provider provision.

## B.

In *Suter*, another case relied on by the majority, plaintiffs brought suit both under the Adoption Assistance and Child Welfare Act of 1980 ("Adoption Act") and § 1983. They alleged the state of Illinois had failed to comply with a provision of the Adoption Act stating that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which. . . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . ." <u>503 U.S. at 350</u>–51 (quoting § 671(a)(15)). The *Suter* Court held that the Adoption Act provision did not unambiguously confer an

94

individually enforceable right, but rather imposed a general duty on state governments that was intended to be enforced by the federal government. *Id.* at 363. The Court also held that the Adoption Act's "reasonable efforts" requirement lacked judicial administrability absent "further statutory guidance as to how 'reasonable efforts' are to be measured" in the complicated foster care and adoption context. *Id.* at 360. But neither of the concerns expressed by the *Suter* Court apply to the free-choice-of-provider provision, which unambiguously confers an individual right and is judicially administrable. Just like the equal access provision at issue in *Armstrong,* significant differences between the Adoption Act's "reasonable efforts" provision and the free-choice-of-provider provision render the majority's reliance on *Suter* wholly unpersuasive.

Subsequent legislation gives further reason to doubt the force of the majority's reliance on *Suter*. After *Suter* was decided, Congress amended the Social Security Act (which includes both the Adoption Act and the Medicaid Act) to make clear that the inclusion of an individual right in a state plan that is subject to federal oversight does not render the right unenforceable by individuals. The so-called "*Suter* fix", 42 U.S.C. § 1320a-2, states that "[i]n an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." *See Dickson*, 391 F.3d at 603 (recognizing that "[t]he requirement of action under a plan is not, however, dispositive of the question of whether the statute confers rights enforceable by § 1983," and citing the *Suter* fix); *Harris v. James*, 127 F.3d 993, 1003 (11th Cir. 1997) (same); *Ball v. Rodgers*, 492 F.3d 1094, 1111–12 (9th Cir. 2007) (same); *Planned Parenthood of Ind.,* 699 F.3d at 976, n.9 (same). The *Suter* fix is an express legislative statement to the judiciary

95

reaffirming that Congress intended to create individual rights—like the free-choice-of-provider right—within the state plan requirements of the Medicaid Act and related acts. Yet, ignoring the Congressional rebuke at the heart of the *Suter* fix, the majority cites *Suter* to justify undercutting the enforceability of one of the most important rights that Congress granted Medicaid patients.

For these reasons, contrary to the majority's assertions, *Armstrong* and *Suter* do not undermine the holdings of the majority of circuit courts that have held that a Medicaid recipient has an enforceable right to choose any willing and qualified provider and to challenge the state's wrongful termination of a chosen qualified and willing provider in a § 1983 action.

## C.

Finally, the majority suggests that providers are better situated than patients to challenge an unlawful termination and opines that Congress must not have intended for patients to have an enforceable federal right because parallel litigation could lead to conflicting results if patients challenge an unlawful provider termination in a § 1983 suit and providers seek separate review. However, the majority's concerns about litigation are simply not relevant to the issue before us, because the ability of *health-care providers* to seek administrative or state court review of a provider agreement termination in no way negates or lessens Congress' unambiguous conferral on *patients* of the federal right to obtain care from a qualified, willing provider of their choice, nor their ability to enforce that right under § 1983. *Providers'* remedies are not a comprehensive enforcement scheme that forecloses *patients'* § 1983 remedy—and rightly so. Congress conferred an individual right on Medicaid *patients* in § 1396a(a)(23) that is independent of administrative remedies available to health care providers; this makes sense because Medicaid is ultimately for the benefit of patients and not for providers (nor state

96

No. 17-50282

governments).  *See Atkins v. Rivera,* 477 U.S. 154, 156 (1986) ("Medicaid . . . is designed to provide medical assistance to persons whose income and resources are insufficient to meet the cost of necessary care and services.") (citations omitted); *see also Armstrong,* 575 U.S. at 332 (stating that Medicaid was created "for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves") (plurality op.).

## IV.

The district court faithfully followed our circuit precedent, *Gee,* and then, after a three-day hearing, granted injunctive relief because it concluded that the plaintiff Medicaid patients had shown a substantial likelihood of proving that their providers were not terminated because of lack of qualifications, but for unlawful reasons.  Because the en banc majority does not follow *Gee,* and instead holds that the Medicaid patients in this case have no right to bring a § 1983 action, it did not review the district court's decision.  In my view, as explained above, the majority erred in not applying *Gee* and in departing from the majority of our fellow circuits.  Further, upon a proper review of the record, the district court's decision should have been affirmed.

## A.

Before addressing the merits of the district court's preliminary injunction, it is appropriate to emphasize that the district court's decision should be reviewed as we are required to consider any § 1983 case in which the trial court has granted a preliminary injunction to preserve the status quo.[5] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

---

[5] *See* 11A FED. PRAC. & PROC. CIV. § 2948 (3d ed.) (Wright & Miller).

that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "We review the district court's determination on each of these elements for clear error, its conclusions of law de novo, and the ultimate decision whether to grant relief for abuse of discretion." *Google, Inc. v. Hood,* 822 F.3d 212, 220 (5th Cir. 2016) (citations and internal quotation marks omitted).

Appellate courts must begin from the premise that a district court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." FED. R. CIV. P. 52(a)(6). "Clear error review follows from a candid appraisal of the comparative advantages of trial courts and appellate courts." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2141 (2020) (Roberts, C.J., concurring in judgment) ("While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living." (quoting *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc))). "In 'applying this standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.'" *Id.* at 2121 (plurality opinion) (alteration omitted) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). "Where 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson*, 470 U.S. at 573–74). "A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Id.* (quoting *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017)).

No. 17-50282

Applying these familiar precepts, I conclude that the district court's factual findings were plausible, it made no errors of law, and it did not abuse its discretion in granting the individual Medicaid patients injunctive relief.

First, the experienced district court judge diligently developed an extensive record—viewing more than eight hours of videos, considering testimony over a three-day hearing, and weighing the relevant evidence—and I have discerned no error, let alone clear error, in his findings. Analyzing the factual support for the state's termination, the court found that the state lacked prima facie evidence to conclude that the providers were not qualified. *Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 990 (W.D. Tex. 2017).[6] The court also considered evidence, based on the state's course of conduct, that the state's termination was motivated by reasons other than whether the providers were qualified.[7] *Id.* at 997. Ultimately, the court found that the plaintiffs had

---

[6] In terminating the Provider Plaintiffs' agreements, the Inspector General relied on a series of controversial videos released by the Center for Medical Progress (CMP), an anti-abortion group, purporting to show that "Planned Parenthood and its affiliates were contracting to sell aborted human fetal tissue and body parts." *Smith*, 236 F. Supp. 3d at 984. "After reviewing the CMP video in its entirety and considering the Inspector General's testimony," the district court found that "there is no evidence in the record [that] PPGC violated any medical or ethical standard." *Id.* at 990. In short, the court found that "the Inspector General did not have any factual support to conclude the bases of termination . . . merited finding the Plaintiff Providers were not qualified. Rather, in light of the current record, it appears the termination decision had nothing to do with the Provider Plaintiffs' qualifications." *Id.* After reviewing the CMP videos and the record, I agree. Moreover, my review of the record indicates that the CMP video was never authenticated under Federal Rule of Evidence (FRE) 901(a) & (b)(1) by the testimony of a witness with knowledge who, from being present at the videotaped encounter or otherwise, could attest that the video is what CMP claims it to be; nor was the CMP video authenticated under FRE 901(b)(2)-(10) or otherwise. Although the proponents of the video produced a certification that the videos had not been altered, this alone does not authenticate the video in accord with FRE 901 or otherwise.

[7] To highlight one example noted by the district court, the state sent its initial termination notice to the providers before the Inspector General had even viewed the CMP

99

No. 17-50282

established a strong likelihood of success on the merits of their free-choice-of-provider claim—and the record reveals no clear error that would justify an appellate court in reversing that finding.

Further, in granting the preliminary injunction, the district court plausibly determined that the Plaintiffs carried their burden to show a substantial threat of irreparable harm had the injunction not issued; that the threatened injury, if the injunction were denied, outweighed any harm that would result if the injunction were granted; and that the grant of the injunction would not disserve the public interest. Again, a review of the record reveals no clear error in the district court's factual findings, nor any error of law, nor abuse of discretion. Accordingly, unlike the majority, I would affirm the district court's grant of a preliminary injunction.

## B.

I respectfully disagree with Judge Elrod's concurrence, echoing the now-vacated panel opinion, that the district court erred in not applying an arbitrary and capricious standard in deciding whether to grant a preliminary injunction. No statute or case law mandates that the district court apply a deferential standard in this case. Indeed, far from being a longstanding part of our precedents,[8] the idea to apply arbitrary and capricious review to this case appears to have originated with the panel. *See Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc v. Smith*, 913 F.3d

---

videos that supposedly formed the basis for the state's determination that the providers had violated medical and ethical standards, and then waited more than a year before sending a final notice which contained material differences in the grounds for termination. *Smith*, 236 F. Supp. 3d at 997.

[8] The *Abbeville* court noted a "litany of cases for the indisputable proposition that a state agency's *rate-setting action* is entitled to considerable deference." 3 F.3d at 802. (emphasis added). Of course, the present case does not involve a rate-setting action.

No. 17-50282

551, 571 (5th Cir. 2019) (panel concurrence).  But, as discussed above, the rules are well-settled regarding how a district court should adjudicate a motion for preliminary injunction in a § 1983 action brought by individuals alleging that a person acting under color of state law has deprived them of their federal statutory rights.  Therefore, evidence of the state's actions should be treated like any other evidence that a district court may consider in making its factual findings.[9]

The case that my colleague Judge Elrod relies upon, *Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir. 1993), is clearly inapposite and distinguishable from the present case.  In *Abbeville*, hospital service providers challenged the Medicaid reimbursement rates that Louisiana set pursuant to the Boren Amendment.  *Abbeville*, 3 F.3d at 800–01.  The Boren Amendment required the state to make factual findings as part of its rate-making process and submit those findings and other assurances to the federal Medicaid agency for approval.  *Id*.  The law also mandated that the reimbursement rates be "reasonable and adequate."  *Id.* at 802.  The *Abbeville* court decided that Louisiana's compliance with the procedural requirements of the Boren Amendment should be reviewed *de novo*, while its substantive findings and reimbursement rates should be reviewed under the arbitrary and capricious standard.  *Id.* at 803.[10]

---

[9] The same standard of proof applies to the question of whether a provider is "qualified" as applies to any other factual question in a civil case: the preponderance of the evidence. *See* 5th Cir. Pattern Civil Jury Instruction 3.2 (explaining that a finder of fact in a civil case should determine if a fact is established by considering whether the plaintiff proved it by the preponderance of the evidence).

[10] Ultimately, the court held that Louisiana had not complied with the procedural requirements of the Boren Amendment. *Abbeville*, 3 F.3d at 809–10.

101

No. 17-50282

The *Abbeville* court explicitly based its decision to apply the arbitrary-and-capricious standard on two factors: (1) the discretionary nature of the rate-setting action, i.e. whether reimbursement rates were "reasonable and adequate" as required by the Boren Amendment, and (2) the federal agency approval of the state's rates. "It is precisely the [state] agency's exercise of discretion and the [federal Department of Health & Human Services] Secretary's approval that warrant application of the arbitrary and capricious standard of review." *Id.* at 803 (citing *Illinois Health Care Assoc. v. Bradley*, 983 F.2d 1460, 1463 (7th Cir. 1993)). Neither of the *Abbeville* court's rationales for deferential review in the reimbursement rate context apply in the context of a patient's free-choice-of-provider claim.

First, the nature of the state action challenged in the present case is radically different from the rate-setting considered in *Abbeville*. Setting "reasonable and adequate" reimbursement rates involves a great amount of discretion and the need to "balance political and financial interests underlying the Medicaid plan." *Id.* at 802. By contrast, the question of whether a provider is "qualified" is concrete and objective and does not require such a balancing of competing interests. *See Gee*, 862 F.3d at 462; *see also Baker*, 941 F.3d at 702; *Andersen*, 882 F.3d at 1230; *Planned Parenthood of Ind.*, 699 F.3d at 978; *Betlach*, 727 F.3d at 969. Second, the involvement of the federal Medicaid agency is lacking. As noted above, the Boren Amendment required that the state agency submit findings and assurances to the federal agency for approval. *Abbeville*, 3 F.3d at 803. By contrast, in the present case there is no federal agency involvement. Simply put, *Abbeville*—a Boren Amendment rate-setting case—is inapposite and does not apply here.

102

No. 17-50282

## V.

This past summer, in *June Medical Services L.L.C. v. Russo*, the Supreme Court strongly reaffirmed that, even in abortion-related cases, the principles of *stare decisis,* as well as clear error review, must be respected. *See* 140 S. Ct. at 2120–32 (plurality opinion); *id.* at 2134, 2141 (Roberts, C.J., concurring in judgment). Both Justice Breyer, writing for a four-justice plurality, and Chief Justice Roberts, concurring in the judgment, concluded that, under the facts found by the district court without clear error, because Louisiana's admitting privileges law imposed an undue burden on access to abortion just as severe as that imposed by the nearly identical Texas law invalidated four years prior in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016), it could not stand under principles of *stare decisis. See June Med. Servs. L.L.C.*, 140 S. Ct. at 2120–32, 2134, 2141.

In his opinion concurring in the judgment, Chief Justice Roberts issued a lengthy admonition pertaining to the duty of judges to adhere to the principles of *stare decisis*. He explained that "[t]he legal doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike." *Id.* at 2134; *see also id.* ("*Stare decisis* ('to stand by things decided') is the legal term for fidelity to precedent."). He stated:

> It has long been "an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." 1 W. Blackstone, Commentaries on the Laws of England 69 (1765). This principle is grounded in a basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them. Because the "private stock of reason . . . in each man is small, . . . individuals would do better to avail themselves of the general bank and capital of nations and of

103

ages." 3 E. Burke, Reflections on the Revolution in France 110 (1790).

Adherence to precedent is necessary to "avoid an arbitrary discretion in the courts." The Federalist No. 78, p. 529 (J. Cooke ed. 1961) (A. Hamilton). The constraint of precedent distinguishes the judicial "method and philosophy from those of the political and legislative process." Jackson, Decisional Law and Stare Decisis, 30 A. B. A. J. 334 (1944).

The doctrine also brings pragmatic benefits. Respect for precedent "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). It is the "means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery*, 474 U.S. 254, 265 (1986). In that way, "*stare decisis* is an old friend of the common lawyer." *Jackson*, *supra*, at 334.

*Id.*

Today, the majority fails to heed the Chief Justice's warning. It overrules our circuit precedent, *Gee*, just three years after we decided the case, after we declined to review it en banc, after the Supreme Court denied certiorari, and after other circuits relied on the decision as precedent in grappling with the same issue. *Gee*, 876 F.3d 699, 700 (5th Cir. 2017) (denying rehearing en banc); *Gee v. Planned Parenthood of Gulf Coast, Inc.*, 139 S. Ct. 408 (2018) (denying certiorari); *see generally Baker*, 941 F.3d 687 (citing *Gee*); *Andersen*, 882 F.3d 1205 (same). *Gee* is well written and soundly reasoned, and nothing of substance has changed since we decided it—while the Eighth Circuit created a circuit split subsequent to *Gee*, neither the statute we are analyzing nor the leading Supreme Court cases that inform our analysis have changed.

No. 17-50282

I respectfully call on my colleagues to heed the admonitions of the *June Medical* Court and Chief Justice Roberts, to apply the principles of *stare decisis* "to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion," *June Med. Servs. L.L.C.*, 140 S. Ct. at 2134 (Roberts, C.J., concurring in the judgment) (quoting 1 W. Blackstone, Commentaries on the Laws of England 69 (1765)), and to reconsider its decision to overrule circuit precedent and eviscerate Medicaid patients' freedom of choice.

For these reasons, and out of respect for this court, I collegially dissent.

105

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

December 15, 2020

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

No. 17-50282    Planned Parenthood of Grt TX, et al v.
Cecile Young, et al
USDC No. 1:15-CV-1058

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Record/original papers/exhibits to be returned.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Mary Frances Yeager, Deputy Clerk
504-310-7686

cc:  Mr. Steven H. Aden
     Mr. Boris Bershteyn
     Mr. Michael Cantrell
     Ms. Thania Charmani
     Ms. Alice J. Clapman
     Mr. Roger K. Evans
     Mr. Adam Gustafson
     Mr. Kyle Douglas Hawkins
     Mr. Lawrence John Joseph
     Ms. Beth Ellen Klusmann
     Ms. Sophia Morris Mancall-Bitel
     Mr. Jonathan F. Mitchell
     Ms. Elizabeth Baker Murrill

Ms. Martha Jane Perkins
Ms. Jennifer Sandman
Ms. Elizabeth Anne  Molino Sauvigne
Ms. Hillary Schneller
Mr. Thomas Hart Watkins